UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MAURICE LAMAR FLOYD,

                    Petitioner,

v.                                    Case No. 3:09-cv-1017-J-34TEM

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,
                    Respondents.
_____

## **ORDER**

## **I. Status**

Petitioner Maurice Lamar Floyd, who is represented by counsel, initiated this action by filing a Petition for Writ of Habeas Corpus (Petition) (Doc. #1) with exhibits (P. Ex.) under 28 U.S.C. § 2254 on October 13, 2009.  Floyd challenges a 1999 state court (Putnam County, Florida) judgment of conviction for first degree murder.  Respondents have submitted a memorandum in opposition to the Petition.  See Respondents' Response to Petition for Writ of Habeas Corpus (Response) (Doc. #19) with exhibits (Resp. Ex.). Floyd submitted a brief in reply on December 20, 2010.  See Floyd's

Preliminary Statement, Standard of Review and Applicable Law (Reply) (Doc. #21).  This case is ripe for review.

## II. Procedural History

On August 5, 1998, the State of Florida charged Maurice Lamar Floyd with first degree murder (count one), armed burglary of a dwelling (count two) and aggravated assault (count three).  Resp. Ex. A-1 at 11-12, Indictment.  After jury selection on April 5, 1999, Floyd proceeded to a trial.  Resp. Exs. A-8; A-9; A-10, Transcripts of the Jury Trial (Tr.).  At the conclusion of the trial, a jury found Floyd guilty of first degree murder, armed burglary of a dwelling, and aggravated assault, as charged in the Indictment.  Resp. Ex. A-3 at 497-98, Verdict; Tr. at 1998.  The jury, by a vote of eleven to one, recommended that the court impose the death penalty.  Resp. Exs. A-3 at 504, Penalty Advisory Recommendation; A-11 at 2179.  Following a <u>Spencer</u>[1] hearing, <u>see</u> Resp. Ex. A-12, on May 26, 1999, the court sentenced Floyd to death for the first degree murder, a term of imprisonment of thirty years for the armed burglary of a dwelling, and a term of imprisonment of five years for the aggravated assault, to run concurrently with count two, <u>see</u> Resp. Ex. A-5 at 976-83, 984-89.  The Florida Supreme Court, on direct appeal, set forth the facts of the crimes as well as the testimony at trial.

---

[1] <u>See</u> <u>Spencer v. State</u>, 615 So.2d 688 (Fla. 1993).

Mary Goss, the victim in this case, was found dead at approximately 11:30 p.m. on July 13, 1998. Police found her body on the ground beside her house located on Bronson Street in Palatka, Florida. The cause of Ms. Goss's death was a single .357 caliber gunshot that entered the left side of her face and proceeded to sever her brain stem, killing her instantaneously. Two days later, on July 15, 1998, police found Floyd, Ms. Goss's son-in-law, hiding in the attic of a house in the Palatka area. Floyd was subsequently charged with the murder of Ms. Goss.[FN1]

> FN1. The indictment returned against Floyd was for premeditated murder or felony murder (Count I), armed burglary of a dwelling (Count II), and aggravated assault (Count III).

Testimony adduced at trial indicated that Floyd exhibited very controlling behavior toward his wife, Trelane,[FN2] who was Ms. Goss's daughter. On July 11, 1998 (extending into the early morning hours of July 12), Trelane had gone with some of her cousins to a supper club to celebrate her birthday. Floyd followed her to the club and spotted her consuming alcohol and dancing. He later approached the group and told Trelane that it would be necessary for her to find another way home, because he was going to take her car, which she had driven to the club. In the past Floyd had expressed his disapproval of Trelane's alcohol consumption.

> FN2. When she testified at trial, Trelane was no longer married to Floyd.

When Trelane returned home around 5 a.m. on the morning of July 12, Floyd informed her that he would not permit her to sleep, and he proceeded to increase the volume on the televisions and the radio in their apartment. He also threatened to kill Trelane or someone she loved as a reprisal for her drinking or if she ever attempted to run or hide from him. Shortly thereafter, Trelane felt a gun being

placed beside her head as she was lying in
bed. Floyd pulled the trigger three times, but
the weapon did not fire.[FN3] Trelane advised
Floyd that she was going to seek a divorce and
testified at trial that she did not call the
police about this incident because she was in
a very confused state.

> FN3. The record does not indicate
> whether the gun was loaded at that
> time. Later in the day on July 12
> (one day before Ms. Goss was
> murdered), Trelane surmised that the
> gun must have been a .357, because
> she saw a .357 on the toilet tank in
> the bathroom when Floyd was
> showering. She hid the gun behind
> the bar in their apartment, and
> testified that she never saw the gun
> again.

On July 13, the day Ms. Goss was murdered,
Trelane and Floyd had a heated argument on a
Palatka street not far from their apartment.
Trelane had stopped her car in the street to
speak with a friend. Her three-year-old
goddaughter was also in the vehicle. Floyd was
in his car behind Trelane and he insisted that
Trelane take her goddaughter home, calling
Trelane a "whore." Fearful for the safety of
both herself and her goddaughter, Trelane
decided to seek protection in a sheriff's
office. Floyd followed and proceeded to ram
his car into the back of Trelane's vehicle.

A high speed chase ensued, during which
Trelane sounded the horn on her automobile to
warn both oncoming traffic and pedestrians who
might be in harm's way. The tires on both cars
squealed as they slid into the parking lot at
the sheriff's office. Trelane exited her car
and screamed for help. Hearing both the sounds
of squealing tires and Trelane's plaintive
cries, Deputy Dean Kelly responded from his
desk inside the sheriff's office. Deputy Kelly
was the only armed officer in the vicinity as
the events unfolded at approximately 7:30 p.m.
that evening. Trelane hurriedly reported to

4

Deputy Kelly that Floyd had rammed her car and
that she was fearful for her safety. The
deputy saw Floyd moving rapidly toward them as
they spoke, and he held out his hand to
prevent Floyd from accosting Trelane. He then
advised Floyd that he was going to be placed
into investigative custody until it could be
determined exactly what had transpired. Deputy
Kelly instructed Floyd to turn around and to
place his hands behind his back. Floyd
extended his hands in the air and backed up,
insisting that he had done nothing wrong and
that he merely wanted to talk to his wife.
After the deputy repeated his order for Floyd
to submit to custody, Floyd fled the scene.
Deputy Kelly began pursuit for a few moments
but then halted, fearful of leaving Trelane
and her goddaughter defenseless if Floyd
decided to double back to attempt to harm
them. The subsequent efforts of a K-9 unit and
other officers to apprehend Floyd on the
evening of July 13 were fruitless.

After giving a statement to sheriff's office
personnel, Trelane called her mother, Ms.
Goss, from a pay phone at the sheriff's
office. Trelane testified that she "told her
[mother] what was going on" regarding the
incident at the sheriff's office. Ms. Goss
informed Trelane that Trelane's three children
were at Ms. Goss's house.[FN4]   After hearing
what had transpired earlier on the street and
at the sheriff's office between Trelane and
Floyd, Ms. Goss said of Floyd, "I won't let
him get my grandchildren." Ms. Goss was also
aware that the twenty-one-year-old Floyd was
then on probation for previous violations of
the law.

> FN4. Earlier on July 13, Floyd had
> transported Trelane's three children
> to be with their grandmother, Ms.
> Goss.

During the trial, several witnesses described
the subsequent events that led to the death of
Ms. Goss. J.J. Jones, the oldest of Trelane's
three children, testified[FN5] that on July 13,

1998, the day that Ms. Goss was killed, Floyd took him and his two younger siblings to the home of their grandmother, Ms. Goss. J.J. also stated that after he had fallen asleep that evening, Ms. Goss awakened him and instructed him to go to the home of her neighbor, Jeanette Figuero, and to call the police from there. Before he exited Ms. Goss's home, J.J. noted that she was clearly upset. As J.J. was moving toward Jeanette Figuero's home, he noticed that Floyd was "squeezing [Ms. Goss] behind the door" at the front of Ms. Goss's home. Moments later he saw Ms. Goss running outside. J.J. stated that he also observed Floyd standing on Ms. Goss's front porch and firing a gun three times. J.J.'s two siblings, LaJade Evans and Alex Evans, were directly behind him, as Ms. Goss had awakened them also. J.J. testified that he never saw Floyd leave the victim's porch, and that the last thing he observed before pounding on Jeanette Figuero's door for help was his grandmother, Ms. Goss, lying on her back. J.J. eventually led the police to the spot where he thought his grandmother's body would be. As one of the officers directed a flashlight beam on the ground, the light revealed Ms. Goss's lifeless body. Ms. Goss was clad only in a nightgown and was not wearing any undergarments.[FN6]

> FN5. J.J. Jones was eight years old when he testified. The trial judge engaged in witness-qualification procedures to ensure that J.J. was capable of understanding the proceedings and that he understood his responsibility to testify truthfully. After the trial judge indicated that he was prepared to have J.J. sworn as a witness, the defense voiced no objection.

> FN6. Ms. Goss's husband, Clifford Goss, testified that his wife never received guests in her home unless she was fully dressed. He said that she would never have company inside

her home if she was not wearing undergarments.

LaJade Evans, J.J. Jones' younger sister, testified[FN7] that she followed J.J. to Ms. Figuero's home to seek help. LaJade saw Floyd on the victim's porch, shooting a gun at the victim. LaJade said Floyd fired two shots from the porch, and that she heard one more shot fired in the direction of the victim. She added that she saw Floyd running toward the victim's home but that he did not go inside the home again after having fired his weapon.

> FN7. LaJade Evans was six years old when she testified. After the trial judge and the State asked qualifying questions, LaJade was sworn as a witness. The defense did not object.

Jeanette Figuero testified[FN8] that during the evening of July 13, she heard three gunshots followed by the sounds of pounding on her door and the plaintive cries of a child or children saying, "Open the door, open the door, please open the door." Figuero's son, Gary Melendez, opened the door to allow J.J., LaJade, and Alex into the home. Figuero said the children were talking very fast and when she inquired as to the problem, they exclaimed that their grandmother, Ms. Goss, had been shot. When she asked J.J. who shot Ms. Goss, he responded, "Maurice Floyd."[FN9]   Figuero also testified that she heard J.J. mention Floyd's name when he talked to the 911 dispatcher.[FN10]   The prosecutor asked Jeanette Figuero if she believed that J.J. was "smart" and "bright," and whether she believed him when he said that Floyd had shot Ms. Goss. Figuero answered that she believed J.J. was a bright child and that she believed his version of the events, especially after she called over to Ms. Goss from her front porch and received no response.

> FN8. In the chronology of the trial, Jeanette Figuero testified before J.J. Jones.

FN9. Floyd's objection to this testimony as inadmissible hearsay and lacking in foundation was overruled. Floyd did not object until Ms. Figuero had fully completed her answer. Gary Melendez, Figuero's son, also testified that the children said that "Maurice Floyd" shot Ms. Goss. He said the children were frightened, crying, and nervous when they first reached Figuero's home.

FN10. Relevant parts of J.J. Jones' conversation with the 911 dispatcher were played during the trial over Floyd's hearsay objections. On the 911 tape, J.J. Jones said that "Maurice Floyd" was the person "who was shooting."

Figuero also testified that earlier in the evening on July 13, she had been speaking with her neighbor, John Brown, from the porch of her house. Brown mentioned that a young male had been constantly walking up and down the sidewalk in front of Ms. Goss's home. Subsequently, Figuero noticed that a young African-American male was on Ms. Goss's front porch, and was talking to Ms. Goss for some time through the closed screen door. She could not recognize the young male because his back was to her and it was also dark. After leaving her porch for a few moments and then returning, Figuero noticed that the young male had apparently entered Ms. Goss's home. She heard the voice of an angry male emanating from inside the victim's home, addressing Ms. Goss in sometimes profane tones. Figuero testified that she clearly heard the young male say in an angry tone, "Why did she have to involve the GD crackers."[FN11]  She also saw the young male move menacingly toward a person who was sitting on the sofa in Ms. Goss's home. The young male abruptly halted when he noticed that Figuero had spotted him. Figuero stated that she assumed at all times the young male was addressing himself to Ms. Goss

because she knew that Ms. Goss was in the home. Approximately twenty-five minutes after hearing the angry male's voice, Figuero heard the sounds of gunfire which led J.J. Jones and his siblings to appear at her door.

> FN11. The record indicates Figuero's moral reluctance to relate exactly the profane or sacrilegious statement made by the young male. Therefore, she used "GD" as a euphemism. The record also indicates Figuero's understanding that the term "cracker" as used in this context was a reference to a white person. The State posits in its brief that Floyd's reference was to Deputy Dean Kelly, who prevented Floyd from accosting Trelane earlier in the evening outside the sheriff's office. The State notes that Deputy Kelly is a white male and that Floyd is African-American.

John Brown, the neighbor with whom Figuero was speaking earlier that evening, testified that on the evening of July 13 he saw two men walking up and down the sidewalk in the vicinity of Ms. Goss's house. One man, dressed in black, was noticeably taller than the other. The shorter man eventually disappeared from sight, but the taller man continued walking up and down the sidewalk. The man dressed in black eventually made his way up the steps of the home to Ms. Goss's front porch and began talking to her. Brown testified that approximately an hour later he heard a loud "commotion" emanating from Ms. Goss's house, involving a loud, angry male voice. He heard "two big shots" while he was still inside his home and subsequently heard children running. Proceeding to the sidewalk in front of his home, Brown saw a man dressed in black run off the steps of Ms. Goss's home and then run up a side street in a northerly direction. Brown stated that this man "fit the general description" of the "black man" who

9

had dropped off children at Ms. Goss'[s] house
earlier in the day on July 13.[FN12]

> FN12. Brown also said that the man
> who dropped off children at Ms.
> Goss's house drove a red Honda
> automobile. This matches the general
> description of Floyd's automobile
> which was established through other
> trial testimony.

Police officers Stokes and Zike responded to
the 911 call made from Jeanette Figuero's
home. Stokes spoke with J.J. Jones and his
sister, LaJade Evans, about what had happened.
He noted that they were in a very excited
state when he spoke with them. He also stated
that when he asked if the children had seen
the shooting, they responded that Floyd had
fired a gun at their grandmother, Ms. Goss.[FN13]
Zike testified that when he and Stokes entered
Ms. Goss's home looking for suspects and
clues, they noticed that "the door had been
kicked in."[FN14]

> FN13. Floyd objected that the
> excited utterance exception was not
> a proper basis to admit Stokes's
> testimony regarding what the
> children had told him. The trial
> judge overruled the objection.

> FN14. Ms. Goss's husband, Clifford,
> testified that the lock on the door
> appeared as if it had been kicked or
> broken. He said the lock was not in
> that condition when he left for work
> on July 13 at approximately 4 p.m.
> Ms. Goss was not at home when
> Clifford left for work.

The State did not produce the murder weapon at
trial. However, the State did present evidence
of a confession that Floyd made to a friend.
Tashoni Lamb testified that Floyd visited her
apartment around midnight on July 13, and that
he left after 6 a.m. on July 14. Floyd asked
to speak with Lamb privately, out of the

10

hearing of her children. Lamb stated that Floyd pulled a gun out of the pants he was wearing, placed it on a dresser in the apartment, and said, "I just shot Miss Mary, the grandmother." She related that Floyd's reason for shooting Ms. Goss was that "she had threatened to call the police on him." Lamb stated that she did not call the police because she concluded that they would certainly apprehend Floyd. She further testified that Floyd contacted her by phone later on July 14, a day before he was arrested. When the prosecutor asked at trial if anyone had ever asked her to provide an alibi for Floyd, she responded, "Maurice did." She also testified that during the phone conversation, Floyd asked, "Do you want to see me die?"

When the State sought to introduce evidence of the bullet that killed the victim, Floyd objected, asserting that the State had failed to establish a proper chain of custody for the bullet. The trial judge sustained Floyd's initial objection that the testimony of Detective Mike Lassiter had not established a proper chain of custody, noting that Lassiter could not positively state that the bullet and its jacket were in the same condition at the trial as they were when he last saw them. The State then presented the testimony of Florida Department of Law Enforcement (FDLE) agent Steve Leary, who was the person to whom the medical examiner handed the bullet and jacket after removing them from the victim's head. Leary testified that the bullet and jacket were in the same condition at trial as when he last saw them. The trial judge overruled Floyd's subsequent chain-of-custody objection, on the bases that Leary's testimony established that the items in question were in the same condition at trial as they were when he last saw them, and that Floyd had not satisfied his legal burden of showing the probability that there had been tampering with the bullet and jacket. The trial judge did note, however, that the State could not definitively account for the bullet and jacket

11

in the interval between the time Leary gave the items to an FDLE evidence technician and their introduction into evidence at Floyd's trial.

Medical examiner Dr. Terence Steiner testified that the victim sustained a gunshot injury to her face, facial bones, and brain. The bullet entered the victim through her left cheek, and the cause of death was trauma to the brain caused by a single shot. The manner of death was a homicide. Dr. Steiner stated that during the autopsy he recovered a spent bullet, a bullet jacket, and a lead fragment. He identified those items at trial as the ones he recovered during the autopsy. When Dr. Steiner was asked to describe the physical position of the victim when she was shot, he first opined that based on blood spatter evidence, the victim was "standing up." Moments later, however, he elaborated that "perhaps she was almost maybe kneeling, but she was upright to the injury to the brain, severed the brainstem, which is instantaneous, if you will, death."

After Dr. Steiner's testimony, the State rested and Floyd presented his motion for judgment of acquittal, which was denied. Floyd did not testify in his own defense, nor did he present any witnesses or evidence on his behalf during the guilt phase. The jury convicted Floyd on all charges.[FN15]

> FN15. In its verdict form, the jury found Floyd guilty based on the theories of both premeditated murder and felony murder. On the verdict form, the line for Count I, indicating that the jury found Floyd "GUILTY of First Degree Premeditated Murder, and First Degree Felony Murder as charged in the indictment" was checked, and the verdict form was signed by the jury foreperson. The jury found that the homicide involved a firearm. The verdict form also indicates that the jury found

Floyd guilty of armed burglary of a
dwelling, and that a firearm was
involved in this offense. Floyd was
convicted in 1999.

Additionally, the verdict form
indicates that the jury found Floyd
guilty of aggravated assault. Floyd
does not challenge his conviction
for aggravated assault.
Nevertheless, we determine that
competent, substantial evidence
supports the aggravated assault
conviction.

The State introduced victim impact evidence
during the penalty phase, along with evidence
of Floyd's prior conviction for a violent
felony in North Carolina and evidence of his
current parole violation. Floyd did not
testify in the penalty phase, nor did he
present any witnesses or evidence on his
behalf. The jury recommended a sentence of
death by a vote of eleven to one. A <u>Spencer</u>
hearing[FN16] was held prior to the pronouncement
of sentence. In sentencing Floyd to death for
the murder of Ms. Goss, the trial judge found
four statutory aggravating factors[FN17] and no
statutory mitigating factors. Four
nonstatutory mitigating factors were found,[FN18]
with each receiving little weight. The trial
judge also sentenced Floyd to thirty years for
the armed burglary conviction, and to five
years for the aggravated assault conviction.
The five-year sentence for aggravated assault
was ordered to run concurrently with the
thirty-year sentence for armed burglary.

FN16. <u>See</u> <u>Spencer v. State</u>, 615
So.2d 688 (Fla. 1993).

FN17. Those statutory aggravating
factors are: (1) Floyd was on
probation for the felonies of
burglary and accessory after the
fact to robbery when he committed
the murder (great weight); (2) Floyd
had previously been convicted of the

13

violent felony of the voluntary
manslaughter of his brother
(substantial weight); (3) Floyd
committed the murder while engaged
in the commission of armed burglary
of the victim's home (great weight);
and (4) Floyd committed the murder
for the purpose of avoiding or
preventing a lawful arrest
(substantial weight).

FN18. Those nonstatutory mitigating
factors are: (1) Floyd displayed
exemplary courtroom behavior in the
face of much adversity; (2) Floyd
assisted defense counsel throughout
the proceedings by taking notes and
communicating with counsel; (3)
Floyd was successfully completing
his probation for other offenses
before he committed the murder; and
(4) Floyd expressed concern that his
wife conduct herself in such a way
that she not use alcohol and that
she not subject their relationship
to the potential stresses of the use
of alcohol.

<u>Floyd v. State</u>, 850 So.2d 383, 387-93 (Fla. 2002) (per curiam).

On appeal, Floyd, through counsel, filed an Initial Brief,
arguing that the trial court erred when it: denied Floyd's motion
for judgment of acquittal where the State failed to prove
premeditation and the underlying felony of burglary (ground one);
found that the State had a race neutral reason for exercising a
peremptory challenge on prospective juror Rios (ground two); failed
to instruct the jury that it could consider in mitigation any other
aspect of Floyd's character, record, or background; refused to
specifically instruct the jury on Floyd's proposed nonstatutory

14

mitigating factors; failed to instruct the jury on the statutory mitigating factor relating to age (ground three); overruled Floyd's objections and instructed the jury that it could consider the heinous, atrocious, or cruel aggravating factor when there was no evidence to support the instruction (ground four); instructed the jury and found that the evidence supported the aggravating circumstance that the murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody (ground five); instructed the jury on the aggravating factor that the homicide was committed during the commission of a burglary where there was not sufficient competent evidence (ground six); improperly admitted Jeanette Figuero's hearsay evidence and allowed her to bolster the testimony of a child witness (ground nine); denied Floyd's requested instruction regarding circumstantial evidence (ground ten); and overruled Floyd's objection and allowed the introduction of the projectile purportedly taken from the victim's head where the State could not establish the chain of custody, thus resulting in Floyd's inability to establish the probability of tampering (ground twelve).  Resp. Ex. B.

Moreover, Floyd argued that there was fundamental error when the prosecutor, at the penalty phase, improperly stated that the jury was required to impose the death penalty (ground seven); the jury's recommendation at the penalty phase was tainted by highly

inflammatory and improper victim impact evidence (ground eight);
the death penalty is not proportional when the remaining valid
aggravators are weighed against the mitigating evidence (ground
eleven); and in light of the cumulative errors that occurred
throughout the proceedings, Floyd's constitutional right to a fair
trial was violated (ground thirteen).  <u>Id</u>.  The State filed an
Answer Brief.  Resp. Ex. C.

In accordance with an order directing the parties to address
the applicability of <u>Delgado v. State</u>, 776 So.2d 233 (Fla. 2000),[2]
<u>see</u> Resp. Ex. D, the parties filed supplemental briefs, <u>see</u> Resp.
Exs. D-2; D-3; D-4; D-5.  On August 22, 2002, the Florida Supreme
Court affirmed Floyd's conviction for first degree murder and the
sentence of death as well as the conviction and sentence for
aggravated assault.   <u>Floyd</u>, 850 So.2d at 409 ("Competent,
substantial evidence supports his conviction for premeditated

---

[2] On August 24, 2000, in a revised opinion on rehearing, the
Florida Supreme Court recognized that there are two methods by
which burglary can be committed, <u>i.e.</u>, unlawful entry with the
intent to commit a crime, or remaining in a structure or conveyance
with the intent to commit a crime therein.   <u>See Delgado v. State</u>,
776 So.2d 233 (Fla. 2000) (per curiam), <u>cert</u>. <u>denied</u>, 551 U.S. 1151
(2007). The issue before the <u>Delgado</u> court was "whether the phrase
'remaining in' found in Florida's burglary statute[] should be
limited to situations where the suspect enters lawfully and
subsequently secretes himself or herself from the host." <u>Id</u>. at
238.  After reviewing the evolution of the crime of burglary, the
Florida Supreme Court concluded that the "remaining in" burglary
theory applied "only in situations where the remaining in was done
surreptitiously." <u>Id</u>. at 240.  Thus, in order to prove burglary
after an initial consensual entry, the evidence must show that the
defendant remained in the structure surreptitiously. <u>Id</u>. at 240-
41.

murder, and the sentence of death for this conviction is proportional. Competent, substantial evidence also supports Floyd's conviction for aggravated assault."). The court stated: "the only relief to which Floyd is entitled is the reversal of his conviction for armed burglary and the striking of the murder in the course of a felony aggravating circumstance." Id. The parties filed motions for rehearing, see Resp. Exs. D-7; D-8; D-9, and supplemental briefs, see Resp. Exs. D-11; D-12; D-13. The court denied the motions for rehearing, see Resp. Ex. D-14, and the mandate issued on June 12, 2003, see Resp. Ex. D-15. Floyd filed a petition for writ of certiorari, see Resp. Ex. E, and the State filed a brief in opposition, see Resp. Ex. E-2. On January 12, 2004, the United States Supreme Court denied certiorari. See Floyd v. Florida, 540 U.S. 1112 (2004); Resp. Ex. E-3.

On January 10, 2005, Floyd, through counsel, filed a motion for post conviction relief pursuant to Florida Rule of Criminal Procedure 3.851 (Rule 3.851 motion). Resp. Ex. F-1 at 1-79. In his request for post conviction relief, Floyd claimed, as ground one, that counsel was ineffective during the investigative, guilt and penalty phases, which violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and denied him a fair trial and sentence worthy of confidence. As subclaim (a) under ground one, Floyd asserted that counsel's performance regarding the testimony of the child eyewitnesses and

17

bolstering was deficient and resulted in prejudice to the defense. Specifically, he stated that counsel failed to object or properly object to: the 911 tape; Corporal Stokes' testimony regarding J.J.'s statements; Officer Zike's testimony that the children identified Floyd as the shooter; Jeanette Figuero's testimony that the children identified Floyd as the shooter, that J.J. was smart and she believed what he told her, that she heard J.J. name Floyd when he spoke to the 911 dispatcher, and that she heard J.J. identify Floyd to police; and Gary Melendez' testimony that he saw the children name Floyd when Ms. Figuero asked them who shot Ms. Goss. Additionally, Floyd asserted that counsel: failed to elicit LaJade's deposition testimony that Ms. Goss slammed Floyd to the ground; allowed J.J. to be qualified to testify in front of the jury and failed to challenge his competence to testify; and failed to follow up on State experts who had evaluated J.J.

As subclaim (b), Floyd stated that counsel was ineffective because he failed to object to evidence of bad acts (testimony regarding a threat Floyd made to his wife, Trelane, the day before the shooting and Trelane's testimony that Floyd placed a gun to her head as he threatened to kill her family if she left him and that there was a domestic assault several hours before the shooting) and failed to sever the aggravated assault charge. Additionally, as subclaim (c), Floyd asserted that counsel failed to impeach Ms. Lamb and adequately investigate theories of innocence and alibi.

And, under that same subclaim, Floyd argued that the State violated Brady v. Maryland, 373 U.S. 83 (1963), by withholding evidence of threats the State made to Ms. Lamb regarding her criminal culpability for harboring Floyd after the shooting, and that the State violated Giglio v. United States, 405 U.S. 150 (1972), by knowingly using false testimony.

Under subclaim (d), Floyd asserted that counsel was ineffective because he failed to conduct an adequate investigation into potential mitigation evidence for the penalty phase and failed to present available mitigation evidence on Floyd's behalf at either the penalty phase before the jury, or at the Spencer hearing before the trial court. Additionally, under that same subclaim, he asserted that counsel failed to object to the trial judge's errors in the jury instructions, specifically omitting a portion of the instruction on nonstatutory mitigation, and failed to request an instruction on age as a mitigating circumstance. As subclaim (e), Floyd stated that counsel was ineffective during jury selection because he failed to: request a change of venue; seek a mistrial after an outbreak of applause from the venire after a comment about the cost of pursuing the death penalty; and clarify Rios' answer, which would have eliminated his equivocation. Under that same subclaim, Floyd also asserted that counsel acquiesced to the State's dismissing three prospective jurors for cause, and others were struck because they knew Reverend Karl Flagg.

19

As ground two, Floyd asserted that he was deprived of his due process right to develop factors in mitigation and a fair penalty phase because the court-appointed psychologist failed to conduct the appropriate tests for organic brain damage and mental illness, and defense counsel was ineffective because he failed to ensure that Floyd received competent mental health assistance.  As ground three, Floyd stated that the cumulative effect of the errors deprived him of the right to a fair trial and penalty phase.  As to grounds one through three, Floyd requested an evidentiary hearing.

Floyd also asserted the following issues, but contended that they did not require an evidentiary hearing. Resp. Ex. F-1 at 37.  As ground one, he asserted that he was charged with a faulty Indictment and deprived of a unanimous verdict.  He set forth the following subclaims: unconstitutional merging of premeditated and felony murder; separate Indictments are required to charge premeditated and felony murder; necessity of a specific verdict distinguishing premeditated and felony murder; Florida's death sentencing statute is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002); the advisory verdict is not based on proof beyond a reasonable doubt; a unanimous twelve-member jury verdict is required in capital cases under the United States Constitution; Floyd's death sentence violated the state and federal constitutions because the elements of the offense necessary to establish capital murder were not charged in the Indictment.  Resp. Ex. F-1 at 37-73.

Additionally, as ground two, he asserted that the combination of procedural and substantive errors deprived him of a fair trial. Id. at 74-75.

The State responded to the Rule 3.851 motion. Resp. Ex. F-1 at 80-105. As requested by Floyd, the court scheduled an evidentiary hearing on grounds one, two, and three and denied Floyd's claims "set forth at or beyond page 37" of the Rule 3.851 motion. Resp. Ex. F-3 at 416-21. On October 17, 2005, Floyd filed a motion to amend his Rule 3.851 motion, requesting to add claim four: Floyd's constitutional rights were violated when he was shackled in front of the jury at trial. Resp. Ex. F-2 at 395-415. The court granted his motion to amend, see Resp. Ex. F-7 at 1233, and stated that the evidentiary hearing would include the shackling claim, see Resp. Ex. F-4 at 682.

An evidentiary hearing was held November 28-29, 2005, and January 9, 2006. See Resp. Exs. G-1; G-2; G-3, Transcripts of the Evidentiary Hearing (EH Tr.). The court denied the Rule 3.851 motion on January 8, 2007, see Resp. Ex. F-7 at 1239-58, as amended on January 31, 2007, see id. at 1259-78. On appeal, Floyd filed an Initial Brief, see Resp. Ex. H; the State filed an Answer Brief, see Resp. Ex. I; and Floyd filed a Reply Brief, see Resp. Ex. J. Additionally, Floyd, through counsel, filed a Petition for Writ of Habeas Corpus, asserting that appellate counsel was ineffective because he failed to raise on direct appeal the issue concerning

21

the competency of Dr. Krop (ground one); the combination of procedural and substantive errors deprived Floyd of a fair trial (ground two); Floyd's constitutional rights were violated when he was shackled in front of the jury, and appellate counsel was ineffective because he failed to raise the issue on direct appeal (ground three); appellate counsel failed to challenge the facially inadequate qualification of the child witnesses (ground four); any claims raised in the Rule 3.851 motion, which should have been raised in a petition for writ of habeas corpus, should be considered contemporaneous and collateral to the appeal from the Rule 3.851 motion (ground five); Floyd's right to be free from cruel and unusual punishment under the Eighth Amendment will be violated as he may be incompetent at the time of execution (ground six); and appellate counsel was ineffective because he failed to argue that Florida's rule prohibiting counsel from interviewing jurors violates Floyd's federal constitutional rights (ground seven). Resp. Ex. K.  The State responded, see Resp. Ex. L, and Floyd replied, see Resp. Ex. M.  On June 4, 2009, the Florida Supreme Court affirmed the trial court's denial of the Rule 3.851 motion and also denied the state habeas petition. Floyd v. State, 18 So.3d 432 (Fla. 2009) (per curiam).  The court denied Floyd's motion for rehearing on September 24, 2009, see Resp. Exs. N-2; N-3; N-4, and the mandate issued on October 12,2009, see Resp. Ex. N-5.

### III. One-Year Limitations Period

The Petition is timely filed within the one-year period of limitations.  See 28 U.S.C. § 2244(d); Response at 11-12.

### IV. Evidentiary Hearing

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. The pertinent facts of this case are fully developed in the record before the Court.  Because this Court can "adequately assess [Floyd's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), cert. denied, 541 U.S. 1034 (2004), an evidentiary hearing will not be conducted.

### V. Standard of Review

The Court will analyze Floyd's claims under 28 U.S.C. § 2254(d).  This standard is described as follows:

> As explained by the Supreme Court, the phrase "'clearly established Federal law' . . . refers to the holdings . . . of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).  We have held that to be "contrary to" clearly

established federal law, the state court must either (1) apply a rule "that contradicts the governing law set forth by Supreme Court case law," or (2) reach a different result from the Supreme Court "when faced with materially indistinguishable facts." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2003).

As regards the "unreasonable application" prong of § 2254(d)(1), we have held as follows:

> A state court decision is an unreasonable application of clearly established law if the state court unreasonably extends or fails to extend a clearly established legal principle to a new context. An application of federal law cannot be considered unreasonable merely because it is, in our judgment, incorrect or erroneous; a state court decision must also be unreasonable. Questions of law and mixed questions of law and fact are reviewed de novo, as is the district court's conclusion regarding the reasonableness of the state court's application of federal law.

Jennings v. McDonough, 490 F.3d 1230, 1236 (11th Cir. 2007) (quotation marks and citations omitted). In sum, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409, 120 S.Ct. at 1521. Finally, 28 U.S.C. § 2254(e)(1) commands that for a writ to issue because the state court made an "unreasonable determination of the facts," the petitioner must rebut "the presumption of correctness [of a state court's factual

findings] by clear and convincing evidence."[3]
28 U.S.C. § 2254(e)(1).

Ward v. Hall, 592 F.3d 1144, 1155-56 (11th Cir. 2010), cert. denied, 131 S.Ct. 647 (2010).

Finally, for a state court's resolution of a claim to be an adjudication on the merits, so that the state court's determination will be entitled to deference for purposes of federal habeas corpus review under AEDPA, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling. Harrington v. Richter, 131 S.Ct. 770, 785 (2011) (holding that section 2254(d) does not require a state court to give reasons before its decision can be deemed to have been adjudicated on the merits); Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002), cert. denied, 538 U.S. 906 (2003). Thus, to the extent that Floyd's claims were adjudicated on the merits in the state courts, they must be evaluated under § 2254(d).

## VI. Exhaustion/Procedural Default

There are prerequisites to a federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b), (c). To exhaust

---

[3] "This presumption of correctness applies equally to factual determinations made by state trial and appellate courts." Bui v. Haley, 321 F.3d 1304, 1312 (11th Cir. 2003) (footnote omitted) (citing Sumner v. Mata, 449 U.S. 539, 547 (1981)).

state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'"opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)) To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365-366, 115 S.Ct. 887; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

Recently, the United States Supreme Court discussed the doctrine of procedural default:

Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. <u>See</u>, <u>e.g.</u>, <u>Coleman</u>,[4] <u>supra</u>, at 747–748, 111 S.Ct. 2546; <u>Sykes</u>,[5] <u>supra</u>, at 84–85, 97 S.Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. <u>See</u>, <u>e.g.</u>, <u>Walker v. Martin</u>, 562 U.S. --, --, 131 S.Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); <u>Beard v. Kindler</u>, 558 U.S. --, --, 130 S.Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. <u>See</u> <u>Coleman</u>, 501 U.S., at 750, 111 S.Ct. 2546.

<u>Martinez v. Ryan</u>, 132 S.Ct. 1309, 1316 (2012).

Thus, procedural defaults may be excused under certain circumstances: notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual

---

[4] <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991).

[5] <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977).

prejudice from the default; or (2) a fundamental miscarriage of justice.  Maples v. Thomas, 132 S.Ct. 912, 922 (2012) (citations omitted).  In order for Floyd to establish cause, the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct."  Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999) (citing McCoy v. Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting Carrier,[6] 477 U.S. at 488)), cert. denied, 528 U.S. 934 (1999).  And, under the prejudice prong, in order for Floyd to establish actual prejudice as a result of the alleged violation of federal law, he must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness."  Id. (citation and internal quotations omitted).

---

[6] Murray v. Carrier, 477 U.S. 478 (1986).

In <u>Martinez</u>, the Supreme Court modified the general rule in <u>Coleman</u>[7] to expand the "cause" that may excuse a procedural default. <u>Martinez</u>, 132 S.Ct. at 1315.

> Allowing a federal habeas court to hear a claim of ineffective assistance of trial counsel when an attorney's errors (or the absence of an attorney) caused a procedural default in an initial-review collateral proceeding acknowledges, as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim. From this it follows that, when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-

---

[7] "Negligence on the part of a prisoner's postconviction attorney does not qualify as 'cause.'" <u>Maples v. Thomas</u>, 132 S.Ct. 912, 922 (citing <u>Coleman</u>, 501 U.S. at 753). The Court reasoned that, under principles of agency law, the attorney is the prisoner's agent, and therefore, the principal bears the risk of negligent conduct on the part of his agent. <u>Coleman</u>, 501 U.S. at 753-54. In <u>Coleman</u>, the alleged ineffectiveness of counsel was on appeal from an initial-review collateral proceeding, and in that proceeding the prisoner's claims had been addressed by the state habeas trial court. <u>Id</u>. at 755. However, the <u>Martinez</u> Court addressed inadequate assistance of counsel at an initial-review collateral proceeding.

>trial-counsel claim is a substantial one,
>which is to say that the prisoner must
>demonstrate that the claim has some merit. Cf.
>Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct.
>1029, 154 L.Ed.2d 931 (2003) (describing
>standards for certificates of appealability to
>issue).

Id. at 1318-19.

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if he can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

>[I]f a petitioner cannot show cause and
>prejudice, there remains yet another avenue
>for him to receive consideration on the merits
>of his procedurally defaulted claim. "[I]n an
>extraordinary case, where a constitutional
>violation has probably resulted in the
>conviction of one who is actually innocent, a
>federal habeas court may grant the writ even
>in the absence of a showing of cause for the
>procedural default." Carrier, 477 U.S. at
>496, 106 S.Ct. at 2649.[8] "This exception is
>exceedingly narrow in scope," however, and
>requires proof of actual innocence, not just
>legal innocence. Johnson v. Alabama, 256 F.3d
>1156, 1171 (11th Cir. 2001).

Ward, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v.

---

[8] Murray v. Carrier, 477 U.S. 478 (1986).

<u>Delo</u>, 513 U.S. 298, 327 (1995)), <u>cert</u>. <u>denied</u>, 535 U.S. 926 (2002).

Additionally, "'[t]o be credible,' a claim of actual innocence must

be based on reliable evidence not presented at trial." <u>Calderson</u>

<u>v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting <u>Schlup</u>, 513 U.S. at

324). With the rarity of such evidence, in most cases, allegations

of actual innocence are ultimately summarily rejected. <u>Schlup</u>, 513

U.S. at 324.

## VII. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective

assistance of counsel. That right is denied when a defense

counsel's performance falls below an objective standard of

reasonableness and thereby prejudices the defense." <u>Yarborough v.</u>

<u>Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (citing <u>Wiggins v. Smith</u>,

539 U.S. 510, 521 (2003), and <u>Strickland v. Washington</u>, 466 U.S.

668, 687 (1984)).

> To establish deficient performance, a
> person challenging a conviction must show that
> "counsel's representation fell below an
> objective standard of reasonableness."
> [<u>Strickland</u>,] 466 U.S. at 688, 104 S.Ct. 2052.
> A court considering a claim of ineffective
> assistance must apply a "strong presumption"
> that counsel's representation was within the
> "wide range" of reasonable professional
> assistance. <u>Id</u>., at 689, 104 S.Ct. 2052. The
> challenger's burden is to show "that counsel
> made errors so serious that counsel was not
> functioning as the 'counsel' guaranteed the
> defendant by the Sixth Amendment." <u>Id</u>., at
> 687, 104 S.Ct. 2052.

> With respect to prejudice, a challenger
> must demonstrate "a reasonable probability

31

> that, but for counsel's unprofessional errors,
> the result of the proceeding would have been
> different. A reasonable probability is a
> probability sufficient to undermine confidence
> in the outcome." Id., at 694, 104 S.Ct. 2052.
> It is not enough "to show that the errors had
> some conceivable effect on the outcome of the
> proceeding." Id., at 693, 104 S.Ct. 2052.
> Counsel's errors must be "so serious as to
> deprive the defendant of a fair trial, a trial
> whose result is reliable." Id., at 687, 104
> S.Ct. 2052.

Harrington, 131 S.Ct. at 787-88.

Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Ward, 592 F.3d at 1163 (citation omitted). "Surmounting Strickland's high bar is never an easy task." Harrington, 131 S.Ct. at 788 (quoting Padilla v. Kentucky, 130 S.Ct. 1473, 1485 (2010)).

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> The question "is not whether a federal
> court believes the state court's
> determination" under the Strickland standard
> "was incorrect but whether that determination
> was unreasonable - a substantially higher
> threshold." Schriro, supra, at 473, 127 S.Ct.
> 1933. And, because the Strickland standard is
> a general standard, a state court has even
> more latitude to reasonably determine that a
> defendant has not satisfied that standard.
> See Yarborough v. Alvarado, 541 U.S. 652, 664,
> 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)
> ("[E]valuating whether a rule application was
> unreasonable requires considering the rule's
> specificity. The more general the rule, the

more leeway courts have in reaching outcomes in case-by-case determinations").

Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).   Thus, the standards created by Strickland and § 2254(d) are both highly deferential, "and when the two apply in tandem, review is 'doubly' so[.]"  Harrington, 131 S.Ct. at 788 (quoting Knowles, 556 U.S. at 123; see Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004) ("In addition to the deference to counsel's performance mandated by Strickland, the AEDPA adds another layer of deference - this one to a state court's decision - when we are considering whether to grant federal habeas relief from a state court's decision."), cert. denied, 544 U.S. 982 (2005).

## VIII. Findings of Fact and Conclusions of Law

### A. Ground One

In ground one, Floyd claims that counsel was ineffective during the penalty phase proceedings.   As acknowledged by the parties, Floyd raised this claim in his Rule 3.851 motion, as ground one, subclaims (d)(1) and (d)(2).  This issue was addressed at the state court evidentiary hearing, at which Floyd and his counsel, Douglas Withee, testified.[9]   After the evidentiary hearing, the trial court identified the two-prong Strickland ineffectiveness test as the controlling law and denied the Rule 3.851 motion with respect to this issue, stating in pertinent part:

---

[9] Floyd was represented by counsel at the state court evidentiary hearing.  See EH Tr. at 2.

CLAIM I(d)(1): Counsel was ineffective during the penalty phase proceedings against Mr. Floyd for failure to conduct an adequate investigation into potential mitigation evidence for the penalty phase which was deficient and, therefore, caused prejudice to the defendant.

At the evidentiary hearing[,] Mr. Floyd presented numerous mental health experts which he claims establish that Mr. Withee had available to him the opportunity to assert additional statutory mitigators, those being (1) the crime was committed while under the influence of extreme mental and emotional disturbance and (2) the defendant was unable to appreciate the criminality of his conduct or conform his conduct to the requirements of law. According to Dr. Dee, a neuropsychologist, Mr. Floyd suffers from some unspecified form of brain damage and sleep disturbance. Mr. Floyd further asserts that Dr. Berland established that Floyd had a longstanding psychotic disturbance and suffers from delusional, paranoid beliefs, auditory hallucinations, early childhood brain injury causing psychotic symptoms during childhood and a brain injury from an automobile accident at age 18. Mr. Floyd asserts that Dr. Riebsame, the State's mental health expert, supplied non-statutory mitigating factors including sleep disorder, low executive functioning, learning disability, chaotic childhood and inattentive parenting.

The facts of this case clearly indicate that Mr. Withee did contact a mental health expert, Dr. Krop, to assist in both the guilt and penalty phases of Mr. Floyd's trial. Dr. Krop, a well known expert who has testified for years in cases throughout the Central Florida area, found the same disparity between Floyd's verbal and performance IQ scores that every other expert found before or since the murder of Mary Goss. In fact, Mr. Withee gave notice on March 3, 1999 that he intended to present evidence of family dysfunction, learning disability and statutory and non-

statutory mental health information offered by
Dr. Krop.[10] Mr. Floyd had been undergoing a
mental health status evaluation and Mr. Withee
had been communicating with Dr. Krop for some
time.[11] On March 31, 1999, Dr. Krop advised
Mr. Withee that his testimony regarding Mr.
Floyd could "cause the jury to view him in a
negative way."[12] Dr. Krop had reviewed
Floyd's school records, police records,
medical records and other documents.[13] He
interviewed Mr. Floyd's parents for additional
background information. Dr. Krop observed in a
letter to Mr. Withee that Floyd had not been
"candid" in providing his background and his
parents have also provided inconsistent and
contradictory information.[14] Mr. Withee's
handwritten note on this letter indicates that
Dr. Krop's first letter [(dated March 26,
1999)] stated that some mental health
mitigation existed, however, Dr. Krop's March
31, 1999 letter said there is no mitigation he
could offer on Floyd's behalf.[15] Apparently
Dr. Krop indicated in a letter of December 11,
1998 that neuro-psychological testing showed
"a significant discrepancy between his verbal
and non-verbal abilities. Although these
results may reflect academic deficiencies,

---

[10] See Resp. Ex. A-1 at 127, Notice of Intent to Present Expert
Testimony of a Mental Health Professional During Penalty Phase,
filed March 3, 1999.

[11] See Resp. Ex. F-4 at 624, 625, 627, 628, 629, 630.

[12] See Resp. Ex. F-4 at 625, Dr. Krop's Letter to Mr. Withee,
dated March 31, 1999.

[13] See Resp. Ex. F-4 at 624.

[14] See Resp. Ex. F-4 at 624.

[15] See Resp. Ex. F-4 at 624, Dr. Krop's Letter to Mr. Withee,
dated March 26, 1999 ("I am concerned that my testimony would be
harmful to his case in that there are few, if any, mitigating
factors that could be presented."); id. at 625, Dr. Krop's Letter
to Mr. Withee, dated March 31, 1999 ("I am concerned that my
testimony would be harmful to his case in that there are no
psychological mitigating factors that could be presented.").

they may also reflect a learning
disability."[16] Furthermore, Floyd "showed
deficits in his memory (both verbal and non-
verbal realms), and that all of the
neurocognitive functions were within normal
limits."[17]

Dr. Krop testified at the evidentiary
hearing that he could not locate Floyd's file
and he did not specifically remember Mr.
Floyd, but that he could discuss what he meant
by the statements included in his report.[18]
He states his evaluation would have consisted
of a clinical interview and the standard
battery of psychological tests.[19] Dr. Krop
also testified that he worked with Mr. Withee
before and he had a standard list that he
would provide to defense counsel of records he
wanted to review to format an opinion.[20]
Based on his review of the correspondence with
Mr. Withee, Dr. Krop stated that his tests
revealed Floyd's IQ to be in the average range
with a full scale IQ of 95.[21] Dr. Krop noted
that there was a difference between verbal and
performance IQ scores of over 20 points "which
generally is considered significant."[22]
However, Dr. Krop explained that this
disparity "doesn't necessarily reflect
overnicity" [sic] [(organicity)] which he
later explained to be brain damage.[23] At best
Dr. Krop felt that the discrepancy between

---

[16] See Resp. Ex. F-4 at 623, Dr. Krop's Letter to Mr. Withee,
dated December 11, 1998.

[17] See Resp. Ex. F-4 at 623.

[18] See EH Tr. at 314.

[19] See EH Tr. at 314.

[20] See EH Tr. at 315, 332.

[21] See EH Tr. at 317.

[22] See EH Tr. at 317.

[23] See EH Tr. at 317.

performance IQ test scores and his verbal scores suggests the possibility of a learning disability.[24] The more important fact is that there was no deficit in Mr. Floyd's neurocognitive functions which means that his testing did not reveal "anything related to frontal lobe or [conceptual] reasoning or those areas which might have a direct bearing on the offense itself."[25] There does not appear to be any serious memory problems and no further testing was recommended.

Dr. Krop reportedly saw no sign of psychosis or psychotic behavior in his examination of Mr. Floyd.[26] He spent 12 hours with Mr. Floyd and stated that he would have requested more time if he felt it was needed.[27] Dr. Krop agreed that Mr. Floyd and his parents both lacked truthfulness in providing background information which would have hindered his ability to develop mitigation.[28]

Based on this information[,] Mr. Withee testified that an anti-social personality disorder which would have been the conclusion of Dr. Krop was not something that he would want to present to a jury although it is a common diagnosis for homicide defendants.[29] Mr. Withee also recognized that Dr. Krop has handled hundreds of cases and testified extensively in capital cases so that his conclusion that the negative component of his

---

[24] See EH Tr. at 317.

[25] See EH Tr. at 317.

[26] See EH Tr. at 340.

[27] See EH Tr. at 345.

[28] See EH Tr. at 322, 341.

[29] See EH Tr. at 323-24, 358-59.

testimony would clearly outweigh the positive side was well respected.[30]

The <u>Strickland</u> test measures the reasonableness of trial counsel's conduct and the adequacy of his representation which should not be utilized in hindsight. The question is whether the decision not to call Dr. Krop or any other mental health experts for either statutory or non-statutory mitigation was reasonable based on the facts and circumstances of the case and whether a complete and thorough mental health evaluation was done. The court believes Mr. Withee and the testimony of Dr. Krop that a strategic decision was made by counsel after consulting a very well respected mental health expert who had a great deal of experience in testifying in capital cases concerning Mr. Floyd. It is clear that a thorough mental health work up had been done, that the evaluation was done as much as could be expected, especially in light of the negative information provided by Mr. Floyd and his parents which was apparently provided selectively in order to gain advantage. The expert himself concluded that he was vulnerable on cross-examination of causing more harm to the client based on the information that he had than benefit to be gained[31] and, therefore, a strategic decision not to call a mental health expert and to abandon the presentation of those issues appears to be a sound strategic approach at that time.

It should be noted that there appears to be a trend in the law where extensive work is being done in terms of presenting both statutory and nonstatutory mitigation that deals with mental health issues. From a practical standpoint these may or may not be successful and always carry with them great risk of harm if not properly and soundly

---

[30] <u>See</u> EH Tr. at 303, 362.

[31] <u>See</u> EH Tr. at 322-24.

38

presented. In light of Mr. Floyd's violent past which resulted in the death of his brother at age 14, the court finds that the defendant has not established the first prong of the <u>Strickland</u> test that the decision of counsel not to advance the proposed statutory and non-statutory mitigation was deficient.

In addition Mr. Withee had done some investigation into the background concerning the killing of Mr. Floyd's brother. Rather than allow that to be a focal point of the case, he declined to cross examine when that information was presented since it, in his judgment, represented a much more violent circumstance.[32] Having made a bonafide and solid strategy decision, the obligation of this court is to view the case in the posture in which it was presented at that time. There is no viable challenge to the quality of the expertise of Dr. Krop and the doctor's analysis with his extensive background, training and reputation in the area. Mr. Floyd has failed to meet his burden of proof on this issue.

CLAIM I(d)(2) Counsel was ineffective during the penalty phase proceedings by failure to present available mitigation evidence on Mr. Floyd's behalf at either the penalty phase before the jury or at the <u>Spencer</u> hearing.

Mr. Floyd asserts that the trial court erred by amending a portion of the instruction on non-statutory mitigation and that counsel was ineffective in that regard. The Supreme Court, in its ruling, indicated that "we conclude that a perfect instruction would not have in any way altered the jury's recommendation here." <u>Floyd v. State</u>, 850 So.2d 403. Since the Florida Supreme Court has already determined that the error of omission in instructing the jury would not have changed the outcome of this case, then Mr. Floyd

---

[32] <u>See</u> EH Tr. at 361, 387-88.

> cannot demonstrate a reasonable probability of a different result that is required by the prejudice prong of <u>Strickland</u>. Mr. Floyd next claims that trial counsel was ineffective when he failed to request an instruction on age as a mitigating circumstance in this case. Mr. Withee did not think the requested instruction applied.[33] Mr. Floyd being the age of 21 in and of itself does not require a finding of the age mitigator. <u>Garcia v. State</u>, 492 So.2d 360 (Fla. 1986) (age 20), <u>Gudinas v. State</u>, 693 So.2d 953 (Fla. 1997) (age 20), <u>Nelson v. State</u>, 850 So.2d 514 (Fla. 2003) (age 21). The trial evidence indicated that Mr. Floyd was married, held a job, assumed responsibility for a house and his wife's children from a former relationship and had assumed the normal responsibilities of adult life prior to murdering Mary Goss, those facts would be inconsistent with the finding that he was too immature to bear full moral responsibility for the crime. The court has concluded that the age mitigator is not applicable and therefore failure to request same is not ineffective assistance of counsel.

P. Ex. 3 at 11-14; Resp. Ex. F-7 at 1269-72 (emphasis deleted).

Upon Floyd's appeal, the Florida Supreme Court affirmed the circuit court's denial of post conviction relief with respect to this claim, stating in pertinent part:

> Floyd contends that trial counsel was ineffective for failing to adequately investigate and present statutory and nonstatutory mitigation. According to Floyd, had existing mitigation evidence been presented, the mitigating circumstances would have outweighed any aggravating circumstances, and the jury would have recommended a life sentence. Floyd also asserts that trial counsel was ineffective for the failure to object to an erroneous jury instruction which

---

[33] <u>See</u> EH Tr. at 352-53.

prohibited the jury from considering any
nonstatutory mitigator aside from "other
circumstance[s] of the offense." Lastly, Floyd
contends that the failure of trial counsel to
seek a jury instruction based upon age as a
mitigating circumstance constituted
ineffective assistance. We reject each of
these claims.

With regard to assertions of penalty-
phase ineffectiveness, we recently explained:

> "To succeed in an ineffective
> assistance of penalty phase counsel
> claim, the claimant must demonstrate
> that counsel performed deficiently
> and that such deficiency prejudiced
> his defense." Hannon v. State, 941
> So.2d 1109, 1124 (2006) (citing
> Strickland, 466 U.S. at 687, 104
> S.Ct. 2052). "Prejudice, in the
> context of penalty phase errors, is
> shown where, absent the errors,
> there is a reasonable probability
> that the balance of aggravating and
> mitigating circumstances would have
> been different or the deficiencies
> substantially impair confidence in
> the outcome of the proceedings."
> Gaskin v. State, 737 So.2d 509, 516
> n.14 (Fla. 1999), receded from on
> other grounds by Nelson v. State,
> 875 So.2d 579, 582–83 (Fla. 2004).

Lynch v. State, 2 So.3d 47, 70 (Fla. 2008). We
have further established standards for the
review of ineffectiveness challenges that are
based on allegedly defective investigation and
presentation of mental mitigation:

> This Court has found counsel's
> performance was deficient where
> counsel "never attempted to
> meaningfully investigate mitigation"
> although substantial mitigation
> could have been presented. Rose, 675
> So.2d at 572; Hildwin v. Dugger, 654
> So.2d 107, 109 (Fla. 1995)

41

("woefully inadequate" investigation failed to reveal a large amount of mitigating evidence, such as prior psychiatric hospitalizations and statutory mental health mitigators); State v. Lara, 581 So.2d 1288, 1289 (Fla. 1991) (finding counsel "virtually ignored" preparation for penalty phase).

However, in those cases where counsel did conduct a reasonable investigation of mental health mitigation prior to trial and then made a strategic decision not to present this information, we have affirmed the trial court's findings that counsel's performance was not deficient. See Rutherford, 727 So.2d at 223; Jones, 732 So.2d at 317; Rose v. State, 617 So.2d 291, 293-94 (Fla. 1993). This case is similar to Jones, where the defendant had been examined prior to trial by a mental health expert who gave an unfavorable diagnosis. As we concluded in Jones, the first evaluation is not rendered less than competent "simply because appellant has been able to provide testimony to conflict" with the first evaluation. 732 So.2d at 320; see Rose, 617 So.2d at 295. Also instructive is our opinion in Rose, where a psychologist advised trial counsel prior to the penalty phase that the defendant suffered from antisocial personality disorder and ruled out the possibility of an organic brain disorder. 617 So.2d at 294. In both Rose and Jones, we affirmed the trial court's finding that counsel had made a reasonable tactical decision not to further pursue an investigation of mental health mitigation evidence after receiving an initial unfavorable

diagnosis. See Jones, 732 So.2d at
320 n.5; Rose, 617 So.2d at 294.

Asay v. State, 769 So.2d 974, 985-86 (Fla.
2000).

Here, the postconviction court found,
based on competent, substantial evidence, that
counsel properly relied on Dr. Krop - an
experienced and well-documented expert - to
conduct a thorough mental-health evaluation.
The court ultimately concluded that a thorough
mental-health evaluation had, in fact, been
performed. Trial counsel's investigation into
mental-health mitigation "is not rendered
incompetent merely because the defendant has
now secured the testimony of a more favorable
mental health expert." Asay, 769 So.2d at
986.

Furthermore, the postconviction court
found, based on competent, substantial
evidence, that trial counsel made a strategic
decision not to present mitigation evidence
after consultation with Dr. Krop. It was
reasonable for trial counsel to conclude that
the evidence offered in mitigation would do
more harm than good in light of Floyd's
antisocial personality disorder diagnosis, the
fact that he killed his brother at age
fourteen, and the inconsistencies between the
statements of Floyd's parents. This strategic
decision did not render trial counsel's
performance deficient.

Floyd further contends that after Dr.
Krop advised counsel that he should not
testify during the penalty phase, trial
counsel totally abdicated his duty to
investigate mitigation. Conversely, trial
counsel testified during the evidentiary
hearing that he investigated Floyd's
background, but was unable to locate much
mitigation. Trial counsel explained that he
avoided the incident in which Floyd killed his
brother because he had spoken with a police
officer, who informed counsel that the prior
killing "was a whole lot worse [than the

43

charge indicated], toward the premeditated range."[34]

Despite the alleged failures of trial counsel to offer mitigation, a review of the record demonstrates that postconviction counsel did not offer a single family member, teacher, or acquaintance to provide information about Floyd's upbringing or with regard to any abuse or neglect that he allegedly suffered as a child. Rather, the only witnesses offered during the postconviction hearing were experts who testified with regard to Floyd's mental health. There was no non-mental-health-related evidence presented during the postconviction proceedings, and we conclude that Floyd has failed to establish that his trial counsel exhibited deficient performance with regard to the mitigation investigation. See generally Holland v. State, 916 So.2d 750, 757 (Fla. 2005) ("[C]ounsel cannot be deemed deficient for failing to investigate or present mitigation evidence unless the defendant establishes that mitigation exists." (emphasis supplied)).

With regard to the failure of trial counsel to object to the jury instruction that addressed nonstatutory mitigation, Floyd has not established that any purported error in the jury instruction satisfies the prejudice requirement of Strickland. In our decision that affirmed Floyd's conviction and sentence, we specifically held that when we further considered "the three strong aggravating factors present in this case, the possible mitigation factors, and the eleven-to-one jury recommendation for a sentence of death," we concluded that "a perfect instruction would not have in any way altered the jury's recommendation here." Floyd, 850 So.2d at 403 (emphasis supplied).

---

[34] See EH Tr. at 361.

Finally, with regard to the mitigating circumstance of age, we have held:

> [W]here the defendant is not a minor, as in the instant case, "no per se rule exists which pinpoints a particular age as an automatic factor in mitigation." [<u>Shellito v. State</u>, 701 So.2d 837, 843 (Fla. 1997)]. The existence and weight to be given to this mitigator depends on the evidence presented at trial and the sentencing hearing. <u>See id</u>. For example, this Court has held that age twenty, in and of itself, does not require a finding of the age mitigator. <u>See Garcia v. State</u>, 492 So.2d 360, 367 (Fla. 1986).
>
> In <u>Gudinas v. State</u>, 693 So.2d 953 (Fla. 1997), we held, "Although Gudinas is certainly correct that he had a troubling past and had always been small for his age, there was no evidence presented that he was unable to take responsibility for his acts and appreciate the consequences thereof <u>at the time of the murders</u>." <u>Id</u>. at 967. In that case, we found that there was substantial, competent evidence in the record to support the trial court's finding "that Gudinas was mentally and emotionally mature enough that his age should not be considered as a mitigator." <u>Id</u>.

<u>Nelson v. State</u>, 850 So.2d 514, 528–29 (Fla. 2003). In <u>Nelson</u>, this Court upheld the lower court's rejection of the age mitigator and concluded that evidence demonstrated the maturity of the defendant based on the following considerations:

> [H]e obtained and temporarily held a job; he provided his child's mother with money to buy necessities when she was visiting; Nelson did not

> have a home of his own, but arranged
> to stay with [others]; and Nelson
> did not have a driver's license or a
> car, yet was able to travel places
> on his own.

> Id. at 529. Here, at the time of the murder,
> Floyd was twenty-one years old and married, he
> maintained employment, and he assumed
> responsibilities for a household and his
> wife's children from a prior relationship.
> Since many aspects of Floyd's life were
> consistent with that of a mature adult, it was
> not unreasonable for trial counsel to conclude
> that the age mitigator was inapplicable.

> Accordingly, Floyd has failed to establish
> that trial counsel was ineffective, and we
> reject this claim.

Floyd, 18 So.3d at 452-55.

As this ineffectiveness claim was rejected on the merits by the Florida Supreme Court, there is a qualifying state court decision. Thus, this claim should be addressed applying the deferential standard for federal court review of state court adjudications required by AEDPA. The Court must next consider the "contrary to" and "unreasonable application" components of the statute. "It is the objective reasonableness, not the correctness per se, of the state court decision that we are to decide." Brown v. Head, 272 F.3d 1308, 1313 (11th Cir. 2001), cert. denied, 537 U.S. 978 (2002).

Upon a thorough review of the record and the applicable law, the Court concludes that the Florida Supreme Court's adjudication of this claim was not contrary to clearly established federal law,

did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Thus, Floyd is not entitled to relief on the basis of this claim.

Additionally, even assuming that the Florida Supreme Court's adjudication of this claim is not entitled to deference under AEDPA, Floyd's claim is still without merit.  After the evidentiary hearing, the state court resolved the credibility issue in favor of believing counsel's testimony as well as the testimony of Dr. Krop. The Court notes that credibility determinations are questions of fact.  See Martin v. Kemp, 760 F.2d 1244, 1247 (1985) (per curiam) (finding that factual issues include basic, primary, or historical facts, such as external events and credibility determinations). Here, Floyd has not rebutted the trial court's credibility finding by clear and convincing evidence.  See Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  Given the trial court's credibility determination, Floyd's claim is wholly unsupported, and therefore must fail.

In evaluating the performance prong of the Strickland ineffectiveness inquiry, there is a strong presumption in favor of competence.  The presumption that counsel's performance was reasonable is even stronger when, as in this case, counsel is an

47

experienced criminal defense attorney.[35]  The inquiry is "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  Strickland, 466 U.S. at 690.  "[H]indsight is discounted by pegging adequacy to 'counsel's perspective at the time' . . . and by giving a 'heavy measure of deference to counsel's judgments.'"  Rompilla v. Beard, 545 U.S. 374, 381 (2005) (citations omitted).  Thus, Floyd must establish that no competent attorney would have taken the action that counsel, here, chose.  United States v. Freixas, 332 F.3d 1314, 1319-20 (11th Cir. 2003).

"In considering claims that counsel was ineffective at the penalty phase of trial, [the Court must] determine 'whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court.'"  Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting Henyard v. McDonough, 459 F.3d 1217, 1242 (11th Cir. 2006)); see also Porter v. McCollum, 130 S.Ct. 447, 452 (2009) ("It is unquestioned that under the prevailing professional

---

[35] "When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger."  Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc), cert. denied, 531 U.S. 1204 (2001); see Williams v. Head, 185 F.3d 1223, 1229 (11th Cir. 1999) (noting that "[i]t matters to our analysis" whether the attorney is an experienced criminal defense attorney), cert. denied, 530 U.S. 1246 (2000).  Douglas Withee, an experienced public defender who had extensive death penalty experience, see EH Tr. at 286-89, referred to his "30 some years of practice," id. at 390, and "30-year track record," Resp. Ex. A-11 at 2013.

norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background'") (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 396 (2000)).  Given the record, counsel's performance was not deficient.

The State of Florida charged Floyd with first degree murder on August 5, 1998.  <u>See</u> Resp. Ex. A-1 at 11-12.  The next day, recommending Dr. Harry Krop, Ph.D., defense counsel moved for appointment of an expert, stating that he had "reason to believe" that "there may be statutory or nonstatutory mitigating circumstances which may only be discovered and presented by an expert mental health professional." <u>Id</u>. at 13, Motion for Appointment of Expert.  On August 11, 1998, the court granted Floyd's motion and appointed Dr. Harry Krop.  <u>Id</u>. at 19, Order Appointing Expert and Order of Transport.  Thus, defense counsel contacted Dr. Krop, a respected mental health expert, to assist in both the guilt and penalty phases of Floyd's trial.  On August 19, 1998, Dr. Krop evaluated Floyd.  <u>See</u> Resp. Ex. F-4 at 597, Dr. Krop's Statement of Services.

Prior to the trial, defense counsel and Dr. Krop had ongoing communications relating to the investigation and development of potential mitigation evidence.  Dr. Krop had a standard list of records he routinely requested from defense counsel to formulate his mental health opinion.  Accordingly, upon counsel's providing Dr. Krop with those requested records, Dr. Krop reviewed the

documentation, including school records, police records, medical records, and "various other relevant documents," which would have included Department of Corrections records as well as any depositions.  <u>See</u> Resp. Ex. F-4 at 624; EH Tr. at 320-21.  Defense counsel also provided Dr. Krop with copies of the October 15, 1998 interview with Floyd's parents and Floyd's proposed alibi.  <u>See</u> Resp. Ex. F-4 at 628; 631-47, Interview, dated October 15, 1998.[36] Undoubtedly, with the assistance of defense counsel, Dr. Krop possessed the documentation necessary to formulate his mental health opinion.

In an effort to obtain additional background information relating to Floyd, Dr. Krop also interviewed Floyd's parents.  <u>See</u> <u>id</u>. at 624, 647.  After conducting a clinical interview and mental health evaluation upon Floyd as well as a standard battery of psychological tests, Dr. Krop advised counsel that he believed his mental health testimony relating to Floyd could "cause the jury to

---

[36] At the close of the October 15, 1998 interview with Floyd's parents, defense counsel asked Floyd's mother if she would be willing to talk to Dr. Krop at a confidential interview, which she agreed to do.  Counsel then stated:

> His name is Dr. Harry Krop.  K R O P, I'm going to write down. He will be calling you and your husband to talk about this.  To determine whether or not we have any defenses of [sic] the mental illness.  Okay.

Resp. Ex. F-4 at 647.

view [Floyd] in a negative way." <u>See id</u>. Given the record,[37] Dr. Krop's stated that his ability to develop mitigation was hindered. <u>See</u> EH Tr. at 322, 341.

In light of Floyd's antisocial personality disorder diagnosis, the fact that Floyd killed his brother at age fourteen,[38] and the inconsistencies between the statements of Floyd's parents,[39] it was not unreasonable for counsel to conclude that any evidence offered in mitigation would be more harmful than beneficial to Floyd. Counsel concluded that he would not have wanted to present Floyd's antisocial personality disorder diagnosis to a jury. <u>See id</u>. at 323-24, 358-59. Recognizing Dr. Krop's extensive experience with capital cases and his ability to sift through various documents to formulate a mental health opinion and determine what mitigation evidence was available, counsel respected Dr. Krop's opinion that

---

[37] The record establishes that neither Floyd nor his parents were candid about his background. Moreover, Floyd's neurocognitive functions were within normal limits, and Floyd's testing did not show any memory or cognitive reasoning problems or signs of psychotic behavior.

[38] <u>See</u> Pet. Ex. 3 at 15-16 ("It is clearly noted by the court that should those mitigating factors have been advanced, the State would have an opportunity to discuss [Floyd's] criminal background including the violent death of his brother at age 14 which Mr. Withee had concluded would more likely make that a predominant feature of the case rather than others that he wished to shift the presentation to.").

[39] <u>See</u> Pet. Ex. 3 at 15 ("Mr. Floyd and his parents gave inconsistent information that would expose [Floyd] to allowing the jury to conclude that he was somehow trying to manipulate the mental health status which could be devastating to his defense.").

the jury would view his expert testimony negatively, and thus he would do more harm than good.

On this record, counsel's reliance upon Dr. Krop's advice was not unreasonable. As the Florida Supreme Court recognized, counsel conducted a reasonable investigation of mental health mitigation prior to trial, and worked closely with Dr. Krop in determining what mitigating evidence was available. Then, after consultation with Dr. Krop, made a strategic decision not to present any statutory mitigation evidence. Given the record, counsel's performance was within the wide range of professionally competent assistance.

With respect to the prejudice prong, Floyd "must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence. To assess that probability, [the Court must] consider 'the totality of the available mitigation evidence - both that adduced at trial, and the evidence adduced in the habeas proceeding' - and 'reweig[h] it against the evidence in aggravation.'" Porter, 130 S.Ct. at 453-54 (quoting Williams, 529 U.S. at 397-398); see also Sears v. Upton, 130 S.Ct. 3259, 3267 (2010) (finding that a proper prejudice analysis must take into account the newly uncovered mitigating evidence, along with the mitigation evidence introduced during the defendant's penalty phase trial, to assess whether there is a reasonable probability that the defendant "would have received a

different sentence after a constitutionally sufficient mitigation investigation") (citations omitted).

Thus, even assuming arguendo deficient performance by defense counsel, Floyd has not shown the resulting prejudice. Floyd has not shown that a reasonable probability exists that the outcome of the case would have been different if defense counsel had presented mental health mitigation. Therefore, Floyd's ineffectiveness claim is without merit since he has neither shown deficient performance nor resulting prejudice.

Moreover, as to Floyd's assertion that counsel was ineffective because he failed to request an instruction on age as a mitigating factor, the evidence at trial was that, at the time of the murder, Floyd was twenty-one years old, married, and employed. He had assumed responsibilities for a household and his wife's children from a prior relationship. Those facts showing the assumption of adult responsibilities and a mature lifestyle provided no basis for concluding that age could be considered as a mitigating factor. At the evidentiary hearing, counsel testified that he did not request an instruction on age as a mitigating factor because Floyd did not "fit the category." EH Tr. at 352. Counsel stated: "I don't assert things that I don't – that I can't back up. I couldn't back that one up." Id. at 353. Counsel's conclusion was a reasonable assessment of Florida law. See Gudinas v. State, 693 So.2d 953 (Fla. 1997); Garcia v. State, 492 So.2d 360, 367 (Fla. 1986). Given

the record, it was not unreasonable for counsel to conclude that the age mitigator was not applicable to Floyd. Even assuming arguendo deficient performance by defense counsel, Floyd has not shown the resulting prejudice.  Therefore, Floyd's ineffectiveness claim is without merit since he has neither shown deficient performance nor resulting prejudice.

Additionally, Floyd asserts that counsel failed to object to the trial judge's omission in the jury instruction on mitigation.[40] In reading the instructions to the jury at the penalty phase relating to mitigating circumstances, the trial judge stated that the jury could consider "any other circumstance of the offense" committed by Floyd.  Resp. Ex. A-11 at 2172. However, the standard jury instructions required that the trial judge instruct the jurors that they may consider as mitigation "[a]ny [other] aspect of the defendant's character, record, or background" and "[a]ny other circumstance of the offense." Floyd, 850 So.2d at 402-03 (quoting Fla. Std. Jury Instr. (Crim.) 113 (1997)).  Even assuming deficient performance for counsel's failure to object to the trial judge's omission in the jury instruction, as recognized by the Florida Supreme Court, Floyd has not shown resulting prejudice.  Id. at 403 (considering "the three strong aggravating factors present in this

---

[40] In ground 6(a) of the Petition, Floyd asserts that the trial judge improperly instructed the jury regarding mitigating factors when he said only that the jury could consider "[a]ny other circumstance of the offense." See Section VIII. F. Ground Six.

case, the possible mitigation factors, and the eleven-to-one jury recommendation for a sentence of death," and concluding that "a perfect instruction would not have in any way altered the jury's recommendation here"). Thus, Floyd's ineffectiveness claim is without merit. For all of the above-stated reasons, Floyd is not entitled to habeas relief with respect his ineffectiveness claims under ground one.

## B. Ground Two

As ground two, Floyd claims that (a) the shackling in front of the jury throughout his trial violated his Fifth and Fourteenth Amendment rights, as recognized in Deck v. Missouri, 544 U.S. 622 (2005); (b) defense counsel was ineffective because he failed to object to the shackling; and (c) appellate counsel was ineffective because he failed to raise the shackling issue on direct appeal. Floyd did not raise ground 2(a) on direct appeal, but instead raised grounds 2(a) and 2(b) in his Rule 3.851 motion. Additionally, Floyd raised ground 2(c) in his state habeas petition.

In addressing ground 2(a), the trial court stated, in pertinent part:

> Mr. Floyd's claim IV is based on the assertion that he is raising pursuant to Deck v. Missouri, _ U.S. _, 161 L.Ed.2d. 953, 125 S.Ct. 2007 (2005) which denounced that routine shackling of defendants as a matter of course i[s] not permitted during the penalty phase of a capital trial. Florida law requires that the trial courts protect the due process rights of

defendant[s] by avoiding unnecessary shackling during trials including penalty phase proceedings and has done so. Hill v. State, 921 So.2d 579 (Fla. 2006). The Hill case cited Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987). The State asserts that the claim has been available to Mr. Floyd since Mr. Floyd's trial in 1999 and, therefore, is procedurally barred since it could and should have been raised on direct appeal. Therefore, the court finds that the argument is procedurally barred.

P. Ex. 3 at 16.   Upon Floyd's appeal, the Florida Supreme Court

stated:

Floyd next contends that his constitutional rights were violated when he was shackled during his capital murder trial without any determination by the court that shackling was necessary. Evidence offered during the evidentiary hearing established that the purported "shackle" consisted of a leg brace that Floyd was compelled to wear on his leg while he was in the courtroom and before the jury.

. . . .

In support of this claim, Floyd relies upon the decision of the United States Supreme Court in Deck v. Missouri, 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005), that "courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding." Id. at 633, 125 S.Ct. 2007 (emphasis supplied). However, the Court also clarified that this constitutional directive is not absolute: "It permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling. In so doing, it accommodates the important need to protect the courtroom and its occupants." Id. Moreover, Deck, which was decided in 2005, does not

apply retroactively. See Marquard v. Sec'y, Dep't of Corr., 429 F.3d 1278, 1311 (11th Cir. 2005), cert. denied, 547 U.S. 1181, 126 S.Ct. 2356, 165 L.Ed.2d 283 (2006), and Floyd's criminal trial occurred in 2000.[41]

Although Deck does not apply to Floyd, "[s]ince at least 1987, the law in Florida has been that shackling a defendant during the penalty phase without ensuring that his due process rights are protected is a sufficient ground for reversing a death sentence." Hill v. State, 921 So.2d 579, 585 (Fla. 2006). A claim based on unconstitutional shackling, however, is procedurally barred unless raised on direct appeal. See Sireci v. State, 773 So.2d 34, 41 n.11 (Fla. 2000). Since a challenge to the leg brace worn by Floyd was not raised on direct appeal, this claim is procedurally barred.

Floyd, 18 So.3d at 456-57.

Respondents contend, and this Court agrees, that ground 2(a) is procedurally barred since it was raised in a procedurally incorrect manner in state court. See Response at 43, 47-49. The procedural bar identified above by the Florida Supreme Court is regularly imposed and was not applied in an arbitrary manner. See Spencer v. Sec'y, Dep't of Corr., 609 F.3d 1170, 1179 (11th Cir. 2010) (recognizing "[t]here is no doubt that, under Florida law, a claim is procedurally barred from being raised on collateral review if it could have been, but was not raised on direct appeal"), cert. denied, 131 S.Ct. 1049 (2011). Floyd has not shown

---

[41] Floyd's trial was in April 1999 well before the 2005 decision in Deck.

either cause[42] excusing the default or actual prejudice resulting from the bar.  Moreover, Floyd has failed to identify any fact warranting the application of the fundamental miscarriage of justice exception.  Even assuming the claim is not procedurally barred, it is nevertheless without merit.  See Floyd, 18 So.3d at 457-59.

With respect to ground 2(b) relating to the ineffectiveness of trial counsel because he failed to object to the shackling, Floyd raised the issue in his Rule 3.851 motion.  After an evidentiary hearing, the trial court,[43] in denying the Rule 3.851 motion with respect to this issue, stated:

> [I]f the case were considered on its factual basis, the essence of the case is that the courts do not wish to have constraints or "shackles" that are visible to the jury, whether in the guilt phase or penalty phase of a capital murder trial. The theory is when shackles are visible to the jury, they may influence the jury to abandon the presumption that the defendant is innocent in the guilt phase of the proceeding or to perceive that he

---

[42] To the extent that Floyd asserts, as cause to excuse the default, that appellate counsel was ineffective because he failed to raise the issue on direct appeal, that claim is without merit. See Floyd, 18 So.3d at 459 ("Floyd's challenges to his alleged shackling are without merit" and therefore "the failure of appellate counsel to raise this challenge does not constitute deficient performance.") (citation omitted).

[43] Circuit Court Judge William A. Parsons presided over the guilt and penalty phases of Floyd's trial as well as the evidentiary hearing on the Rule 3.851 motion. See Resp. Exs. A-8; A-9; A-10, Transcripts of the Jury Trial; A-11, Penalty Phase; A-12, Spencer hearing; G-1; G-2; G-3, Transcripts of the Evidentiary Hearing.

is a bad or dangerous person while considering whether to recommend a death sentence during the penalty phase. The case applies only to visible shackles.

At the evidentiary hearing, Mitch Holbrook,[44] the bailiff at Mr. Floyd's trial, testified that Mr. Floyd did not ever have shackles on during either the guilt/innocence or penalty phase of the trial. The restraint employed was a leg brace device.[45] The device essentially is a hinged metal device that is secured around the ankle region and upper thigh in such a way that when it straightens out totally, it locks into place.[46] The effect of the brace would mean that the leg would be locked in place which would make it difficult or impossible for the defendant to run. The device itself is under the pants leg of the defendant and is not visible.

By practice defendants were not typically walked in and out of the courtroom in the jury's presence and each of the defendants was instructed on the operation of the leg brace so it would not lock into position.[47] The testimony of Mr. Holbrook and other evidence at the evidentiary hearing indicated that Mr. Floyd himself testified that he wore the brace during the trial and claimed that it caused him to "limp" when he had to walk wearing it.[48] He recalled walking to the judge's bench for a bench conference once during trial

---

[44] According to the transcript of the evidentiary hearing, the bailiff's surname is "Halbrook."  See EH Tr. at 459.

[45] See EH Tr. at 460.

[46] See EH Tr. at 461-62.

[47] See EH Tr. at 462, 470.

[48] See EH Tr. at 485, 486.

and he claimed that the leather strap would be visible around his ankle.[49]

Quite the contrary, Mr. Withee, defense counsel, testified that he did not remember anything about the leg brace. He did not remember anything that stood out or that the leg brace ever became a problem. Mr. Withee himself indicated that he had been "very aware" of the issue of visible shackling, jail garb and the like throughout his 30 year career and has always been "an advocate of no braces of any kind" although he stated he would not object if there was a legitimate security issue and the restraint used was not visible to the jury.[50]

Factually during this case, Mr. Floyd had the leg brace on underneath his clothes during the guilt/innocence phase. During [the] penalty phase the bailiffs proposed putting Mr. Floyd in cuffs or leg shackles that would have been visible to the jury.[51] Mr. Withee objected[52] and a hearing was held. This court directed that the shackles not be used during the penalty phase and that the same constraint used during the guilt/innocence phase, that being the leg brace, continue to be used.[53]

The court at the time did not consider the leg brace to be a shackle and it clearly was not a visible constraint of any kind. The leg brace was a security device used to protect the court, the court staff, the public, the bailiffs, and counsel from a defendant who has now killed twice. The constraint was reasonable and invisible to the jury. At best they saw an ankle [st]rap around

---

[49] See EH Tr. at 486, 488.

[50] See EH Tr. at 390-91.

[51] See Resp. Ex. A-11 at 2011-12.

[52] See Resp. Ex. A-11 at 2012-14.

[53] See Resp. Ex. A-11 at 2016-17.

the lower part of the device. To spring to a conclusion that this is somehow a shackle or constraint requires a level of sophistication that is unlikely and clearly has not been established by the proof. When the issue was raised at the beginning of the penalty phase, the court ruled in favor of Mr. Withee and would not allow the shackles to be used during the penalty phase.[54] Mr. Withee does not remember any noise or snapping[55] that current counsel demonstrated at the time of the evidentiary hearing and there is absolutely no evidence that any such snapping ever took place. If it had[,] the attorney sitting next to the defendant would obviously have heard it and he did not.[56]

While defense counsel wishes to speculate that the jury somehow saw an ankle [st]rap and concluded that the defendant was shackled seems to be in the assertion of wild speculation. The claim that the bailiffs or other court personnel may have explained the purpose of the brace to the jurors if they were curious about the leg mechanism is an absurd statement without any legal support.

It should be noted that the Putnam County Courthouse is a relatively small courthouse of ancient origin. Somehow the defendant presumes that the jury expects people charged with first degree murder to be walking to and from the courthouse every day at the beginning and the end of trial. It would not take a rocket scientist to conclude that the defendant is not coming and going with all others to and from the courtroom on a daily basis. The purpose for avoiding constraints is to avoid the negativity associated with those constraints. Obviously we have seen defendants appear in cages in civil countries and heavily shackled which creates an aura that detracts

---

[54] See Resp. Ex. A-11 at 2017.

[55] See EH Tr. at 416.

[56] See EH Tr. at 416.

from the jury's duty to first presume a person
innocent during the guilt/innocence phase and
second to provide the defendant with freedom
from negative influences during the important
penalty phase. Both of those goals were met in
this case by this trial judge. The leg device
is a commonly used device that is not visible
under the clothing of Mr. Floyd. Even if one
or more of the jurors had seen the ankle
portion of the device, there is really no
logical reason they would conclude that was a
restraint or anything other than a brace of
some kind.   The jury is instructed not to
receive information about the case other than
during the course of the trial from the
witness stand and evidence offered in trial.
To presume that they somehow went on some type
of search to discover information about the
brace is without record support and patently
absurd. When the deputy sheriffs sought to
actually use shackles, during the penalty
phase, Mr. Withee objected and the court, as
is its obligation, held a hearing. The court
concluded that level of security was not
necessary and the shackles were not used.[57]

    There is no evidence that Mr. Withee has
been ineffective in regard to the constraint
issue.   In  fact,  the  evidence  is  to  the
contrary. The minute visible constraints were
proposed, Mr. Withee objected, his objection
was heard and his objection was sustained. To
now try to manufacture something that did not
occur demeans the process. In regard to the
shackling issue, there has been neither a
showing that Mr. Withee was ineffective or
that there was any actual prejudice within the
meaning of <u>Strickland</u>. <u>See</u> <u>also</u> <u>Eutzy v.</u>
<u>State</u>, 536 So.2d 1014 (Fla. 1985).

P. Ex. 3 at 16-19 (emphasis added).   Upon Floyd's appeal, the

Florida Supreme Court affirmed the circuit court's denial of post

---

[57] <u>See</u> Resp. Ex. A-11 at 2011-17.

conviction relief with respect to this claim, stating in pertinent part:

> Under the facts of the present case, Floyd fails to establish that his counsel was deficient. Trial counsel actually objected to the proposed use of cuffs and leg shackles during the penalty phase, and his objection was successful. The trial court ordered that the shackles be removed and that a leg brace be used instead. With regard to this brace, there was competent, substantial evidence to support the conclusion of the postconviction court that not even trial counsel was aware of the brace worn by Floyd.[58] The brace was attached to Floyd's leg, and was worn under his pants so the only time the brace could have been seen was if Floyd sat down and his pant leg moved up. Moreover, even if counsel had been aware of the brace, it is unlikely that an objection to the use of the brace would have been successful in light of the unobtrusiveness of the restraint measure and the need to protect the occupants in the small courtroom from Floyd, who was short-tempered and had already killed two people. Furthermore, without presenting any evidence indicating that anyone in the courtroom - especially the jurors - noticed the brace, Floyd fails to demonstrate that he was prejudiced by the failure of counsel to assert further challenges. Accordingly, Floyd is not entitled to relief based on this constitutional/ineffectiveness claim.

Floyd, 18 So.3d at 457-58 (footnote omitted).

As this ineffectiveness claim was rejected on the merits by the Florida Supreme Court, there is a qualifying state court decision. Thus, this claim should be addressed applying the deferential standard for federal court review of state court

---

[58] See EH Tr. at 416-17.

adjudications required by AEDPA.   Upon a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.   Thus, Floyd is not entitled to relief on the basis of this claim.   Additionally, even assuming that the state court's adjudication of this claim is not entitled to deference under AEDPA, Floyd's ground 2(b) is still without merit since he has shown neither deficient performance nor resulting prejudice.

Moreover, Floyd raised ground 2(c) (appellate counsel was ineffective because he failed to raise the shackling issue on direct appeal) in his state habeas petition.   In denying the claim on the merits, the Florida Supreme Court stated:

> In this claim, Floyd adopts and incorporates all claims he made in his rule 3.851 appeal based on his purported shackling during the penalty phase. Further, since the postconviction court found that any shackling challenges should have been raised on direct appeal, Floyd contends appellate counsel was ineffective for the failure to raise this challenge. However, as previously discussed, Floyd's challenges to his alleged shackling are without merit. Therefore, the failure of appellate counsel to raise this challenge does not constitute deficient performance. See Rutherford, 774 So.2d at 643.

Floyd, 18 So.3d at 458-59.  Applying the deferential standard for federal court review of state court adjudications required by AEDPA, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law and did not involve an unreasonable application of clearly established federal law.  Nor was the decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Thus, Floyd is not entitled to relief on the basis of this claim.

Even assuming that the state court's adjudication of this claim is not entitled to deference under AEDPA, Floyd's ineffectiveness claim is without merit.  A petitioner asserting ineffective assistance of appellate counsel "must show that counsel's performance was so deficient that if fell below an objective standard  of reasonableness as well as demonstrate that but for the deficient performance, the outcome of the appeal would have been different."  Ferrell v. Hall, 640 F.3d 1199, 1236 (11th Cir. 2011) (quoting Black v. United States, 373 F.3d 1140, 1142 (11th Cir. 2004)).  Appellate counsel's performance was not deficient for failing to include the shackling issue on direct appeal since it had no merit.  Indeed, even if appellate counsel had raised the issue on direct appeal, it would have been unsuccessful before the Florida Supreme Court, as evidenced by the ruling of the Florida Supreme Court with respect to his habeas petition.  See Floyd, 18 So.3d at 458-59.  Accordingly, Floyd's

ground 2(c) is without merit since Floyd has neither shown deficient performance nor resulting prejudice.

## C. Ground Three

Floyd asserts that (a) counsel was ineffective because he failed to investigate and challenge the competency of the child witnesses; (b) the State concealed relevant information concerning the children's incompetence in violation of Brady v. Maryland; and (c) the state post-conviction court denied Floyd access to evidence of the psychological counseling and preparation provided to the children. Floyd raised these issues in claim I(a) of his Rule 3.851 motion. After the evidentiary hearing, the trial court identified the two-prong Strickland ineffectiveness test and Brady as the controlling law and denied the Rule 3.851 motion with respect to these issues, stating in pertinent part:

> Mr. Floyd argues that Mr. Withee, counsel for the defendant, was ineffective regarding the presentation of information from Mrs. Goss' grandchildren, J.J. Jones and LaJade Evans. Mr. Floyd argues that J.J. Jones wears glasses, that Garry Wood, the prosecutor, told LaJade how to testify, that Ms. Hoffrich[t]er "prepped" the child witnesses, that the State violated Brady v. Maryland, 373 U.S. 83 (1963) by failing to advise defense counsel the children were "prepped" and that Mr. Withee failed to prepare for the children's testimony.

> Mr. Floyd has the burden of proof on an ineffective assistance claim to show (1) counsel's representation fell below an objective standard of reasonableness; and (2) but for counsel's unprofessional errors, the result of the proceeding would have been

66

different. <u>Strickland</u>, supra. On the <u>Brady</u>
claim, Mr. Floyd's burden is to show (1)
evidence favorable to the accused, because it
is either exculpatory or impeaching, (2) that
the evidence was suppressed by the State,
either willfully or inadvertently, and (3)
that prejudice ensued. <u>Guzman v. State</u>, 868
So.2d 498 (Fla. 2003). Prejudice under the
<u>Brady</u> analysis is measured by determining
"whether 'the favorable evidence could
reasonably be taken to put the whole case in
such a different light as to undermine
confidence in the verdict.'" <u>Carol v. State</u>,
815 So.2d 601 (Fla. 2002).

The issue raised by Mr. Floyd as to
whether or not J.J. Jones wears glasses is a
non-starter. J.J.'s mother, Trelane Jackson,
testified that J.J. wore glasses for a short
time, although she could not recall whether it
was before or after her mother, Mary Goss, was
killed.[59] Mr. Wood, the prosecuting attorney,
did not recall J.J. wearing glasses nor did he
ever recommend that J.J.'s eyesight be
checked.[60] There seems to be no reliable
proof that he [(J.J.)] was wearing glasses at
the time of the incident or that he had any
sight problems at all. Mr. Floyd has totally
failed on this issue to the extent that his
ability to see what was happening was actually
affected and that somehow his ability to see
the events would be something other than what
he testified to. Since J.J. was able to lead
police to his grandmother's body, it is quite
obvious that J.J. had perceived the events he
described and nothing presented by Mr. Floyd
reliably challenges that conclusion.

Mr. Floyd also attempts to make an issue
of a statement made by LaJade Evans to the
effect that Mr. Wood, the prosecutor, told
them what to say.[61] When Mr. Wood testified

---

[59] <u>See</u> EH Tr. at 102.

[60] <u>See</u> EH Tr. at 261-62.

[61] <u>See</u> Tr. at 1717.

at the hearing his testimony was that the
child witnesses were not coached or told what
to say or how to testify beyond sitting up
straight and telling the truth.[62] The court
finds the testimony of Mr. Wood believable and
there is no basis to conclude that the
children were told what to say on the record
in this cause.

Mr. Floyd next claims that Mickey
Hoffrichter from the Children's Home Society
"prepped" the child witnesses regarding their
trial testimony and that the State violated
Brady v. Maryland, 373 U.S. 83 (1963) by
failing to advise defense counsel that the
children were "prepped." Ms. Hoffrichter was
listed as a witness in the case and she
originally had the potential to testify in
regard to victim impact involving the
children. As one might expect, children of
such a tender age who had seen and been in the
proximity of the murder of their beloved
grandmother would be adversely affected by
such violence and the loss of a person they
care so deeply for. Counselors regularly
perform the role of counseling people who are
going through difficult periods of time
associated with grief, especially of this
magnitude, and involving children of tender
years. There is some suggestion that efforts
were made to make the children more
comfortable by showing them the courtroom, the
witness chair, and the general layout so that
they would not be stunned when they were
required to come forward.[63] This is not only
garden variety civility on the part of a
counselor and/or prosecutor, but is meant to
diminish the traumatic impact that sometimes
occurs when young children are required to
provide testimony in cases like this one.
There is absolutely no evidence that suggests
that the witnesses were coached or told what
to say and there is no evidence that they

---

[62] See EH Tr. at 263-65.

[63] See EH Tr. at 234, 258.

testified to any facts or circumstances that had been provided to them that were not true.[64] The threshold in regard to this claim has not been met.

Mr. Floyd further asserts that Mr. Withee did not prepare for the testimony of these young children. Mr. Withee himself is an experienced litigator who has been handling serious and difficult cases since 1966 and had specialized in capital cases for some time at the time this case was tried.[65] Evidently after a short stay in another Public Defender's office handling lower level cases, he has returned to handling capital cases at this time. Mr. Withee indicated that from a strategy standpoint he relied upon the court to qualify the child witness and would not generally interfere unless the trial court's actions in that regard were inadequate.[66] By strategy Mr. Withee explained that he did not want to antagonize a jury, especially a death qualified jury, by making "spurious objections" just to make them.[67] As the State points out, Mr. Withee stated that his strategy regarding child witnesses was as follows:

"And also know I am dealing with kids all the time and I have - what do you say in the theatre, kids and animals, you are going to be out shown? I don't - I don't - I don't attack children. Almost always depose them to find out what kind of kids they are, to talk to anybody who shows up at the deposition about have they had a tendency to lie, things like that, if that's possible, but I certainly don't

---

64 See EH Tr. at 419.

65 See EH Tr. at 406.

66 See EH Tr. at 405.

67 See EH Tr. at 392-93.

attack them in any manner in the courtroom unless I am dead dog certain that I have an iron clad liar in my hands and I can prove it."[68]

His evaluation of Mrs. Goss' grandchildren was that they were nice kids and they were on the verge of tears through the whole time that they were testifying about their grandmother.[69] This court finds that the approach of Mr. Withee is consistent with the actions and conduct of a reasonable lawyer under the same or similar circumstances and that his decision to handle these child witnesses on a low key approach made practical and strategic sense based on the facts of this case.

In addition Mr. Floyd claims that Mr. Withee's failure to object to [im]permissible hearsay and bolstering regarding Corporal Stokes, Officer Zike, Jeanette Figuero and Gary Melendez and that the failure constitutes allowing impermissible hearsay and bolstering. As noted above, Mr. Withee clearly stated that his strategy on the appropriate use of objections was that he would not pepper the record with unnecessary objections for fear of irritating the jury during the course of the trial which conversely indicates that he would only object on bases that were clearly sound and relevant. An attorney is not ineffective for decisions that are part of the trial strategy that, in hindsight, did not work out to the defendant's advantage. Strickland, 466 U.S. at 689.

Mrs. Figueroa, who testified at trial, indicated that the children just told her what had happened saying their grandmother was shot when she asked them what was the matter. There was no contemporaneous objection to the

---

[68] See EH Tr. at 406.

[69] See EH Tr. at 406-07.

question, an issue that was dealt with in
regard to Mr. Floyd's appeal. She apparently
went on to confirm that she believed J.J.'s
version of the events and stated that J.J. was
a bright child, all without objection. In the
direct appeal of Floyd v. State, 850 So.2d 383
(Fla. 2002), the court found these issues to
be harmless error which in essence is a
finding that there has been no prejudice.[70]

On Claim I(a), Mr. Floyd has failed to
meet either prong of the Strickland case. He
has failed in his burden to show that the
conduct of Mr. Withee was defective and even
if the alleged conduct was defective, there
has been no showing of prejudice to the extent
that the confidence and the outcome would be
eroded.

Pet. Ex. 3 at 4-7 (emphasis added); Resp. Ex. F-7 at 1262-65

(emphasis added).  Upon Floyd's appeal, the Florida Supreme Court

affirmed the circuit court's decision as to these issues, stating

in pertinent part:

A. Ineffective Assistance - Competency of a
Child Witness

Floyd first contends that trial counsel
was ineffective for the failure to investigate
and challenge the competency of a child
witness.  This claim is without merit.

. . . .

In Florida, whether a child witness is
competent to testify is based on "his or her
intelligence, rather than his or her age, and,
in addition, whether the child possesses a
sense of obligation to tell the truth." Lloyd
v. State, 524 So.2d 396, 400 (Fla. 1988); see
Bell v. State, 93 So.2d 575, 577 (Fla. 1957).
Accordingly, when evaluating the competency of

---

[70] See Floyd, 850 So.2d at 400.

a child, the trial court should consider the following:

> (1) whether the child is capable of observing and recollecting facts; (2) whether the child is capable of narrating those facts to the court or to a jury, and (3) whether the child has a moral sense of the obligation to tell the truth.

Griffin v. State, 526 So.2d 752, 753 (Fla. 1st DCA 1988) (citing Lloyd, 524 So.2d at 400); see also Baker v. State, 674 So. 2d 199, 200 (Fla. 4th DCA 1996). The trial judge has the discretion to decide whether a witness of tender age is competent to testify and, accordingly, the decision to allow a child to testify is reviewed for abuse of discretion. See Lloyd, 524 So. 2d at 400.

Here, a sufficient factual basis existed for trial counsel to reasonably conclude that LaJade and J.J. were competent witnesses. Trial counsel deposed both children before trial and had the opportunity to observe their demeanor.[71] At these depositions,[72] counsel questioned the children about their relationships with the victim and the defendant, their memories of the murder, and their abilities to relate the event truthfully. Each child answered the questions clearly and consistently. Despite a few minor discrepancies (which were understandable due to the speed at which the events unfolded, and the shocking effect of witnessing their grandmother's murder), the versions of the event given by these two prospective witnesses corroborated each other. Therefore, it was reasonable for trial counsel to rely upon what he observed during the deposition[s] to

---

[71] See EH Tr. at 368.

[72] See Resp. Ex. A-2 at 228-44, Video Deposition of LaJade Evans; 245-51, Video Deposition of Alexander Evans; 252-66, Video Deposition of Jeritz Jones.

conclude that LaJade and J.J. were capable of observation and recollection of facts, were capable of narration with regard to those facts, and had a moral sense of the obligation to tell the truth. See Griffin, 526 So.2d at 753.

Trial counsel was not deficient when he made a strategic decision not to challenge the qualification of the witnesses by the trial court or otherwise attack the children's competency. During the evidentiary hearing, trial counsel testified that his general practice was not to verbally attack a child unless he could prove with certainty that the child was lying.[73] This practice was consistent with trial counsel's articulated strategy, which was not to antagonize a "death qualified jury."[74] Indeed, an attorney who aggressively questions a distressed child runs a high risk of alienating jurors, something which a capital defendant should avoid.[75] Accordingly, the decision of trial counsel here constituted reasonable strategy.

We further conclude that Floyd has failed to establish that he was prejudiced by a failure to object. The two child witnesses were sufficiently examined and properly qualified by the court. Specifically, LaJade proved her intelligence level by correctly counting numbers and reciting the alphabet.[76] She also understood her obligation to tell the truth "no matter what."[77] Likewise, J.J. established his intelligence in that he stated his education level and the subjects he studied in school, and he made an earnest effort to pass the judge's "quiz" on

---

[73] See EH Tr. at 405-06.

[74] See EH Tr. at 392, 398-99.

[75] See EH Tr. at 392-94, 406-07.

[76] See Tr. at 1695-1703.

[77] See Tr. at 1700-01.

mathematics.[78] J.J. also understood the concept of lying, the consequence of lying, and his obligation to tell the truth. Finally, J.J. promised to answer each question truthfully.[79] Based on their answers, the trial court properly concluded that LaJade and J.J. were competent witnesses, and any objection presented by trial counsel would have been meritless. See Baker, 674 So.2d at 200-01 (finding no abuse of discretion where the trial court qualified a six-year-old child after the child demonstrated that she knew her age, where she went to school, where she went to church, and the colors of clothing; the child established that she possessed a sense to tell the truth; and the child stated that she knew it was wrong to lie).

Floyd seems to contend that the in-court voir dire examination of La Jade and J.J. was insufficient to establish competency, and that a separate hearing was required. However, a separate hearing has never been required, and Floyd's argument is without merit. See, e.g., Glendening v. State, 536 So.2d 212, 216 (Fla. 1988) (child witness questioned on voir dire at the beginning of her videotaped testimony); Bennett v. State, 971 So.2d 196, 198 (Fla. 1st DCA 2007) (trial court conducted a competency examination on the morning of the trial). Floyd also suggests that the allegedly contradictory statements of LaJade and J.J. create doubts with regard to the competency of the children to testify. We disagree. Most of these statements are mere imperfect expressions attributable to the witnesses' tender age and do not affect the material portions of the children's testimony. See Lloyd, 524 So.2d at 400 (holding that the inconsistencies in various statements were nothing more than what one could expect from a child of five or six years of age and were not so egregious as to require the total rejection

_____

[78] See Tr. at 1721-26.

[79] See Tr. at 1726.

of the testimony). Further, although there was a discrepancy between the testimony of the children with regard to the physical location of Floyd when the third gunshot was fired,[FN7] this discrepancy can be explained by the location of the witnesses, each of whom had a different view from which to observe the shooting. Accordingly, the failure to challenge the competency of the child witnesses did not render trial counsel ineffective.

> FN7. LaJade testified that Floyd left Ms. Goss's porch to chase the victim before firing the third shot. Conversely, J.J. testified that he never saw Floyd leave the porch.

### B. Ineffective Assistance - Hearsay

Floyd next contends that trial counsel was ineffective for the failure to timely object to various hearsay statements admitted during trial with regard to the children's identification of Floyd as the shooter and to the testimony of Figuero that J.J. was "smart" and "bright." We conclude that Floyd is not entitled to relief.

First, trial counsel's performance was not deficient because counsel testified during the evidentiary hearing that he made a strategic decision "not to pepper the record with unnecessary objections for fear of irritating the jury."[80] Moreover, the record demonstrates that trial counsel objected to most of the hearsay testimony with which Floyd takes issue. One hearsay statement to which trial counsel did not object was the statement of Ms. Figuero's son, who testified that he heard J.J. inform Ms. Figuero that Floyd shot Ms. Goss. However, trial counsel was not deficient for failing to object because J.J.'s statement qualified as an excited utterance. This exception to the hearsay rule authorizes

---

[80] See EH Tr. at 392-93.

admission of hearsay containing "[a] statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." § 90.803(2), Fla. Stat. (Supp. 1998). A statement qualifies as an excited utterance if it was made (1) with regard to an event that was startling enough to cause nervous excitement, (2) before there was time for the declarant to contrive or misrepresent, and (3) while the declarant was under the stress or excitement caused by the event. See Johnson v. State, 969 So.2d 938, 949 (Fla. 2007), cert. denied, -- U.S. --, 128 S.Ct. 2056, 170 L.Ed.2d 799 (2008).

Here, J.J.'s immediate statement related to the shooting of his grandmother by his stepfather, an event that is without question shocking enough to cause nervous excitement. The statement was made within seconds of Ms. Goss's murder and while the children were running from the murder scene. The children were panicking, crying, and begging for help when they spoke to Figuero. The record supports a finding that J.J. did not have time to contrive or misrepresent, and that he was still under the stress caused by the startling event when he made this statement. See Williams v. State, 967 So.2d 735, 748-49 (Fla. 2007) (holding that the declarant's 911 statements approximately twenty minutes after she was stabbed qualified as an excited utterance), cert. denied, -- U.S. --, 128 S.Ct. 1709, 170 L.Ed.2d 519 (2008); Damren v. State, 838 So.2d 512, 520 (Fla. 2003) (holding that statement qualified as an excited utterance where it was made shortly after the victim's murder, the declarant was in a highly agitated state when he made the statements, and the declarant feared for his own life because of the homicide he had just witnessed); Ware v. State, 596 So.2d 1200, 1201 (Fla. 3d DCA 1992) (declarant's call to 911 after finding her son bleeding profusely from a neck wound qualified as an excited utterance).

Floyd also contends that trial counsel was deficient for the failure to object to Figuero's comment that J.J. was "bright" and "smart," and that this testimony constituted impermissible bolstering of J.J. as a witness. We disagree. Counsel testified during the evidentiary hearing that he made a strategic decision to limit unnecessary objections to avoid "irritating the jury during the course of the trial." Trial counsel was not ineffective for following a trial strategy that, in hindsight, did not ultimately result in the defendant's acquittal. <u>See</u> <u>Dufour v. State</u>, 905 So.2d 42, 62 (Fla. 2005). Floyd has also failed to demonstrate prejudice because there was no reasonable probability that, had trial counsel objected, the results of the trial would have been impacted, and our confidence in this outcome is not undermined. The record demonstrates that J.J. was properly qualified by the court and had shown sufficient intelligence to testify with coherence, consistency, and clarity. It is unlikely that Figuero's isolated comments with regard to J.J. as a "bright" and "smart" child impacted the jury's evaluation of his actual testimony, and they do not undermine our confidence in the outcome here.

Accordingly, this claim is without merit.

<u>C. Denial of Postconviction Discovery Request</u>

Floyd next challenges the postconviction court's denial of his requests to subpoena the counseling records of the three children and to depose J.J.[FN8] The ruling of a postconviction court on a motion for discovery is reviewed for an abuse of discretion. <u>See</u> <u>Reaves v. State</u>, 942 So.2d 874, 881 (Fla. 2006). With regard to the counseling records of the children, the Florida Evidence Code generally provides that records made during the course of treatment of a patient's mental or emotional condition are privileged:

> FN8.   Although trial counsel initially sought to depose all three

77

children, the request later was
limited solely to J.J.

A patient has a privilege to refuse to
disclose, and to prevent any other person from
disclosing, confidential communications or
records made for the purpose of diagnosis or
treatment of the patient's mental or emotional
condition . . . between the patient and the
psychotherapist, or persons who are
participating in the diagnosis or treatment
under the direction of the psychotherapist.
This privilege includes any diagnosis made,
and advice given, by the psychotherapist in
the course of that relationship. § 90.503(2),
Fla. Stat. (2005). This privilege may be
claimed by certain individuals, including the
patient himself or herself, see id.
§90.503(3)(a), and the psychotherapist on
behalf of the patient. See id. § 90.503(3)( d)
("The authority of a psychotherapist to claim
the privilege is presumed in the absence of
evidence to the contrary."). Here, the
postconviction record reflects that legal
counsel for the entity that provided the
children with counseling "absolutely" asserted
that the records were privileged and
confidential.[FN9]

> FN9. This assertion was communicated
> to the trial court by way of the
> State because the entity did not
> receive notice that Floyd sought the
> records of the children.

In State v. Roberson, 884 So.2d 976, 979 (Fla.
5th DCA 2004), review denied, 895 So.2d 406
(Fla. 2005), the Fifth District Court of
Appeal held that "neither the Evidence Code,
nor any applicable constitutional principle
allows the invasion of a victim's privileged
communications with her psychotherapist." The
district court quashed a trial court order
that granted discovery into the mental health
records of a child sex-crime victim and quoted
the United States Supreme Court for the
proposition that

78

[e]ffective psychotherapy... depends
upon an atmosphere of confidence and
trust in which the patient is
willing to make a frank and complete
disclosure of facts, emotions,
memories, and fears. Because of the
sensitive nature of the problems for
which individuals consult
psychotherapists, disclosure of
confidential communications made
during counseling sessions may cause
embarrassment or disgrace. For this
reason, the mere possibility of
disclosure may impede development of
the confidential relationship
necessary for successful treatment.

Id. (quoting Jaffee v. Redmond, 518 U.S. 1,
10, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996)).
Despite the statutory privilege, section
394.4615(2)(c), Florida Statutes (2005),
allows a court to order the release of
confidential clinical records when "there is
good cause for disclosure."

Here, postconviction counsel contended that he
sought the records in light of the fact that
the prosecutor had at one time expressed
concern about the mental health of the
children. However, this does not constitute
"good cause." Rather, it is completely
reasonable, if not expected, for children who
witnessed the murder of their grandmother to
have psychological issues arising from the
event. Moreover, during trial, J.J. and LaJade
were qualified by the trial court for
competency and testified with regard to the
events that occurred on the night of the
murder. Accordingly, the jury had the
opportunity to observe the children and weigh
their credibility when it evaluated the guilt
or innocence of Floyd. We do not understand
what disclosure of these privileged
communications could have achieved at the
postconviction stage. Consequently, Floyd has
failed to demonstrate that the postconviction
court abused its discretion when it denied the

request to compel disclosure of counseling records.

With regard to deposing J.J., postconviction counsel asserted that he wished to inquire with regard to lighting conditions on the night of the murder and the ability of J.J. to observe the person who was in Ms. Goss's house. However, as previously noted, the trial court determined competency before he testified. Accordingly, any issue with regard to his competency should have been raised on direct appeal and is procedurally barred at this time. Further, while postconviction counsel certainly may assert that trial counsel was ineffective for the failure to question J.J. about lighting conditions, we agree with the trial court that to depose J.J. seven years after the murder merely to adduce whether any part of his recollection has changed is of dubious relevance to an effectiveness evaluation of trial counsel. We find no abuse of discretion on the part of the trial court when it denied the request to depose J.J.

Floyd, 18 So.3d at 443-48 (emphasis deleted).

Since these claims were rejected on the merits by the Florida Supreme Court, there is a qualifying state court decision. Accordingly, applying the deferential standard for federal court review of state court adjudications required by AEDPA and reviewing the record and the applicable law, the Court concludes that the state court's adjudication of these claims was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceedings.  Thus, Floyd is not entitled to relief on the basis of these claims.

Additionally, even assuming that the Florida Supreme Court's adjudication of these claims is not entitled to deference under AEDPA, Floyd's claims are still without merit.  Given the record, there was a sufficient factual basis for trial counsel to reasonably conclude that J.J. and LaJade were competent witnesses. Counsel cannot be faulted for his decision not to challenge the trial court's qualification of J.J. and LaJade to testify or otherwise attack the children's competency.  See EH Tr. at 394, 405-06, 407-08.  Thus, counsel's performance was within the wide range of professionally competent assistance.  The record reflects that the trial judge sufficiently examined and properly qualified J.J. and LaJade.  There is no evidence that the children were improperly prepared to testify at trial.  Additionally, counsel was not deficient when he failed to object to the testimony of Figuero's son (that he heard J.J. inform Ms. Figuero that Floyd shot Ms. Goss) since J.J.'s statement qualified as an excited utterance, an exception to the hearsay rule.  Nor can counsel be faulted for his failure to object to Ms. Figuero's comment that J.J. was "bright" and "smart."

With respect to ground 3(b) concerning Floyd's Brady claim relating to the State's alleged failure to inform the defense that the children were receiving psychological treatment for the trauma

from the shooting, and thus, the children may have been coached or told how to testify, the post-conviction court concluded:  "There is absolutely no evidence that suggests that the witnesses were coached or told what to say and there is no evidence that they testified to any facts or circumstances that had been provided to them that were not true."  Pet. Ex. 3 at 5.

According to Garry Wood (the prosecutor), he had listed Mickey Hoffrichter, an employee of the Children's Home Society, as a witness in the case, see EH Tr. at 234, 249-51,[81] and had informed defense counsel that the children were going to the Children's Home Society, see id. at 248-49.  Wood testified that Hoffrichter "was working with the children" and "was involved with them in helping [him] deal with the children and their needs."  Id. at 234-36, 258. According to Wood, he never coached LaJade and J.J. as to how they would testify.  Id. at 263-65.  At most, the children were merely informed on appropriate conduct in the courtroom.  The post-conviction found Wood's testimony to be credible, concluding that "there is no basis to conclude that the children were told what to say . . . ."  Pet. Ex. 3 at 5.

Moreover, at trial, LaJade testified that she was telling the truth, see Tr. at 1717-18, and J.J. agreed that he would truthfully answer each question, see id. at 1726.  Thus, there is no merit to

---

[81] See Resp. Ex. A-1 at 85, 100, Supplemental Witness Lists (listing Hoffrichter as a witness).

Floyd's <u>Brady</u> claim.  Defense counsel did not act unreasonably in believing that the children were neither coached nor improperly prepared to testify at trial by either counselors or the prosecution, but instead were straightforward and truthful about the facts.  <u>Id</u>. at 419 ("They were pretty good little kids, under those trying circumstances, and seemed to be pretty straightforward with what was -- with what all the other reports indicated.").

Even assuming arguendo deficient performance by defense counsel, Floyd has not shown prejudice.  Floyd has not shown that a reasonable probability exists that the outcome of the case would have been different if defense counsel had challenged the competency of the children and objected to the testimony of Ms. Figuero and her son.  Floyd's ineffectiveness claims fail because he has not shown either deficient performance or resulting prejudice.

Finally, to the extent that Floyd challenges the state collateral proceeding in ground 3(c), this issue does not state a basis for federal habeas relief.  The Eleventh Circuit Court of Appeals "has repeatedly held defects in state collateral proceedings do not provide a basis for habeas relief." <u>Carroll v. Sec'y, Dep't of Corr</u>, 574 F.3d 1354, 1365 (11th Cir.) (citations omitted), <u>cert</u>. <u>denied</u>, 130 S.Ct. 500 (2009). "The reasoning behind this well-established principle is straightforward:  a challenge to a state collateral proceeding does not undermine the legality of

the detention or imprisonment--i.e., the conviction itself--and thus habeas relief is not an appropriate remedy." Id. (citations omitted).    Thus, for the above-stated reasons, Floyd is not entitled to federal habeas corpus relief on ground three.

### D. Ground Four

As ground four, Floyd asserts that (a) counsel was ineffective because he failed to impeach Tashunie[82] Lamb; (b) the State committed a Brady violation when it failed to disclose Lamb's purportedly inconsistent statements to defense counsel and withheld evidence of threats that the State allegedly made to Lamb regarding her criminal culpability for harboring Floyd after the shooting; (c) the State violated Giglio when it allowed Lamb to testify that Floyd admitted to shooting Ms. Goss because she had threatened to call the police; and (d) counsel was ineffective because he failed to adequately investigate Floyd's alibi.  Floyd raised these issues in claim I(c) of his Rule 3.851 motion. After an evidentiary hearing, the trial court identified Strickland, Giglio, and Brady as the controlling law and denied the Rule 3.851 motion with respect to these issues, stating in pertinent part:

> CLAIM I(c): Counsel was ineffective for failing to adequately investigate theories of innocence, Mr. Floyd's alibi, or to present any such defense to the jury, prejudicing the defense.

---

[82] At the evidentiary hearing, Ms. Lamb spelled her first name: Tashunie.  See EH Tr. at 122.

Floyd alleges that trial counsel was ineffective for failing to present evidence that a domestic violence battery charge against Tashunie Lamb's boyfriend, Kenneth Davis, was dismissed after Ms. Lamb refused to testify against him. Floyd argued that the quid pro quo for the dismissal of charges against Kenneth Davis on October 13, 1998 was Tashunie Lamb's testifying against Floyd at the Grand Jury on October 5, 1998.

At the evidentiary hearing, former prosecutor, Garry Wood, testified that he did not threaten Tashunie Lamb about testifying nor was perjured testimony presented.[83] Mr. Wood stated that there was no deal with Ms. Lamb to dismiss domestic violence charges against her boyfriend, Mr. Davis, if Ms. Lamb testified a certain way in Maurice Floyd's case.[84] The only testimony offered on this point at the evidentiary hearing by the defense was that Tashunie Lamb did not want Kenneth Davis prosecuted and that she would not show up for a court appearance so they dropped the case.[85] She stated that she did not talk to the State Attorney about the domestic violence case against Kenneth Davis.[86] Further, in a police interview dated August 3, 1998, Tashunie Lamb quite clearly stated that Maurice Floyd shot Ms. Goss because "she was talking trash, threatened to call police, I shot her."

At the evidentiary hearing Tashunie Lamb could not recall what Mr. Floyd had told her and Mr. Floyd takes the position that the inconsistencies given 5 years apart show that the State presented false testimony in violation of <u>Giglio v. United States</u>, 405 U.S. 150 (1972). Further, Floyd argues that because

---

[83] <u>See</u> EH Tr. at 232, 263.

[84] <u>See</u> EH Tr. at 269.

[85] <u>See</u> EH Tr. at 172.

[86] <u>See</u> EH Tr. at 172.

only Detective Sandburg's report rather than a written report and an audio tape of Trelane Floyd Jackson's interview were provided to Mr. Withee, the State violated <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

To establish a <u>Giglio</u> violation, Floyd must show (1) the testimony given was false, (2) the prosecutor knew the testimony was false, and (3) the statement was material. <u>Guzman v. State</u>, 868 So.2d 498 (Fla. 2003).

To establish a <u>Brady</u> claim, Floyd's burden is to show (1) the evidence is favorable to the accused, because it is either exculpatory or impeaching, (2) the evidence was suppressed by the State either willfully or inadvertently, and (3) that prejudice ensued. <u>Guzman v. State</u>, supra.

Detective Sandburg's police report contained the same information as the audio tape and there is no dispute that the defense received Sandburg's report, so there can be no <u>Brady</u> violation. The police report put the defense on notice of the tape's existence so they could request a copy from law enforcement if they wanted one. Under these circumstances the tape is equally available to the State and the defense and cannot support a <u>Brady</u> violation. <u>Armstrong v. State</u>, 862 So.2d 705 (Fla. 2003).

The audio taped interview of Tashunie Lamb was clearly referenced in the police report and could not have been suppressed because it's [sic] existence and the substance of its content was disclosed in the police report that was furnished to defense counsel. Apparently the tape was available for the asking. Secondly, there was absolutely no evidence presented by Mr. Floyd at the evidentiary hearing that Tashunie Lamb's differently worded statements were anything other than a witness recalling the same facts and using different semantics on different days. The record is devoid of any evidence that suggests that any state official had any

86

input in Tashunie Lamb's recollection of
Floyd's statements. Mr. Floyd has failed to
show that any evidence was suppressed or that
any false or misleading testimony was given.

In addition Mr. Floyd asserts that Mr.
Withee failed to present a proposed alibi
defense that would be advanced [with] the use
of Mr. Floyd's parents and brother. In his
statements Mr. Floyd first claimed that he ran
from the Sheriff's Office and called his
mother from a pay phone on Highway 17, and
thereafter his mother and two brothers took
him to the bus station in St. Augustine.[87]
Freddie Williams, the investigator for the
Public Defender's Office, and Mr. Withee
investigated the proposed alibi. Notes from
their investigation show that the times did
not match up with Mr. Floyd's brother, Darin,
one of the proposed alibi witnesses, who said
that he was asleep all day and Floyd's father,
Charles, had tried to get Tashunie Lamb to
change her testimony to make the alibi work.
Mr. Withee concluded that to present that
alibi would be a fraud on the court and he
declined to do that.[88] It is obvious that the
strategy could never have worked. Even if
successful the alibi could not eliminate the
possibility of the defendant being in Palatka
at the time of the murder.[89] Mr. Withee also
noted that the father's statement contradicted
Mr. Floyd's mother's statement.[90]

---

[87] See Resp. Ex. F-4 at 648-49.

[88] See EH Tr. at 411.

[89] See EH Tr. at 413 ("The timing didn't work. . . . I do
remember the conclusion I reached, that this isn't going to fly.
And if it would fly, I'd have used it in a second, but the whole
thing made no sense.").

[90] See EH Tr. at 413 ("And then coming right back and Momma
takes him one place and Dad takes him another? I just couldn't buy
it [(the proposed abili defense)], and if I don't buy it, the jury
isn't going to buy it.").

It is clear that the defendant has no due process right to require his counsel to aid in the commission of a fraud on the court by presenting perjuri[o]us testimony. <u>Dehaven v. State</u>, 618 So.2d 337 (Fla. 2d DCA).

Pet. Ex. 3 at 8-10 (emphasis deleted).  Upon Floyd's appeal, the

Florida Supreme Court affirmed the circuit court's denial, stating

in pertinent part:

Under this claim with multiple subparts, Floyd asserts that his counsel was ineffective for the failure to impeach witness Tashoni Lamb with regard to prior statements that she made to the police which, according to Floyd, differed from her trial testimony. During her trial testimony, Lamb stated that Floyd told her that he shot Ms. Goss because she threatened to report him to the police.[91] On the other hand, a police report indicated that Lamb informed the police shortly after Floyd was arrested that Floyd stated he "shot Ms. Goss because she made him angry." The report also referenced an earlier audiotaped interview of Lamb, in which she explained that Floyd stated he killed Ms. Goss because she was "running her mouth, talking."

Floyd contends that Lamb's initial statements to the police were inconsistent with her trial testimony that Floyd said he shot Ms. Goss because she was going to call the police. Floyd claims that counsel was ineffective for the failure to use Lamb's prior inconsistent statements to impeach her because the jury was allowed to hear that the sole reason for the shooting was that Ms. Goss had threatened to call the police. According to Floyd, this testimony eliminated any possibility that the shooting was done in the heat of passion and destroyed the chance for a conviction for second-degree murder. Additionally, Floyd notes that on direct appeal, this Court found

---

[91] <u>See</u> Tr. at 1786-87.

that the avoid arrest aggravating factor was
supported by Lamb's testimony. See Floyd, 850
So.2d at 406. Floyd further asserts that the
State committed a Brady violation when it
failed to disclose Lamb's purportedly
inconsistent statements to defense counsel and
a Giglio violation when it allowed Lamb to
testify that Floyd admitted to shooting Ms.
Goss because she had threatened to call the
police.

. . . .

    With regard to the failure to cross-
examine Lamb concerning her purportedly
inconsistent statements, the trial court
concluded that "there was absolutely no
evidence presented by Mr. Floyd at the
evidentiary hearing that . . . Lamb's
differently worded statements were anything
other than a witness recalling the same facts
and using different semantics on different
days."[92] We agree. Lamb's statement that
Floyd's motive for shooting Ms. Goss was
because she was "running her mouth" could
clearly have encompassed a threat by Ms. Goss
that she intended to call the police because
of Floyd's prior assault upon Trelane. There
is no evidence that the two statements by Lamb
are irreconcilably inconsistent. Indeed, an
individual would not be expected to use
identical words when recounting the same event
on two separate occasions. Accordingly, trial
counsel was not deficient for failing to
impeach Lamb with regard to these two
statements.[FN13]

        FN.13 Although Lamb did make
        somewhat inconsistent statements to
        the police with regard to whether
        Floyd arrived before or after she
        received the phone call from her
        friend, this collateral factual
        detail did not bear on any material
        element in the case. Accordingly,

---

[92] See Pet. Ex. 3 at 10.

counsel was not deficient for
failing to cross-examine Ms. Lamb
with regard to this discrepancy of a
collateral fact.

Floyd's Brady allegation that the State
failed to advise defense counsel of the
"differing" statements by Lamb also fails.
Under Brady v. Maryland, 373 U.S. 83, 83 S.Ct.
1194, 10 L.Ed.2d 215 (1963), the State is
required to disclose material information
within its possession or control that is
favorable to the defense. See Mordenti v.
State, 894 So.2d 161, 168 (Fla. 2004). To
establish a Brady violation, the defendant
must demonstrate (1) that favorable evidence -
either exculpatory or impeaching, (2) was
willfully or inadvertently suppressed by the
State, and (3) the defendant was prejudiced.
See Strickler v. Greene, 527 U.S. 263, 281-82,
119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see
also Wayv. State, 760 So.2d 903, 910 (Fla.
2000). To meet the materiality prong, the
defendant must demonstrate "a reasonable
probability that the jury verdict would have
been different had the suppressed information
been used at trial." Smith v. State, 931 So.2d
790, 796 (Fla. 2006) (citing Strickler, 527
U.S. at 289, 296, 119 S.Ct. 1936). At issue is
whether "the favorable evidence could
reasonably be taken to put the whole case in
such a different light as to undermine
confidence in the verdict." Id. (quoting
Strickler, 527 U.S. at 290, 119 S.Ct. 1936).

With regard to Brady's second prong, this
Court has explained that "[t]here is no Brady
violation where the information is equally
accessible to the defense and the prosecution,
or where the defense either had the
information or could have obtained it through
the exercise of reasonable diligence."
Provenzano v. State, 616 So.2d 428, 430 (Fla.
1993) (citing Hegwood v. State, 575 So.2d 170,
172 (Fla. 1991); James v. State, 453 So.2d
786, 790 (Fla. 1984)). As we have previously
stated:

90

> Although the "due diligence" requirement is absent from the Supreme Court's most recent formulation of the Brady test, it continues to follow that a Brady claim cannot stand if a defendant knew of the evidence allegedly withheld or had possession of it, simply because the evidence cannot be found to have been withheld from the defendant.

Owen v. State, 986 So. 2d 534, 547 (Fla. 2008) (quoting Occhicone, 768 So. 2d at 1042). Thus, evidence is not suppressed where the defendant was aware of the information. See Way, 760 So.2d at 911; see also Tompkins v. State, 872 So. 2d 230, 239 (Fla. 2003) (no suppression where defense was given illegible copy of police report because defense knew about report and could have requested a legible copy); Provenzano, 616 So.2d at 430 (no Brady violation where defendant could have obtained his jail records from jail officials and could have reviewed the notes of the State expert witness if he had requested them).

Here, the record shows that Floyd was aware of the existence and content of the taped interview with Lamb. Indeed, the police report, which had been provided to Floyd, referred to the tape. The postconviction court correctly noted that Floyd could have requested the tape from the police had he so desired. In light of Floyd's knowledge of the tape, it could not have been "suppressed." Therefore, Floyd is not entitled to relief based on this Brady claim.

A Giglio violation is demonstrated when a defendant establishes that (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material. See Guzman v. State, 941 So.2d 1045, 1050 (Fla. 2006). Once the first two prongs are established, the false evidence is deemed material if there is any

reasonable possibility that it could have affected the jury's verdict. See id. at 1050-51. Under this standard, the State has the burden to prove that false testimony was not material by demonstrating that it was harmless beyond a reasonable doubt. See id. at 1050.

Floyd has failed to establish that Lamb's trial testimony - i.e., Floyd stated that he shot Ms. Goss because she threatened to report him to the police - was false. As previously discussed, Lamb's report to the police that Floyd admitted to killing Ms. Goss because she was "running her mouth, talking" and her trial testimony were not inherently inconsistent. Floyd has not established that Lamb's trial testimony was false or, equally significant, that the prosecutor knew it was false. Hence, Floyd has failed to demonstrate that a Giglio violation occurred.

Floyd next contends that counsel was ineffective for the failure to impeach Lamb with evidence that (1) the domestic-violence charge against Lamb's boyfriend, Kenneth Davis, was nolle prossed; (2) Lamb was angry at Floyd because he failed to intervene when Davis battered her; and (3) the State threatened Lamb with prosecution for harboring Floyd if she did not testify against him. Floyd also asserts that the State committed a Brady violation when it failed to inform the defense of Davis's nolle prosequi and to provide the defense with tapes of Lamb's recorded police interview. We reject each of these claims as without merit.

Floyd's ineffectiveness claim with regard to the failure to impeach Lamb based on the nolle prosequi of Kenneth Davis, and Lamb's alleged anger with Floyd, is similarly without merit. There was no evidence presented during the evidentiary hearing that the nolle prosequi of Davis was in any way related to Floyd's criminal case, or that Lamb fabricated her testimony because she was angry with Floyd. Additionally, no evidence was offered in support of the assertion that the State

92

threatened Lamb with prosecution for harboring
Floyd if she did not testify against him.
Accordingly, trial counsel was not deficient
for the failure to use this information to
impeach Lamb's trial testimony.

Further, Floyd's inability to demonstrate that
the nolle prosequi was relevant impeachment
evidence - other than pure speculation that
Lamb might have reached an agreement with the
State to testify against Floyd in exchange for
the nolle prosequi of the charges against her
boyfriend - defeats his Brady claim. As
previously stated, there was no evidence
offered during the evidentiary hearing to
indicate that there was such an agreement
between Lamb and the State. Accordingly, the
nolle prosequi of Davis was immaterial to
Lamb's testimony during the trial. See
Strickler, 527 U.S. at 281-82, 119 S.Ct. 1936.

Floyd, 18 So.3d at 449-52 (emphasis deleted and footnotes omitted).

As to the claim relating to counsel's ineffectiveness for failure

to present evidence of an alibi, the Florida Supreme Court stated:

Floyd next asserts that trial counsel was
ineffective for the failure to present
evidence of an alibi during the trial. We
disagree. Floyd wanted his trial counsel to
present the following alibi theory: After
fleeing from the sheriff's office, Floyd
called his mother from a pay phone and,
thereafter, his mother and two brothers took
him to the bus station in St. Augustine.

Trial counsel testified during the evidentiary
hearing that he refused to offer evidence of
Floyd's purported alibi because he believed
that to do so would commit a fraud on the
court.[93] Trial counsel explained that he
investigated the purported alibi and
discovered that (1) the phone booth from which
Floyd claimed to have made the call had been

---

[93] See EH Tr. at 411.

> removed two years before the alleged phone
> call; (2) contrary to Floyd's account, one of
> Floyd's brothers, who Floyd claimed
> transported him to the bus station, admitted
> that he was sleeping at that time; (3) a
> statement of Floyd's father contradicted that
> of his mother; and (4) Floyd's father
> contacted Lamb in an attempt to persuade her
> to change her testimony so that the alibi
> would appear sound.[94] Based on these facts,
> it was reasonable for trial counsel to
> conclude that the alibi proposed by Floyd was
> fraudulent. It was completely appropriate for
> trial counsel to take no action that he
> believed would perpetrate a fraud upon the
> court. Counsel's actions in this regard were
> not deficient, and there was no
> ineffectiveness.

Id. at 452.

As these claims were rejected on the merits by the Florida Supreme Court, there is a qualifying state court decision. Thus, these claims should be addressed applying the deferential standard for federal court review of state court adjudications required by AEDPA. Upon a review of the record and the applicable law, the Court concludes that the state court's adjudication of these claims was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Floyd is not entitled to relief on the basis of these claims.

---

[94] See EH Tr. at 411-14.

Moreover, even assuming that the state court's adjudication of these claims is not entitled to deference under AEDPA, Floyd's ground four is still without merit.  Given the record, counsel was not deficient for his failure to impeach Ms. Lamb.  As the state courts found, Lamb's statements at issue were not irreconcilably inconsistent. Additionally, based on the facts derived from his pretrial investigation, counsel did not act unreasonably in concluding that the alibi proposed by Floyd was fraudulent.  Thus, his decision to forego pursuing the alibi defense at trial was not deficient performance.  Even assuming deficient performance, Floyd has not shown resulting prejudice.  Thus, Floyd's ineffectiveness claims fail since he has shown neither deficient performance nor resulting prejudice. Moreover, Floyd has established neither <u>Brady</u> nor <u>Giglio</u> violations.  Accordingly, Floyd is not entitled to federal habeas relief on ground four.

## E. Ground Five

As ground five, Floyd asserts that there is insufficient evidence to support the first degree murder conviction.  To the extent that Floyd is raising the same claim he presented on direct appeal and assuming that claim presented an issue of federal constitutional dimension, the claim is sufficiently exhausted.  In affirming his first degree murder conviction, the Florida Supreme Court denied this claim on the merits, stating in pertinent part:

> Floyd asserts that the trial judge should have granted his motion for judgment of

acquittal regarding the charge of first-degree murder because he did not premeditate the killing.[FN22] Floyd contends that the State failed to present evidence to allow the jury to exclude his hypothesis that the killing resulted from nothing more than a "heat of passion" argument in which Floyd did not have a fully formed conscious purpose to kill. We disagree.

. . . .

Premeditation is "more than a mere intent to kill; it is a fully formed conscious purpose to kill." Green v. State, 715 So.2d 940, 943 (Fla. 1998). The use of circumstantial evidence is proper to show that a killing was premeditated. See Woods v. State, 733 So.2d 980, 985 (Fla. 1999). Floyd brought a gun with him to the victim's home on the night of the killing. The defendant's predetermined choice of weapon can be a key factor in determining whether he acted with premeditation. See Spencer v. State, 645 So.2d 377, 380-81 (Fla. 1994) (evidence that defendant had made previous threats upon his victim-wife, and then parked in area away from victim's house and subsequently stabbed her repeatedly with steak knife he had brought with him was sufficient to establish premeditation); Larry v. State, 104 So.2d 352, 354 (Fla. 1958) (nature of the weapon used and manner in which homicide is committed are factors determining whether the defendant acted with premeditation); Wysocki v. State, 715 So. 2d 346, 347-48 (Fla. 4th DCA 1998) (in charge of attempted premeditated murder, inference supporting conclusion of premeditation could be drawn from fact that one or more defendants arrived at victim's home with baseball bat that was ultimately used to beat the victim). Floyd's deliberate selection and transportation of a gun to the victim's home is clearly inconsistent with his theory that he argued with the victim and simply shot her in a moment of uncontrolled rage without having fully formed a conscious purpose to kill.

Moreover, Floyd was in Ms. Goss's home for a significant period of time before chasing her, firing shots at her, and eventually killing her. In <u>Roberts v. State</u>, 510 So.2d 885 (Fla. 1987), we determined that a defendant had premeditated his actions when he drove up beside a car occupied by three people on a secluded section of a beach, impersonated a police officer and requested identification from two of the car's occupants, and then proceeded to beat one of the occupants with a baseball bat who had questioned whether the defendant was truly a police officer. In concluding that the defendant in <u>Roberts</u> had a fully formed conscious purpose to kill, we rejected the defendant's theory that the killing was nothing more than a "'spontaneous, blind and unreasoning reaction' to the circumstances leading up to the murder." <u>Id</u>. at 888. The events in <u>Roberts</u> appear to have occurred in a time frame equal to, and probably shorter than, the time elements in Floyd's case, thereby strengthening the conclusion that Floyd had many opportunities to premeditate his actions. Floyd argued with the victim in her home for a significant period of time. He told Tashoni Lamb that the victim "threatened to call the police on him." J.J. Jones and LaJade Evans testified that Floyd chased the victim while still in the home and pinned her between a door and door frame at the front of her home. The children then saw or heard a total of three shots being fired. They surmised that the third shot must have produced the fatal injury because J.J. Jones was able to direct police to the spot where he saw Ms. Goss's body lying after the third shot was fired. J.J. saw the victim's body lying on the ground moments before he began pounding on neighbor Jeanette Figuero's front door for help.

We do not endeavor to state with precision the exact moment Floyd premeditated the murder. We simply note that he had many opportunities, at several junctures, to do so before he made and implemented the fateful decision to employ a deadly weapon and

actually place it in use. We further note that
one day prior to the fateful events of July 13
that led to Ms. Goss's death, Floyd threatened
to kill his wife or someone she loved. "No
definite length of time for [premeditation] to
exist has been set and indeed could not be."
Larry, 104 So.2d at 354. Moreover,
premeditation may be evinced by the
defendant's actions in choosing and
transporting a certain weapon and employing
that weapon in performance of the killing. See
Spencer; Larry; Wysocki. The facts of Floyd's
case are inconsistent with his "heat of
passion" theory. In a circumstantial evidence
case in which there is inconsistency between
the defendant's theory of innocence and the
evidence when viewed most favorably to the
State, the question is for the finder of fact
to resolve and the motion for judgment of
acquittal must be denied. See Orme v. State,
677 So. 2d 258, 262 (Fla. 1996).

We further reject Floyd's contention that Tien
Wang v. State, 426 So.2d 1004 (Fla. 3d DCA
1983), and Forehand v. State, 126 Fla. 464,
171 So. 241 (1936), compel the conclusion that
the killing of Ms. Goss was not premeditated.
In Tien Wang, a husband who was having marital
difficulties with his wife confronted his
wife's stepfather when the stepfather
attempted to shepherd the wife/stepdaughter to
her homeland. A violent quarrel ensued between
the husband and the stepfather, and culminated
when the husband stabbed the stepfather. No
witness testified to seeing the stabbing,
though three witnesses testified that they saw
the husband chase the stepfather down a
street, and one witness testified that the
husband struck the stepfather. The district
court noted that "[t]here was no direct
evidence elicited by the State bearing on the
element of premeditation," Tien Wang, 426
So.2d at 1006, and concluded that the evidence
was not entirely inconsistent with the
husband's hypothesis that he had never fully
formed a conscious purpose to kill.
Conversely, the State in Floyd's case
presented evidence of his premeditation which

98

is highly inconsistent with his "heat of passion" hypothesis. Therefore, relief based on Tien Wang is not warranted.

Similarly, no relief is warranted under Forehand, in which a defendant shot and killed a deputy sheriff who was struggling with the defendant's brother. In Forehand there was virtually no evidence that the defendant contemplated killing the deputy until he saw him struggling with his brother. Floyd's threatening statements, his choice of a firearm as a weapon, and his transportation of it to the victim's home, along with his subsequent actions as he placed the weapon in use, clearly distinguish his case from Forehand.[FN23]

> FN23. The other cases on which Floyd relies for support of his assertion that the killing was not premeditated are distinguishable because: the defendant acted in a reflexive manner similar to the defendant in Forehand; the defendant was under a dominating fear of the victim resulting from the victim's repeated abuse of the defendant; or the State failed to produce sufficient evidence of premeditation. No situation similar to any of these cases occurred in Floyd's case. Therefore, no relief is warranted.

We further reject Floyd's contention that his motion for judgment of acquittal should have been granted because the State produced inconsistent testimony regarding the identity of the killer. Specifically, Floyd claims that the testimony of the victim's neighbor, John Brown, conflicts with the testimony of LaJade Evans regarding the whereabouts and identity of the person who shot Ms. Goss. Floyd contends that he "could not have fired the fatal shot" because John Brown saw a man running in a different direction than the one in which LaJade Evans testified that she saw

Floyd running. Floyd fails to take into account that LaJade Evans and J.J. Jones testified that they saw him firing a gun at Ms. Goss, and that on both direct and cross-examination neither identified anyone else in the area who could have fired the shots. He also fails to demonstrate that LaJade Evans and John Brown saw events transpiring in the same time frame or from the same vantage point. Most important, John Brown testified that the man he saw running from the vicinity of Ms. Goss's home appeared to be the man who had dropped off children earlier in the day at Ms. Goss's home. The record shows that Floyd dropped off his wife's children earlier in the day on July 13. According to John Brown, the man who dropped off the children was driving a red Honda automobile, which generally matched the description of Floyd's vehicle. There is no plausible explanation how someone other than Floyd happened to be present at the scene of the killing to fire the fatal shot at precisely the time that a third bullet killed Ms. Goss after Floyd had fired and missed with two shots. Floyd's scenario cannot be deemed to be a reasonable hypothesis of innocence. The State is not required to "'rebut conclusively every possible variation' of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events." <u>State v. Law</u>, 559 So.2d at 189; <u>see</u> <u>also</u> <u>Beasley v. State</u>, 774 So.2d 649, 659 (Fla. 2000) (because the State presented competent, substantial evidence that was inconsistent with defendant's theory that an unknown perpetrator killed the victim, trial judge did not err in denying defendant's motion for judgment of acquittal). This the State has done. Therefore, relief is not warranted.

Based upon the circumstantial evidence in this case, we therefore determine that the trial judge did not err in denying Floyd's motion for judgment of acquittal regarding the charge of premeditated murder. We further conclude that competent, substantial evidence supported

> the jury's verdict on this charge. <u>See</u> <u>State
> v. Law</u>, 559 So. 2d at 188 (in circumstantial
> evidence case, when competent, substantial
> evidence supports the jury verdict, this Court
> will not reverse on appeal).

<u>Floyd</u>, 850 So.2d at 396-99 (footnote omitted).

Floyd would not be entitled to relief because the state court's adjudication of this claim is entitled to deference under AEDPA. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Floyd is not entitled to relief on the basis of this claim.

Moreover, even assuming that the state court's adjudication of this claim is not entitled to deference, Floyd's claim, nevertheless, is without merit because the State presented ample evidence to support Floyd's first degree murder conviction. The Due Process Clause of the Fourteenth Amendment requires the State to prove each element of the offense charged beyond a reasonable doubt. <u>Thompson v. Nagle</u>, 118 F.3d 1442, 1448 (11th Cir. 1997) (citing <u>Jackson v. Virginia</u>, 443 U.S. 307, 314 (1979)), <u>cert. denied</u>, 522 U.S. 1125 (1998).

In reviewing the sufficiency of evidence, "this court must presume that conflicting inferences to be drawn from the evidence were resolved by the jury in favor of the State." Thompson, 118 F.3d at 1448 (citing Machin v. Wainwright, 758 F.2d 1431, 1435 (11th Cir. 1985)). Jackson v. Virginia "provides the federal due process benchmark for evidentiary sufficiency in criminal cases." Williams v. Sec'y for Dep't of Corr., 395 F. App'x 524, 525 (11th Cir. 2010) (per curiam) (citing Green v. Nelson, 595 F.3d 1245, 1252-53 (11th Cir. 2010)) (not selected for publication in the Federal Reporter), cert. denied, 131 S.Ct. 1488 (2011). In accordance with this authority, the relevant question is whether any rational jury, after viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the charged offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 319.

After viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found Floyd committed the offense of first degree murder. The State had substantial evidence against Floyd. Competent evidence of the elements of the offense was introduced at trial, and no due process violation occurred. The jury was entitled to believe the State witnesses' accounts of what transpired that day. Therefore, Floyd is not entitled to habeas relief on the issue.

102

After reversing the armed burglary conviction and striking the murder in the course of a felony aggravating circumstance, the Florida Supreme Court concluded: "Competent, substantial evidence supports his conviction for premeditated murder, and the sentence of death for this conviction is proportional." Floyd, 850 So.2d at 409. In addressing proportionality after the striking of the murder in the course of a felony aggravating circumstance, the court stated:

> Finally, Floyd claims that his sentence of death is not proportional under the circumstances of his case and the decisions of this Court. Floyd emphasizes that the killing of Ms. Goss was nothing more than a "heat of passion" slaying for which a sentence of death is not warranted. We rejected Floyd's "heat of passion" assertion, supra, and therefore find the cases on which Floyd relies for this point to be inapplicable.
>
> Nor do we find a proportionality problem here despite our striking of the murder in the course of a felony aggravating circumstance and our determination that a theory of Floyd's guilt based on felony murder cannot stand. As discussed supra, competent, substantial evidence supports the conviction in this case on the charge of premeditated murder. Also, three aggravating circumstances remain after striking the murder in the course of a felony aggravator,[FN36] in contrast to scant mitigation given little weight by the trial judge. When sufficient aggravating circumstances have remained after the striking of others on appeal and those remaining aggravators were not outweighed by mitigating circumstances, we have previously affirmed a trial judge's sentence of death. See, e.g., Hill v. State, 515 So.2d 176 (Fla. 1987) (affirming the sentence of death despite the striking of the cold, calculated, and premeditated aggravating

103

circumstance, where three other aggravating circumstances remained and were not outweighed by statutory mitigating circumstance of defendant's age); Rogers v. State, 511 So.2d 526 (Fla. 1987) (affirming the sentence of death despite the striking of aggravating circumstances of cold, calculated, and premeditated, pecuniary gain, and committed during course of an attempted robbery, where two other aggravating circumstances remained in contrast to no mitigating circumstances).

> FN36. The aggravating circumstances which remain are: Floyd was on probation for the felonies of burglary and accessory after the fact to robbery when he committed the murder of Ms. Goss (great weight); Floyd had previously been convicted of a violent felony for the voluntary manslaughter of his brother (substantial weight); and Floyd committed the murder for the purpose of avoiding or preventing a lawful arrest (substantial weight).

In Williams v. State, 437 So.2d 133 (Fla. 1983), we affirmed a sentence of death when the trial judge found the aggravating circumstances of committed by a person under sentence of imprisonment and having committed a prior violent felony. Both of these aggravating circumstances also remain in Floyd's case. The trial judge in Williams found no mitigating circumstances, despite the presentation of evidence at the sentencing hearing that the defendant was a good and kind person. In Floyd's case the trial judge found, but gave little weight to, the mitigating circumstances that Floyd displayed exemplary courtroom behavior, that he assisted his defense counsel with note taking, that he was successfully completing his probation before murdering Ms. Goss, and that he expressed concern that his wife not subject their marriage to the stresses attendant to alcohol consumption. We determine that the trial judge did not abuse his discretion in giving little

weight to these mitigating circumstances and in deciding that they did not outweigh the aggravating circumstances. Moreover, **when we consider that although the murder in the course of a felony aggravator no longer applies, three aggravating circumstances still remain which are not outweighed by the scant mitigation in Floyd's case, "we [conclude] that the erroneous consideration of the [murder in the course of a felony] aggravating circumstance . . . [does not present] such a change under the circumstances of this sentencing proceeding that its elimination could possibly compromise the weighing process of either the jury or the judge."** Hill, 515 So.2d at 179.[95]

Floyd's argument that the cases of Farinas v. State, 569 So.2d 425 (Fla. 1990), and White v. State, 616 So.2d 21 (Fla. 1993), demonstrate the lack of proportionality in his death sentence is misplaced. In both Farinas and White, our decision that a life sentence was proper was based in large measure on the significant amount of mental health mitigation present in each case. No similar situation exists here and, therefore, relief based on Farinas and White is not warranted. Our proportionality review leads us to conclude that the death sentence was properly imposed in Floyd's case.[96]

---

[95] See Patrick v. State, 104 So.3d 1046, 1068 (Fla. 2012); Douglas v. State, 878 So.2d 1246, 1268 (Fla. 2004) ("Striking this aggravator necessitates a harmless error analysis.") (citation omitted), cert. denied, 543 U.S. 1061 (2005); Hill v. State, 643 So.2d 1071, 1074 (Fla. 1994) (holding that, in undertaking a harmless error analysis after striking an aggravator, the Court must determine whether a reasonable possibility exists that the evidence in mitigation is sufficient to outweigh the remaining aggravating circumstances), cert. denied, 516 U.S. 872 (1995).

[96] See Matthews v. State, No. SC10-1771, 2013 WL 627131, at *5 (Fla. Feb. 21, 2013) ("In conducting its proportionality review, this Court does not compare the number of aggravating and mitigating circumstances. Rather, 'the Court looks at the totality of the circumstances to determine if death is warranted in

Floyd, 850 So.2d at 408-09 (footnote omitted) (emphasis added).

Floyd would not be entitled to relief because the state court's adjudication of this claim is entitled to deference under AEDPA.  After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.[97]  Thus, Floyd is not entitled to relief on the basis of this claim.  Even assuming that the state court's adjudication of this claim is not entitled to deference under AEDPA, Floyd's claim is still without merit.

## F. Ground Six

As ground six, Floyd asserts that (a) the trial court erroneously instructed the jury by omitting a portion of the jury instruction relating to mitigating circumstances, (b) the trial

_____

comparison to other cases where the sentence of death has been upheld.'") (citations omitted); Patrick, 104 So.3d at 1068 ("Although we find that the evidence is insufficient to support the application of [one of the aggravators], we nevertheless find that Patrick's sentence is proportionate.") (citation omitted).

[97] See Clemons v. Mississippi, 494 U.S. 738, 741 (1990) (stating that "the Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either be reweighing of the aggravating and mitigating evidence or by harmless-error review").

court failed to instruct the jury on Floyd's age as a mitigating circumstance for the jury's consideration, (c) the trial court violated Caldwell v. Mississippi, 472 U.S. 320 (1985), by denying Floyd's request to modify the penalty phase instructions, and (d) counsel was ineffective because he failed to object to the faulty mitigation instruction and failed to request an instruction on age as a mitigating circumstance.[98] Floyd raised grounds 6(a), (b), and (c) on direct appeal, and the Florida Supreme Court, in adjudicating the claims, stated:

> Floyd makes three concurrent assertions of fundamental error regarding the jury instructions, or lack thereof, concerning mitigating factors. First, he asserts that fundamental error occurred when the trial judge, in reading the instructions to the jury, said only that the jury could consider "[a]ny other circumstance of the offense" committed by Floyd.[99] The standard jury instructions require that, unless the defendant requests a different instruction, the trial judge instruct jurors that they may consider as mitigation "[a]ny [other] aspect of the defendant's character, record, or background" and "[a]ny other circumstance of the offense." Fla. Std. Jury Instr. (Crim.) 113 (1997). Floyd never lodged an objection to this instruction as it was read to the jury.[FN30] Floyd nevertheless claims that fundamental error occurred because the effect of the trial judge's misreading of the instruction was that, in the absence of an instruction that it

---

[98] Floyd raised these same ineffectiveness claims under ground one. See Petition at 14 (ground I), 69 (ground VI). Accordingly, the Court addressed these ineffectiveness claims in Section VIII. A. Ground One.

[99] See Resp. Ex. A-11 at 2172.

could consider aspects of Floyd's character, record, or background as mitigation, the jury concluded that it could only consider aggravating circumstances of the killing. Several points militate against this assertion.

> FN30. Moreover, after all penalty phase instructions had been read to the jury, Floyd's defense counsel answered affirmatively when the trial judge inquired as to whether "the instructions [had] been delivered as [he] indicated they would be delivered."[100]

Jury instructions are subject to the contemporaneous objection rule, and in the absence of a contemporaneous objection at trial, relief regarding error in the instructions can be granted on appeal only if that error is fundamental. See Archer v. State, 673 So.2d 17, 20 (Fla. 1996). Fundamental error is that which "reaches down into the validity of the trial itself to the extent that a verdict. . . could not have been obtained without [that] error." Id. at 20. When a contemporaneous objection could easily have been lodged to bring the lack of completeness or clarity of a jury instruction to the trial judge's attention, we have previously declined to conclude that fundamental error occurred. See Archer, 673 So.2d at 20 (no fundamental error occurred when trial judge utilized the term "reasonable doubt" in jury instruction but then did not define that term for jury, especially in light of lack of contemporaneous objection made to jury instruction as given). In State v. Wilson, 686 So.2d 569 (Fla. 1996), we determined that no fundamental error occurred when a preliminary instruction on reasonable doubt was utilized by the trial court that was arguably ambiguous though not entirely incorrect. Though we noted that the trial

---

[100] See Resp. Ex. A-11 at 2177.

judge ultimately gave the correct instruction,
we also unmistakably stated in <u>Wilson</u>:

> In any event, even if it could
> be said that the judge committed
> error in making the preliminary
> comments on reasonable doubt, the
> error would not be fundamental. Any
> perceived ambiguity could have been
> clarified by the simple expedient of
> calling it to the judge's attention
> through a proper objection.

<u>Id</u>. at 570. Our reasoning in <u>Archer</u> and <u>Wilson</u>
is applicable here because the asserted error
in the trial judge's reading of the
instruction "could have been clarified by the
simple expedient of calling it to the judge's
attention through a proper [contemporaneous]
objection." <u>Wilson</u>, 686 So. 2d at 570. When we
further consider that Floyd's defense counsel
had and in fact utilized the opportunity in
his penalty phase closing argument to fully
present and discuss all of the mitigating
factors he believed the jury should consider –
including those related to character and
background[101] – we are unpersuaded by Floyd's
assertion of fundamental error. When we
further consider the three strong aggravating
factors present in this case, the possible
mitigating factors, and the eleven to one jury
recommendation for a sentence of death, we
conclude that a perfect instruction would not
have in any way altered the jury's
recommendation here. Therefore, we determine
that no relief based on fundamental error is
warranted on this matter.

As his next concurrent assertion
regarding fundamental error in the jury
instructions, Floyd contends that the trial
judge erred by not instructing the jury that
Floyd's chronological age of twenty-one years
could be considered as a mitigating factor.
Floyd further contends that the trial judge

---

[101] <u>See</u> Resp. Ex. A-11 at 2163, 2164-65.

also fundamentally erred by not considering
age as a mitigating factor before imposing a
sentence of death. We have previously stated:

> [W]here the defendant has requested
> an instruction on age and submitted
> reliable evidence tending to link
> his or her chronological age to
> "some other [relevant]
> characteristic of the defendant or
> the crime," an appropriate
> instruction should be given.

Campbell v. State, 679 So.2d 720, 726 (Fla.
1996). Floyd did not explicitly request the
trial judge to provide an instruction on age
as a mitigating factor, nor did he present
compelling evidence which could reasonably be
inferred to suggest his desire for such an
instruction. In the absence of both a request
for an instruction on age and any evidence on
which the trial judge could base a decision to
find it as a mitigating factor, we determine
that no error occurred. See also Cooper v.
State, 492 So.2d 1059, 1063 (Fla. 1986)
("There is no per se rule which pinpoints a
particular age as an automatic factor in
mitigation.").

In his final contention regarding the
jury instructions on mitigating circumstances,
Floyd claims that fundamental error resulted
from the trial judge's refusal to give his
instruction that "only in rare instances can
[the trial judge] impose a sentence different
than the jury recommend[s]." Floyd contends
that the trial judge's refusal to give this
instruction resulted in the denigration of the
role and responsibility of the jury and
therefore violated Caldwell v. Mississippi,
472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231
(1985). The record reflects that the trial
judge employed the standard jury instruction
on this matter. We have repeatedly stated that
this instruction properly and fully apprises
the jury of its role and responsibility in the
penalty phase. See, e.g., Archer, 673 So.2d at

21; <u>Sochor v. State</u>, 619 So.2d 285, 291-92
(Fla. 1993). No relief is warranted.[FN31]

> FN31. Floyd further contends that
> fundamental errors committed by the
> trial judge were compounded by his
> failure to instruct the jury with
> regard to two proposed nonstatutory
> mitigators: exemplary courtroom
> behavior and assistance to defense
> counsel with note-taking and other
> communication. While the issue
> regarding these proposed
> nonstatutory mitigators is preserved
> for review, we nevertheless have
> determined that no fundamental error
> occurred with regard to jury
> instructions concerning mitigating
> factors. We also note that the trial
> judge ultimately found the two
> factors in question as nonstatutory
> mitigating circumstances. Moreover,
> when we consider that three strong
> aggravating factors remain in this
> case, it is clear that no error -
> fundamental or otherwise - occurred
> with regard to the jury instructions
> concerning mitigating factors that
> would cast doubt on the validity of
> the outcome of the trial itself. <u>See</u>
> <u>Archer</u>, 673 So.2d at 20. Thus, no
> fundamental error could have been
> "compounded" by the trial judge's
> failure to provide an instruction to
> the jury concerning two proposed
> nonstatutory mitigators.

<u>Floyd</u>, 850 So.2d at 402-04.

Respondents contend, and this Court agrees, that ground 6(a)

is procedurally barred since it was raised in a procedurally

incorrect manner in state court. <u>See</u> Response at 79, 83. Floyd

has not shown either cause excusing the default or actual prejudice

resulting from the bar. Moreover, Floyd has failed to identify any

fact warranting the application of the fundamental miscarriage of justice exception.

Even assuming the claim is not procedurally barred, it nevertheless is still without merit.  See Floyd, 18 So.3d at 403-04.  First, as ground 6(a), Floyd contends that, during the penalty phase proceeding, the trial judge erroneously instructed the jury by omitting a portion of the jury instruction relating to mitigating circumstances.  In instructing the jury, the trial judge tracked the language of the standard criminal jury instructions (in effect at the time of the April 8, 1999 penalty phase proceeding)[102] until the challenged portion relating to mitigating circumstances.  See Resp. Ex. A-11 at 2169-71.  However, in reading the instructions to the jury as to mitigating circumstances, the trial judge stated:

> Among the mitigating circumstances you may consider if established by the evidence are:
>
> One, any of the following circumstances that would mitigate against the imposition of the death penalty;
>
> **Subsection A, any other circumstance of the offense.**

Id. at 2171-72 (emphasis added).  The standard jury instruction regarding mitigating circumstances stated, in pertinent part:

---

[102] See Std. Jury Instr. in Criminal Cases - No. 96-1, 690 So.2d 1263 (Fla. 1997) (per curiam) (stating the new instructions will be effective March 6, 1997).

> Among the mitigating circumstances you may consider, if established by the evidence, are:
>
> . . . .
>
> 8. Any of the following circumstances that would mitigate against the imposition of the death penalty:
>
> > a. Any [other] aspect of the defendant's character, record, or background.
> >
> > b. Any other circumstances of the offense.

Std. Jury Instr. in Criminal Cases - No. 96-1, 690 So.2d 1263 (Fla. 1997) (per curiam); see Booker v. State, 773 So.2d 1079, 1091 (Fla. 2000), cert. denied, 532 U.S. 1033 (2001)  According to the judicial notes in the standard jury instructions, the trial judge was required to instruct the jury on subsections (a) and (b) unless the defendant requested otherwise.  Id.

As recognized by the Florida Supreme Court, see Floyd, 850 So.2d at 402-03, the standard jury instructions require that, unless the defendant requests a different instruction, the trial judge instruct the jurors that they may consider as mitigation "[a]ny [other] aspect of the defendant's character, record, or background" and "[a]ny other circumstance of the offense."  See Std. Jury Instr. in Criminal Cases - No. 96-1, 690 So.2d 1263. Here, it appears that the trial judge misread the instructions to the jury since he used the phrase "[s]ubsection A," from the standard jury instruction, but then omitted that particular portion

of subsection (a) and jumped to the phraseology in subsection (b) of the standard instruction. After the trial judge had read the jury instructions, he asked counsel: "Have the instructions been delivered as I indicated they would be delivered?" Resp. Ex. A-11 at 2177. The prosecutor and defense counsel affirmed that the instructions had been delivered as the trial judge had indicated they would be. Id. Floyd never objected to how the trial judge read the instruction to the jury.

The record reflects that the trial court provided written instructions to the jury at the penalty phase proceeding.[103] See Resp. Ex. A-11 at 2134, 2170, 2176. Given the record, including counsel's penalty phase closing argument where he described the mitigating circumstances that he argued the jury should consider, the penalty phase jury instructions, as a whole, accurately conveyed the applicable law to the jury. While the trial judge denied defense counsel's proposed jury instruction as to the nonstatutory mitigating circumstances, see id. at 2131-34, he ruled that counsel could argue the mitigating circumstances, see id. at

_____

[103] The record contains the written jury instructions for the guilt phase, see Resp. Ex. A-3 at 481-94, but does not contain any written jury instructions for the penalty phase, see Resp. Ex. B, Initial Brief of Appellant, at 43 n.9 ("Undersigned counsel contacted the clerk of the lower court who searched the file without success for the missing written instructions. Defense counsel was also unable to provide a copy. Undoubtedly, they were destroyed or a juror has a trial souvenir.").

2134. Thus, in accordance with the trial judge's ruling, defense counsel, during closing argument, stated:

> We feel that we have established two interesting mitigating circumstances. The Defendant displayed exemplary behavior in this courtroom and demeanor in the face of great adversity, a sad situation that occurred here. Adversity, you bet. I understand that. However, he has been displaying exemplary courtroom behavior and he has assisted me through note taking throughout this proceeding and communication and behaving himself. I consider that to be very important.

Id. at 2164-65.

As the Florida Supreme Court concluded, the trial court's error of omission in instructing the jury as to the mitigating circumstances would not have changed the outcome of the penalty phase. See Floyd, 850 So.2d at 403 ("When we further consider the three strong aggravating factors present in this case, the possible mitigating factors, and the eleven to one jury recommendation for a sentence of death, we conclude that a perfect instruction would not have in any way altered the jury's recommendation here. Therefore, we determine that no relief based on fundamental error is warranted on this matter."). Thus, given the entire record of the penalty phase and the instructions as a whole, Floyd's claim of trial court error (including his assertion that the effect of the judge's misreading of the instruction was that, in the absence of an instruction that it could consider aspects of Floyd's character, record, or background as mitigation, the jury concluded that it

could only consider aggravating circumstances of the killing) is without merit. Floyd has shown neither a violation of due process nor that the penalty phase proceeding was fundamentally unfair. See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991); Taylor v. Sec'y, Dep't of Corr., No. 11-13411, 2013 WL 491570, at *3 (11th Cir. Feb. 11, 2013) (not selected for publication in the Federal Reporter); Jones v. Dugger, 888 F.2d 1340, 1343 (11th Cir. 1989) (stating that "improper jury instructions can never be the basis for federal habeas corpus relief unless the instruction rendered the whole trial so unfair as to amount to a denial of due process) (citation omitted); Erickson v. Sec'y for Dep't of Corr., 243 F. App'x 524, 528 (11th Cir. 2007) (not selected for publication in the Federal Reporter), cert. denied, 552 U.S. 1066 (2007).

Secondly, as to ground 6(b), Floyd asserts that the trial judge failed to instruct the jury that Floyd's chronological age (twenty-one years old at the time of the crime) could be considered as a mitigating factor. Defense counsel neither requested such an instruction nor presented compelling evidence suggesting a desire for such an instruction. Additionally, there was no evidence on which the trial judge could base a decision to find Floyd's age as a mitigating factor. The evidence at trial was that Floyd was married, had a job, assumed responsibility for a house and his wife's children from a former relationship and had assumed the routine responsibilities of adult life prior to murdering the

116

victim.  Those facts would be inconsistent with a finding that age could be considered as a mitigating factor.

Moreover, Floyd's chronological age did not require a finding that it could be considered as a mitigating circumstance.  See Nelson v. State, 850 So.2d 514, 529 (Fla. 2003) (stating the record supported the trial court's rejection of this mitigator because there was evidence that Nelson, at the age of twenty-one, was functioning as a mature adult where he had obtained and temporarily held a job and provided his child's mother with money to buy necessities), cert. denied, 540 U.S. 1091 (2003).  Thus, given the record, the trial court did not err by not instructing the jury that Floyd's chronological age of twenty-one years could be considered as a mitigating factor.

Additionally, as ground 6(c), Floyd asserts that the trial court erred by denying his request to modify the penalty phase instructions.  Specifically, defense counsel requested the following two-part instruction:

> Your advisory sentence as to what sentence should be imposed on the defendant is entitled by law and will be given great weight by this Court in determining what sentence to impose in this case. . . .
>
> It is only under rare circumstances that this Court could impose a sentence other than what you recommend.

Resp. Ex. A-11 at 2134-35.  The State agreed to the first part, but objected to the second portion of the requested instruction.  Id.

at 2135.  Thus, the trial judge granted Floyd's request as to only
the first portion, see id. at 2136-37, and instructed the jury
accordingly, see id. at 2169.

Floyd's contention that the trial court's ruling "tended to
denigrate the jury's responsibility in deciding the appropriate
sentence" and therefore violated Caldwell[104] is unavailing.  See
Petition at 72 (citation omitted).  The record reflects that the
trial judge employed the standard jury instruction on this matter.
Such an instruction properly and fully apprised the jury of its
role and responsibility in the penalty phase.  Here, "the
prosecutor's and court's representation of the advisory role of the
jury under Florida law was legally correct and, as a result, did
not contravene Caldwell."  Johnston v. Singletary, 162 F.3d 630,
643 (11th Cir. 1998) (per curiam) (citing Romano v. Oklahoma, 512
U.S. 1, 8 (1994) ("To establish a Caldwell violation, a defendant
necessarily must show that the remarks to the jury improperly

---

[104] "To establish a Caldwell violation, a defendant necessarily
must show that the remarks to the jury improperly described the
role assigned to the jury by local law." Dugger v. Adams, 489 U.S.
401, 407 (1989).  However, a Caldwell violation is not established
where "the jury was not affirmatively misled regarding its role in
the sentencing process." Romano v. Oklahoma, 512 U.S. 1, 9 (1994).
The Eleventh Circuit has held that "references to and descriptions
of the jury's sentencing verdict . . . as an advisory one, as a
recommendation to the judge, and of the judge as the final
sentencing authority" do not constitute Caldwell violations where
they "accurately characterize the jury's and judge's sentencing
roles under Florida law." Davis v. Singletary, 119 F.3d 1471, 1482
(11th Cir. 1997), cert. denied, 523 U.S. 1141 (1998).

described the role assigned to the jury by local law.")), <u>cert</u>. <u>denied</u>, 528 U.S. 883 (1999).

Viewing the penalty phase jury instructions as a whole, the instructions accurately portrayed the relationship between the judge and the jury and did not denigrate the jury's role in the proceedings.   Indeed, the instructions stressed that the jury's recommendation held "great weight" in the judge's decision.   <u>See</u> Resp. Ex. A-11 at 2169.  Floyd is not entitled to habeas relief on this claim.   <u>See</u> <u>Belcher v. Sec'y, Dep't of Corr.</u>, 427 F. App'x 692, 695 (11th Cir. 2011) (finding no <u>Caldwell</u> error) (not selected for publication in the Federal Reporter), <u>cert</u>. <u>denied</u>, 132 S.Ct. 543 (2011); <u>Lebron v. State</u>, 982 So.2d 649, 666 (Fla. 2008) (stating "this Court has repeatedly rejected the claim that these instructions denigrate the jury's role in capital sentencing proceedings" in violation of <u>Caldwell</u>).

## G. Ground Seven

As ground seven, Floyd asserts that counsel was ineffective because he failed to preclude the admission of evidence relating to prior bad acts, particularly a threat that should have been protected by spousal privilege.   As acknowledged by the parties, Floyd raised this claim in his Rule 3.851 motion, as ground one, subclaim (b).   This issue was addressed at the state court evidentiary hearing, at which counsel testified.   After the evidentiary hearing, the trial court identified the <u>Strickland</u>

ineffectiveness test as the controlling law and denied the Rule 3.851 motion with respect to this issue, stating in pertinent part:

> CLAIM I(b): Trial counsel was ineffective for failing to prevent prior bad acts from being introduced at trial, especially a threat which should have been protected by spousal privilege and, therefore, the defense was prejudiced.
>
> This post judgment claim brought by Mr. Floyd alleges that trial counsel was ineffective for failing to object to the testimony regarding a threat Floyd made to his wife, Trelane, the day before the shooting. Floyd claims that the statement is inadmissible pursuant to a spousal privilege. Further, Floyd alleges that counsel was ineffective for failing to object to the testimony of Trelane Jackson that Floyd placed a gun to her head as he threatened to kill her family if she left him and that there was a domestic assault several hours before the shooting.
>
> The State filed a notice of intent to introduce evidence pursuant to Florida Statutes 90.401 at trial dealing with the prior bad acts.[105] Mr. Floyd complains that Mr. Withee was not diligent in asserting all appropriate pretrial and trial objections to challenge the introduction of the information concerning the prior bad acts.
>
> At the evidentiary hearing Mr. Withee testified that although he originally objected to the <u>Williams</u> Rule evidence,[106] it is clear that he ultimately made a tactical decision to try to use the evidence to the defendant's

---

[105] <u>See</u> Resp. Ex. A-1 at 166-68, Notice of State's Intent to Introduce Evidence Pursuant to F.S. 90.404, filed March 12, 1999.

[106] <u>See</u> Resp. Ex. A-1 at 213-14, Defense Response to State Attorney['s] Notice of Intent to Introduce Evidence Pursuant to F.S. 90.404, filed March 19, 1999.

benefit, testimony which the court finds to be reliable.

As the State points out, the decision not to oppose the admission of domestic violence evidence here was clearly a strategic decision. However, even if Mr. Withee had tried to exclude the evidence, Mr. Floyd has failed to demonstrate that it was actually inadmissible in this case. Evidence of uncharged crimes which are inseparable from the crime charged, or evidence which is inextricably intertwined with the crime charged, is not <u>Williams</u> Rule evidence and is, therefore, admissible under Section 90.402, Florida Statutes, because it is relevant. The testimony regarding the alleged prior bad acts was a relevant and inseparable part of the act which is at issue and it was necessary to admit the evidence to adequately describe the deed. <u>Griffin v. State</u>, 639 So.2d 968.[107] Mr. Floyd was charged with committing an aggravated assault on his wife, Trelane, on July 13 and the facts leading up to that assault are inseparable from the assault itself, just as the assault is inextricably intertwined with the murder of Mary Goss. Even if the prior bad acts were not inextricably intertwined, they could be admitted as <u>Williams</u> Rule evidence which allows the admission of relevant information material to the issues in the murder case, such as identity, intent, motive and premeditation.

Mr. Floyd then assumes that the aggravated assault charged [sic] involving Trelane could properly be severed from the murder charge and, therefore, alleges that counsel was ineffective by failing to seek and obtain a severance of the aggravated assault charge from the murder case involving Trelane's mother, Mary Goss. This, he claims, would have allowed him to exclude the statements that he made to Trelane as prior bad acts days prior to the murder. There is

---

[107] <u>See</u> <u>Griffin v. State</u>, 639 So.2d 966, 968 (Fla. 1994).

no question that in applying spousal privilege, Section 90.504(3) clearly excludes communication between spouses in criminal proceedings in which one is charged with a crime committed against the other spouse. Therefore, the question is whether counsel was ineffective in not obtaining a severance of the charges. Rule 3.150, Florida Rules of Criminal Procedure, provides in Section (a) that two or more offenses that are triable in the same court may be charged in the same indictment or information and a separate count for each offense whether the offenses are felonies or misdemeanors, or both, or based on the same act or transaction or on two or more connected acts or transactions. On the facts of this case, it appears clear that the cases could be brought together and, therefore, counsel was not ineffective in [not] obtaining severance that would allow him to take advantage of the spousal privilege argument.

P. Ex. 3 at 7-8. Upon Floyd's appeal, the Florida Supreme Court affirmed the circuit court's denial of post conviction relief with respect to this claim, stating in pertinent part:

Floyd next contends that his counsel was ineffective for the failure to object to, and seek the exclusion of, his prior threat to Trelane, which he contends constitutes inadmissible Williams rule[FN10] evidence of prior bad acts. Floyd also asserts that the threat was subject to the marital privilege under the Florida Evidence Code and was inadmissible on that basis as well. During the evidentiary hearing, trial counsel testified that he acquiesced to the introduction of the threat to demonstrate that the shooting resulted from a domestic dispute, which he believed would lead to vacation of the death penalty and imposition of a life sentence on appeal. We conclude that trial counsel was not ineffective.

FN10. See Williams v. State, 110 So.2d 654 (Fla. 1959).

First, Floyd's threat to "kill Trelane or someone she loved as a <u>reprisal</u> <u>for</u> <u>her</u> <u>drinking</u> <u>or</u> <u>if</u> <u>she</u> <u>ever</u> <u>attempted</u> <u>to</u> <u>run</u> <u>or</u> <u>hide</u> <u>from</u> <u>him</u>," <u>Floyd</u>, 850 So. 2d at 388 (emphasis supplied), demonstrated the motive behind the murder of Ms. Goss and was inextricably intertwined with that murder. Therefore, it was not true <u>Williams</u> rule evidence. <u>See</u> <u>Griffin v. State</u>, 639 So.2d 966, 968 (Fla. 1994) ("[E]vidence of uncharged crimes which are inseparable from the crime charged, or evidence which is inextricably intertwined with the crime charged, is not <u>Williams</u> rule evidence."). Rather, the evidence of the threat to Trelane was admissible under section 90.402, Florida Statutes (1997), because "it [was] a relevant and inseparable part of the act which [was] in issue. . . . [I]t [was] necessary to admit the evidence to adequately describe the deed." <u>Griffin</u>, 639 So.2d at 968 (quoting Charles W. Ehrhardt, <u>Florida Evidence</u> § 404.7 (1993 ed.)). Therefore, based upon <u>Williams</u> rule precedent, trial counsel would not have succeeded even if he had objected to the introduction of this prior threat.

Floyd is correct that in Florida, "[a] spouse has a privilege during and after the marital relationship to refuse to disclose, and to prevent another from disclosing, communications which were intended to be made in confidence between the spouses while they were husband and wife." § 90.504, Fla. Stat. (1999). Either spouse may claim the privilege. <u>See</u> <u>id</u>. However, there is no privilege in a criminal proceeding in which one spouse is charged with a crime committed against the person or property of the other spouse. <u>See</u> <u>id</u>. Floyd was charged with, among other things, aggravated assault against his wife, Trelane. The spousal privilege was not available as long as Floyd stood trial for aggravated assault. Floyd asserts that trial counsel should have advised him to plead guilty to the aggravated assault charge so that he could have avoided the criminal prosecution exception to the spousal

evidentiary privilege. However, Floyd alleges no facts with regard to the deficient performance of counsel in this respect. He only asserts that he failed to plead guilty to the aggravated assault charge and then explains the consequences of the lost plea. Floyd has failed to meet his burden to establish Strickland deficiency.

Moreover, we conclude that trial counsel did not perform deficiently. This Court has held that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone, 768 So.2d at 1048.[108] We note that trial counsel initially did object to the purported Williams rule evidence, including the threat against Trelane. However, counsel eventually abandoned these objections in an attempt to place the murder in a domestic-dispute context as a means to avoid the death sentence. At the time Floyd was tried, there were decisions which had previously held that a killing under circumstances resulting from an ongoing and heated domestic dispute may render a death sentence not proportionate, provided the defendant had not been convicted of a prior similar violent crime. See Blakely v. State, 561 So.2d 560, 561 (Fla. 1990); see also Garron v. State, 528 So.2d 353, 361 (Fla. 1988) ("[W]hen the murder is a result of a heated domestic confrontation, the penalty of death is not proportionally warranted."). Although this Court later clarified that it "does not recognize a domestic dispute exception in connection with death penalty analysis," Lynch v. State, 841 So.2d 362, 377 (Fla. 2003), this further clarification came years after Floyd's trial.

---

[108] Occhicone v. State, 768 So.2d 1037, 1048 (Fla. 2000) ("Moreover, strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.").

> Furthermore, evidence of an ongoing domestic
> dispute could help a defendant avoid a finding
> of the cold, calculated, and premeditated
> aggravating circumstance (CCP). See Evans v.
> State, 838 So.2d 1090, 1098 (Fla. 2002) ("In
> some murders that [have] result[ed] from
> domestic disputes, we have determined that CCP
> was erroneously found because the heated
> passions involved were antithetical to 'cold'
> deliberation."); Santos v. State, 591 So.2d
> 160, 162-63 (Fla. 1991) (CCP inapplicable
> where the defendant was involved in an highly
> emotional domestic dispute with victim and her
> family, even though defendant had acquired a
> gun in advance and made previous death threats
> against victim; murder was not "cold," even
> though it may have been calculated). Thus, at
> the time of the Floyd trial for the murder of
> Ms. Goss, it was reasonable for trial counsel
> to attempt to portray this case as a domestic
> dispute as a means to avoid either a death
> sentence or application of the CCP aggravating
> circumstance. Although this strategy was not
> ultimately successful, we conclude that it was
> sound. Accordingly, Floyd is not entitled to
> relief based on this claim of ineffectiveness.

Floyd, 18 So.3d at 448-49.

As this ineffectiveness claim was rejected on the merits by the Florida Supreme Court, there is a qualifying state court decision. Thus, this claim should be addressed applying the deferential standard for federal court review of state court adjudications required by AEDPA. Upon a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in

the state court proceedings.  Thus, Floyd is not entitled to relief on the basis of this claim.

Additionally, even assuming that the state court's adjudication of this claim is not entitled to deference under AEDPA, Floyd's claim is still without merit.  After the evidentiary hearing, the state court resolved the credibility issue in favor of believing counsel's testimony relating to his strategic decision.  Here, Floyd has not rebutted the trial court's credibility finding by clear and convincing evidence.  Given the trial court's credibility determination, Floyd's claim is wholly unsupported and therefore must fail.

Given the record, counsel's performance was not deficient.  At the evidentiary hearing, counsel testified that he acquiesced to the introduction of the threat to demonstrate that the shooting resulted from a domestic dispute, which he believed would lead to vacation of the death penalty and imposition of a life sentence on appeal.  See EH Tr. at 381-82.  He explained that he decided the "theme" for the case would be domestic dispute:

> [L]et the whole domestic package in in the hopes that the Supreme Court would -- in the hopes that my appellate people would jump on it and the Supreme Court would buy it, that it was domestic, which it clearly was all the way.

Id. 381-82, 399.  Thus, at the time of trial in 1999, it was not unreasonable for trial counsel to attempt to portray the case as a domestic dispute as a means to avoid either a death sentence or

application of the cold, calculated, and premeditated aggravating circumstance.

Even assuming arguendo deficient performance by defense counsel, Floyd has not shown the resulting prejudice. Floyd has not shown that a reasonable probability exists that the outcome of the case would have been different if counsel had objected to the admission of the prior bad acts. Thus, this ineffectiveness claim is without merit since Floyd has neither shown deficient performance nor resulting prejudice.

### H. Ground Eight

As ground eight, Floyd asserts that he was deprived of his due process right to develop mitigating circumstances because Dr. Krop, the court-appointed psychologist, failed to conduct the appropriate tests for organic brain damage and mental illness and, as a result, Floyd was deprived of a fair penalty phase. Floyd raised this claim in his Rule 3.851 motion. After an evidentiary hearing, the trial court identified Ake v. Oklahoma, 470 U.S. 68 (1985),[109] as the controlling law and denied the Rule 3.851 motion with respect to this issue, stating in pertinent part:

---

[109] In Ake, a prosecution for capital murder, the Court held that where an indigent defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. Ake, 470 U.S. at 83. The right to have access to a competent mental health expert is a due process requirement that extends to the sentencing phase of a criminal case. Id. at 84.

127

Claim II deals with a claimed "ineffective assistance of mental health expert" which is procedurally barred. This type of claim is brought pursuant to <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985). Such claims must be raised on direct appeal and are procedurally barred in collateral litigation. <u>Marshall v. State</u>, 854 So.2d 1235 (Fla. 2003); <u>Moore v. State</u>, 820 So.2d [199 (Fla. 2002)]; <u>Cherry v. State</u>, 781 So.2d 1040 (Fla. 2000).

Again, as the State points out, whether trial counsel was ineffective for relying on Dr. Krop's advice not to call him as a mitigation witness or mental status witness has been discussed [previously]. Obviously Dr. Krop's conclusions in regard to the deficiencies in the evaluation of Mr. Floyd were not severe. The risk of having to discuss a number of negative features of Mr. Floyd's case involving his violent history and an obvious conclusion that he had an anti-social personality disorder all came into play in the evaluations done by Mr. Withee. The tactical and strategic decision was made not to present this slight positive information that Dr. Krop may be able to advance when weighed against the negative information that would likely accompany that evaluation. In essence Mr. Withee concluded, from a tactical and strategic standpoint, that the risk of damage to his client's case was outweighed by the potential benefit which on its fact [sic] seems sound and the court believes Mr. Withee in regard to that having been a tactical decision. This conclusion is complemented by the fact that Mr. Floyd and his parents gave inconsistent information that would expose the defendant to allowing the jury to conclude that he was somehow trying to manipulate the mental health status which could be devastating to his defense. It is clearly noted by the court that should those mitigating factors have been advanced, the State would have an opportunity to discuss his criminal background including the violent death of his brother at age 14 which Mr. Withee had concluded would more likely make

128

> that a predominant feature of the case rather
> than others that he wished to shift the
> presentation to. Those are all strategic
> decisions made by a lawyer based on the facts
> and circumstances in this case. **Mr. Withee had
> the defendant evaluated by a well regarded
> mental health expert who has testified in many
> cases like this and had been cross examined
> hundreds of time[s] and who knew the likely
> outcome and evidentiary value of his entire
> analysis once exposed.**
>
> Based on both the factual and legal
> conclusions set forth above, Mr. Floyd has
> failed to carry the burden in regard to Claim
> II.

P. Ex. 3 at 15-16 (emphasis added). Upon Floyd's appeal, the

Florida Supreme Court affirmed the circuit court's denial, stating

in pertinent part:

> Floyd next asserts that that [sic] he was
> deprived of his due process right to develop
> mitigating circumstances because Dr. Krop
> failed to conduct the appropriate tests for
> organic brain damage and mental illness and,
> as a result, Floyd was deprived of a fair
> penalty phase.
>
> A claim that a defendant has been deprived of
> his right to an evaluation by a competent
> mental-health expert may be raised under <u>Ake
> v. Oklahoma</u>, 470 U.S. 68, 105 S.Ct. 1087, 84
> L.Ed.2d 53 (1985). **Floyd did not raise an <u>Ake</u>
> claim in his direct appeal and, therefore,
> this claim is procedurally barred. <u>See</u>
> <u>Marshall v. State</u>, 854 So.2d 1235, 1248 (Fla.
> 2003). Moreover, even if not barred, this
> claim is without merit.** As previously noted,
> the postconviction court found that Dr. Krop
> was a well-respected mental-health expert who
> had extensive experience, and that Dr. Krop
> performed a thorough mental-health evaluation
> of Floyd. Because these postconviction
> findings were based on competent, substantial

> evidence, they should not be disturbed on
> appeal. Thus, Floyd also fails on the merits
> of his <u>Ake</u> claim.

<u>Floyd</u>, 18 So.3d at 456 (emphasis added).

Respondents contend, and this Court agrees, that ground eight is procedurally barred since it was raised in a procedurally incorrect manner in state court.  <u>See</u> Response at 93-94.  The procedural bar identified above by the Florida Supreme Court is regularly imposed and was not applied in an arbitrary manner.  <u>See</u> <u>Spencer</u>, 609 F.3d at 1179 (recognizing "[t]here is no doubt that, under Florida law, a claim is procedurally barred from being raised on collateral review if it could have been, but was not raised on direct appeal").  Floyd has not shown either cause[110] excusing the default or actual prejudice resulting from the bar.  Moreover, Floyd has failed to identify any fact warranting the application of the fundamental miscarriage of justice exception.

Even assuming the claim is not procedurally barred, Floyd would not be entitled to relief.  After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly

---

[110] To the extent that Floyd asserts, as cause to excuse the default, that appellate counsel was ineffective because he failed to raise the issue on direct appeal, that claim is without merit. <u>See</u> <u>Floyd</u>, 18 So.3d at 458 ("We conclude that the ineffectiveness claim is without merit because, as we determined in this proceeding, the underlying claim is without merit.") (citation omitted).

established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Floyd is not entitled to relief on the basis of this claim.

Moreover, even assuming that the state court's adjudication of this claim is not entitled to deference, Floyd's claim, nevertheless, is without merit. As previously discussed with respect to ground one, well before trial, defense counsel moved for the appointment of a mental health expert to assist in the development of potential mitigation evidence. Thus, upon the recommendation of defense counsel, the court appointed Dr. Krop, a respected and experienced mental health expert. Dr. Krop conducted a mental health evaluation of Floyd and appropriately advised defense counsel as to his findings. Floyd is not entitled to federal habeas relief with respect to this claim. See Section VIII. A. Ground One (regarding Dr. Krop's mental health evaluation and testing of Floyd).

## I. Ground Nine

As ground nine, Floyd asserts that counsel was ineffective because he failed to object or seek a new jury panel when a prospective juror's comment followed by the jury panel's outbreak of applause tainted the panel. Floyd raised this issue in his Rule 3.851 motion, as claim I(e). After an evidentiary hearing, the trial court identified the Strickland ineffectiveness test as the

controlling law and denied the Rule 3.851 motion with respect to this issue, stating in pertinent part:

> In his original 3.851 motion, Mr. Floyd alleged that trial counsel was ineffective during jury selection. However, Mr. Floyd presented no evidence on the issue at the evidentiary hearing even though he did not expressly abandon it. There having been no evidence on the jury selection issue the court, therefore, finds that Mr. Floyd has failed in his burden in regard to either prong of the <u>Strickland</u> test. The court further notes that the Florida Supreme Court clearly held that the jury selection issue was preserved by trial counsel and also had no merit. This court finds that issue is procedurally barred and should not have been raised in a rule 3.851 proceeding under the guise of ineffective assistance of counsel. <u>Freeman v. State</u>, 761 So.2d 1055 (Fla. 2000).

Pet. Ex. 3 at 14-15. Upon Floyd's appeal, the Florida Supreme Court affirmed the circuit court's denial of post conviction relief with respect to this claim, stating in pertinent part:

> During voir dire, the following dialogue occurred:
>
> STATE: Mr. Wilkinson, you indicated you probably would not make it back to jury duty again.
>
> Is there anything in particular that would interfere with you being a good juror in this case for this week?
>
> VENIREMAN: **Well, I don't know about this week or any other week. But the only thing I know for sure is the justice system sometimes works in right ways and other times it don't.**

**If a man is sentenced to die in the electric chair, I feel they ought to go ahead after a certain period of time and go ahead and electrocute the man and get it over with, not give him a lifetime or send them over there for years and years and years, cost the taxpayer. My opinion, too much money.**

**(Clapping erupted by prospective jurors.)**

THE COURT: Please, we need to maintain order. This is not a rooting session.[111]

Floyd contends that the comment by the prospective juror and the outbreak of applause fatally tainted the prospective jury panel. According to Floyd, trial counsel failed to object or seek a new panel, which would have required the court to question the panel as a means to separate those members who had been affected by the comment and those who were not improperly impacted. Floyd contends that the failure of counsel to affirmatively act constituted deficient performance that prejudiced his trial.

On direct appeal, no claim was raised with regard to the comment by prospective juror Wilkinson. Accordingly, any challenge to this comment at this time is procedurally barred. See Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla. 1995) ("[I]ssues that could have been, but were not, raised on direct appeal are not cognizable through collateral attack."). **With regard to the ineffectiveness challenge, the postconviction court found that Floyd failed to produce any evidence whatsoever to demonstrate how trial counsel was deficient. We agree and conclude that, based upon this failure, Floyd has not satisfied the burden of**

---

[111] See Tr. at 1149.

> **proof on an ineffectiveness claim.** See Morris,
> **931 So.2d at 828 (to establish a claim of**
> **ineffective assistance, "the defendant must**
> **show that counsel's performance was deficient"**
> **(emphasis supplied) (quoting** Strickland, **466**
> **U.S. at 687, 104 S.Ct. 2052)).[112]**
> **Accordingly, Floyd is not entitled to relief.**

Floyd, 18 So.3d at 455-56 (emphasis added).

As this ineffectiveness claim was rejected on the merits by the Florida Supreme Court, there is a qualifying state court decision. Thus, this claim should be addressed applying the deferential standard for federal court review of state court adjudications required by AEDPA. Upon a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Floyd is not entitled to relief on the basis of this claim.

Additionally, even assuming that the state court's adjudication of this claim is not entitled to deference under AEDPA, Floyd's claim is still without merit. Given the record, including the voir dire by counsel and the trial judge as well as the court's instructions, it was not unreasonable for counsel not to object or request a new panel after the prospective juror's

---

[112] See Morris v. State, 931 So.2d 821 (Fla. 2006).

comment and the panel's applause.   Moreover, even assuming
deficient performance on counsel's part, Floyd has not shown
prejudice.   Therefore, the ineffectiveness claim fails since he
has shown neither deficient performance nor resulting prejudice.

### J. Ground Ten

Floyd asserts that the trial court impermissibly allowed the
State to exercise a peremptory challenge to excuse Noel Rios from
the prospective panel.   Floyd raised this issue on direct appeal.
Finding that the trial court did not err in allowing the State to
exercise a peremptory challenge against Rios, the Florida Supreme
Court stated, in pertinent part:

>Floyd asserts in his first issue that the
>trial judge impermissibly allowed the State to
>exercise a peremptory challenge to excuse Noel
>Rios from the prospective panel, who was
>identified as a Hispanic male.[FN20] Floyd
>contends that the trial judge impermissibly
>allowed the State to strike Rios from jury
>service based on racial grounds.[FN21] We
>disagree.
>
>FN20. We reject the State's
>contention that this issue is not
>preserved for review. Floyd clearly
>had a continuing objection before
>the trial judge which we determine
>was sufficient to preserve the
>issue.
>
>FN21. We have previously determined
>that Hispanics constitute a
>cognizable ethnic group for purposes
>of preventing peremptory challenges
>based solely on group membership.
>See State v. Alen, 616 So.2d 452,
>454-55 (Fla. 1993).

135

During voir dire, two persons, Young and Hardyman, raised their hands (indicating a "yes," or affirmative, response) when the trial judge asked if any members of the venire had religious, moral, or conscientious objections to the imposition of the death penalty.[113] The record does not indicate whether Rios raised his hand in response to this question. Young and Hardyman consistently adhered to the view, after questioning by the trial judge, the State, and the defense, that they would have difficulty in voting to recommend a sentence of death. **Defense counsel subsequently engaged in the following exchange with Rios:**

>**DEFENSE COUNSEL: How do you feel about the death penalty?**
>
>**RIOS: I don't know.**
>
>**DEFENSE COUNSEL: Don't know at this point?**
>
>**RIOS: No.[114]**

After this exchange, defense counsel moved on to questions unrelated to the death penalty. The State then resumed its questioning of the entire group of prospective jurors that included Young, Hardyman, and Rios. The State asked:

>Is there among you, except for- except for Mr. Young and Mr. Hardyman, anyone that would not seriously consider, if we reach the penalty phase, recommending the death sentence? Is there anyone that would not?[115]

---

[113] <u>See</u> Tr. at 1069.

[114] <u>See</u> Tr. at 1083.

[115] <u>See</u> Tr. at 1090.

The record does not indicate any answer or
other conduct in response to the question. The
State concluded its questioning by saying,
"Thank you, Your Honor."

Young and Hardyman were excused for cause. The
State attempted to use one of its peremptory
challenges to excuse Rios. Defense counsel
objected, noting that Rios was a Hispanic
male, with which the trial judge and the State
agreed.[116] The trial judge then asked the
State to provide its reason for the peremptory
challenge, pursuant to the dictates of
Melbourne v. State, 679 So.2d 759, 764-65
(Fla. 1996).[117] The prosecutor stated the
following:

> [When defense counsel] asked Mr.
> Rios about his feelings about the
> death penalty, he, by body language
> and by answer expressed what I
> perceived to be a negative response
> with regard to imposition of the
> death penalty. I saw that response
> and noted his apparent . . . what I
> perceived to be a dislike for or
> non-agreement with the death
> penalty.
>
> I determined peremptorily that he
> could [be] excused because his
> answers had been conjured earlier.
> But when [defense counsel] asked the
> question, he left me with a definite
> question that [Mr. Rios] would not
> vote for the death penalty, or was
> at least equivocal at best.[118]

---

[116] See Tr. at 1102-03.

[117] See Melbourne v. State, 679 So.2d 759 (Fla. 1996) (citing
Purkett v. Elem, 514 U.S. 765 (1995) and Batson v. Kentucky, 476
U.S. 79 (1986)).

[118] See Tr. at 1107.

The trial judge examined the genuineness of the State's reasons for the strike, and determined that they were race-neutral.[119]

Peremptory challenges are presumed to be exercised in a nondiscriminatory manner. See Melbourne, 679 So.2d at 764. The trial court's decision regarding a peremptory challenge that is alleged to be racially motivated turns primarily on an assessment of credibility and will be affirmed on appeal unless it is clearly erroneous. See id. at 764-65. Our focus here is on the genuineness of the State's reason for excusing Rios. In giving his reason for the peremptory challenge, the prosecutor noted that Rios provided an equivocal answer regarding his views on the death penalty. We have previously determined that no error occurs when a trial judge excuses a prospective juror for cause due to that person's expression of equivocal views on the death penalty. See Sims v. State, 681 So.2d 1112, 1117 (Fla. 1996) (prospective juror excused for cause after responding "I am not sure" to prosecutor's question of whether she could vote to recommend a sentence of death); see also Fernandez v. State, 730 So.2d 277, 281 (Fla. 1999) (four prospective jurors excused for cause based on "equivocal responses" they gave to inquiries as to whether they could follow the law and recommend a sentence of death). **Similarly, then, under the circumstances in Floyd's case[,] the exercise of a peremptory challenge based on the equivocal response of Rios regarding his views on the death penalty does not implicate racial discrimination and is imbued with the requisite genuineness and race-neutrality.**[120]

---

[119] See Tr. at 1108.

[120] See Melbourne, 679 So.2d at 764 ("If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained (step 3). The court's focus in step 3 is not on the reasonableness of the explanation but

Floyd's assertion that the State's comments concerning Rios's body language demonstrate an intent to engage in purposeful discrimination is unavailing. The State's comments regarding Rios's body language were made within the context of commenting on the oral equivocation voiced by Rios concerning the death penalty. In the cases upon which Floyd relies, unlike in his own, the State relied completely on a prospective juror's body language or on unelaborated bad feelings by the State toward a prospective juror, or the trial judge failed to examine the genuineness of the State's proffered reasons for striking a member of a protected group. Thus, those cases are all distinguishable.

Floyd makes two further assertions in this regard which we also determine to be unavailing. First, Floyd contends that the trial judge committed reversible error by noting for the record that three members of the panel actually selected for jury service were African-American.[121] Floyd asserts that this action was an error of law because the racial composition of the jury is irrelevant to whether a particular peremptory challenge was independently racially motivated. The case on which Floyd primarily relies, State v. Johans, 613 So.2d 1319 (Fla. 1993), stands for the much narrower proposition that the trial judge may not look to the composition of the venire as a substitute for asking the proponent of a peremptory challenge for a reason for the challenge. Such did not occur in Floyd's case. We further determine that Floyd is entitled to no relief under Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Powers reflects that a criminal defendant may object to race-based exclusions of jurors that are effected through peremptory challenges, regardless of whether

---

rather its genuineness.") (footnotes omitted).

[121] See Tr. at 1268.

the defendant and the excluded jurors share
the same race, which is not violated here. We
further note that in Melbourne we stated that
"the racial make-up of the venire" is one
circumstance that a trial judge may take into
account when determining the genuineness and
race-neutrality of the reason given for a
peremptory challenge. See Melbourne, 679 So.2d
at 764 n.8.

Finally, Floyd asserts that the State's
striking of Rios was pretextual because the
State did not question Rios during voir dire.
Again, we disagree. In State v. Slappy, 522
So.2d 18, 22 (Fla. 1988), receded from in part
on other grounds by Melbourne v. State, 679
So.2d 759 (Fla. 1996), we noted that one
factor included in the nonexclusive list of
indicia of pretextual discrimination is the
"failure to examine the [prospective] juror or
[engaging in mere] perfunctory examination,
assuming neither the trial court nor opposing
counsel had questioned the [prospective]
juror." (Emphasis added.) See also Overstreet
v. State, 712 So.2d 1174, 1177 (Fla. 3d DCA
1998) (citing Slappy). In Floyd's case[,]
defense counsel questioned Rios and elicited
the equivocal response on which the State
relied as a genuine, race-neutral reason for
excusing Rios. We conclude that the trial
judge did not err in allowing the State to
exercise a peremptory challenge against Rios.

Floyd, 850 So.2d at 393-95 (emphasis added).

Floyd would not be entitled to relief because the state

court's adjudication of this claim is entitled to deference under

AEDPA. After a review of the record and the applicable law, the

Court concludes that the state court's adjudication of this claim

was not contrary to clearly established federal law,[122] did not

_____

[122] The test for determining the propriety of a challenge to a
juror when there is an allegation that the challenge was based upon

involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Thus, Floyd is not entitled to relief on the basis of this claim.

---

race was established in Batson v. Kentucky, 476 U.S. 79 (1986). The Supreme Court further explained this test in Purkett v. Elem, 514 U.S. 765, reh'q denied, 515 U.S. 1170 (1995):

> Under our Batson jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step 1), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2).  If a race-neutral explanation is tendered, the trial court must then decide (step 3) whether the opponent of the strike has proved purposeful discrimination. Hernandez v. New York, 500 U.S. 352, 358-359, 111 S.Ct. 1859, 1865-1866, 114 L.Ed.2d 395 (1991)(plurality opinion); id., at 375, 111 S.Ct., at 1874 (O'CONNOR, J., concurring in judgment); Batson, supra, at 96-98, 106 S.Ct., at 1722-1723.  The second step of this process does not demand an explanation that is persuasive, or even plausible.  "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Hernandez, 500 U.S., at 360, 111 S.Ct., at 1866 (plurality opinion); id., at 374, 111 S.Ct., at 1874 (O'CONNOR, J., concurring in judgment).

Id. at 767-68.

Moreover, even assuming that the state court's adjudication of this claim is not entitled to deference, Floyd's claim, nevertheless, is without merit. <u>See</u> <u>Sneed v. Florida Dep't of Corr.</u>, No. 11-15535, 2012 WL 5417103, at *5-6 (11th Cir. Nov. 7, 2012) (not selected for publication in the Federal Reporter); <u>United States v. Maxime</u>, 484 F. App'x 439, 446 (11th Cir. 2012) ("[T]he race and gender neutral reasons given by the prosecutor were at least plausible, if not persuasive, and they were grounded in the record in the form of the jurors' responses on <u>voir</u> <u>dire</u>. It follows that the district court's acceptance of those explanations was not clearly erroneous, especially since Maxime has not shown that the racial and gender composition of the jury reflected a disproportionate shortfall of African-American women.") (footnote and citations omitted) (not selected for publication in the Federal Reporter); <u>United States v. Puentes</u>, 50 F.3d 1567, 1578 (11th Cir. 1995) ("Although the presence of African-American jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity of the claim.") (citation omitted). Accordingly, Floyd is not entitled to federal habeas relief with respect to this claim.

## K. Ground Eleven

As ground eleven, Floyd asserts that the trial court erred by failing to give Floyd's requested jury instruction on circumstantial evidence. Floyd raised this issue on direct appeal.

Finding that the trial court did not err in denying the requested

jury instruction, the Florida Supreme Court stated:

> Floyd raises as his next issue the trial
> judge's denial of his request to instruct the
> jury regarding circumstantial evidence. Floyd
> proposed his own special instruction, which
> the trial judge declined. Thus, the issue was
> preserved for review. See State v. Heathcoat,
> 442 So.2d 955, 956 (Fla. 1983) (in criminal
> case, issue regarding denial of requested jury
> instruction is preserved for review when the
> record clearly indicates that "a request was
> made for a specific instruction and that the
> trial court clearly understood the request and
> just as clearly denied [it]"). **We determine
> that the trial judge did not err in denying
> the requested special jury instruction.** We
> have previously stated that when proper
> instructions on reasonable doubt and burden of
> proof are given, an instruction on
> circumstantial evidence is "unnecessary." See
> In re Standard Jury Instructions in Criminal
> Cases, 431 So.2d 594, 595 (Fla. 1981); Trepal
> v. State, 621 So.2d 1361, 1366 (Fla. 1993)
> (citing In re Standard Jury Instructions).
> Floyd makes no assertion that the instructions
> on reasonable doubt and burden of proof were
> not given or that they were faulty. We
> determine that the trial judge did not abuse
> his discretion in denying the requested
> instruction on circumstantial evidence.

Floyd, 850 So. 2d at 400-01 (emphasis added).

Floyd would not be entitled to relief because the state

court's adjudication of this claim is entitled to deference under

AEDPA.  After a review of the record and the applicable law, the

Court concludes that the state court's adjudication of this claim

was not contrary to clearly established federal law, did not

involve an unreasonable application of clearly established federal

law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Thus, Floyd is not entitled to relief on the basis of this claim.

Additionally, even assuming that the state court's adjudication of this claim is not entitled to deference, Floyd's claim, nevertheless, is without merit.  Before trial, Floyd requested a jury instruction on circumstantial evidence and filed the following proposed instruction.

> The State of Florida has tried its case based entirely on circumstantial evidence. Circumstantial evidence is not direct evidence.  The State has offered no witness or witnesses who claim to have seen MAURICE LAMAR FLOYD shoot Mary Goss.
>
> Circumstantial evidence is governed by the following rules.  The circumstances must be proved beyond a reasonable doubt.  The circumstances must be consistent with guilt and inconsistent with innocence.  If the circumstances are susceptible of two reasonable constructions, one indicating guilt and the other indicating innocence, you must accept that construction indicating innocence.

Resp. Ex. A-2 at 397, Defendant's Proposed Jury Instruction [on] Circumstantial Evidence.  Prior to trial, defense counsel reminded the trial judge about the proposed jury instruction.  See Resp. Ex. A-7 at 1367-68.  Later, at the charge conference, upon the State's objection, see Tr. at 1895-97, trial judge denied the request for the special instruction, see id. at 1897-98.

In 1981, the Florida Supreme Court amended the standard jury instructions to remove a circumstantial evidence instruction as part of the standard jury instructions, stating:

> We find that the circumstantial evidence instruction is unnecessary. . . . The elimination of the current standard instruction on circumstantial evidence does not totally prohibit such an instruction if a trial judge, in his or her discretion, feels that such is necessary under the peculiar facts of a specific case. However, the giving of the proposed instructions on reasonable doubt and burden of proof, in our opinion, renders an instruction on circumstantial evidence unnecessary.

In re Standard Jury Instructions in Criminal Cases, 431 So.2d 594, 595 (Fla. 1981), modified, 431 So.2d 599 (Fla. 1981). Nevertheless, Floyd asserts that the trial judge should have instructed the jury on circumstantial evidence due to "the unique factual scenario" in this case. Petition at 94. Given the record, including the court's fully instructing the jury on reasonable doubt and burden of proof, see Tr. at 1961-87, the trial court's decision not to read a special instruction regarding circumstantial evidence was not an abuse of discretion. See Jackson v. State, 25 So.3d 518, 530-31 (Fla. 2009) (rejecting petitioner's argument that the trial court erred in denying his request for a special jury instruction regarding circumstantial evidence), cert. denied, 130 S.Ct. 3420 (2010); Parker v. State, 873 So.2d 270, 294 (Fla. 2004) ("Although the trial court can give the circumstantial evidence instruction, we have 'expressly approved courts which have

exercised their discretion and not given the instruction.'") (quoting Monlyn v. State, 705 So.2d 1, 5 (Fla. 1997)), cert. denied, 543 U.S. 1049 (2005); Branch v. State, 685 So.2d 1250, 1252-53 (Fla. 1996) (holding it was not error to refuse to use a former standard instruction on circumstantial evidence where the jury was fully instructed on reasonable doubt and burden of proof); Salter v. State, 77 So.3d 760, 763-64 (Fla. 4th DCA 2011) ("This court has held that the instruction on circumstantial evidence was eliminated and that a trial court may, in its discretion, opt to give a circumstantial evidence special instruction if the court feels it is necessary.") (citation omitted). Accordingly, Floyd is not entitled to federal habeas relief on this ground.

## L. Ground Twelve

As ground twelve, Floyd asserts that the prosecutor improperly commented during the penalty phase closing argument. Floyd raised this issue on direct appeal, and the Florida Supreme Court stated:

> Floyd asserts that fundamental error occurred when the prosecutor, without a defense objection voiced, ended his penalty phase closing argument by saying:
>
> > Let the final chapter be justice was done. This man not only deserves but the law requires that he receive the death penalty.
>
> Relying on Henyard v. State, 689 So.2d 239 (Fla. 1996), Floyd claims that fundamental error occurred because a jury is never required to vote to recommend the death penalty. In Henyard, a prosecutor on three separate occasions told jurors that if the

146

aggravating factors outweighed the mitigating factors, they must recommend a sentence of death. We determined in that case that the prosecutor had misstated the law, but that the comments did not rise to the level of fundamental error when viewed in the totality of the entire trial. We further determined that if any error occurred such was harmless. Here, with regard to the prosecutor's statement, to the extent that it might have implied that the jury was bound by law and had no option but to recommend a sentence of death, we disapprove its content. **However, the remark in Floyd's case was isolated, not repeated as in <u>Henyard</u>, and could be interpreted as an evaluation of the evidence and the conclusions to be drawn from such evidence.** Moreover, just as in <u>Henyard</u>, the trial judge here properly instructed the jury on its role in the sentencing process. Given the three strong aggravators in Floyd's case and the paucity of mitigation, we determine that any error that may have been engendered by the prosecutor's statements was harmless. Any error with regard to this issue in no way "affected the foundation of the case." <u>Sanford v. Rubin</u>, 237 So.2d 134, 137 (Fla. 1970). Therefore, we deny relief on this issue.

<u>Floyd</u>, 850 So.2d at 407-08 (emphasis added).

Floyd would not be entitled to relief because the state court's adjudication of this claim is entitled to deference under AEDPA.  After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court

proceedings.  Thus, Floyd is not entitled to relief on the basis of this claim.

Additionally, even assuming that the state court's adjudication of this claim is not entitled to deference, Floyd's claim, nevertheless, is without merit.  The prosecutor concluded his closing argument at the penalty phase as follows:

> We could have brought in family members. We could have brought in people that would cry. But we don't need crying children and grieving husbands to prove these aggravating factors.  And we don't need an emotional decision.  We need a decision based on the law and what is right.
>
> You'll never meet Mary Goss this side of Heaven.
>
> You grew to know her today. She has a wonderful legacy of those young'ns [sic], and they're precious and they're going to be fine.
>
> **Let the final chapter be justice was done.  This man not only deserves but the law requires that he receive the death penalty.**

Resp. Ex. A-11 at 2158-59 (emphasis added).  Defense counsel did not object.

Attorneys are permitted wide latitude in their closing arguments, and the record reflects that the trial judge instructed the jury that the attorneys were not witnesses in the case, and therefore, their statements and arguments were not evidence, but rather their arguments were "intended to aid [the jury] in understanding the case."  Resp. Ex. A-11 at 2148; see Hammond v. Hall, 586 F.3d 1289, 1334 (11th Cir. 2009), cert. denied, 131 S.Ct.

917 (2011); <u>Brown v. Jones</u>, 255 F.3d 1273, 1280 (11th Cir. 2001) (citations omitted) (stating that "jurors are presumed to follow the court's instructions."), <u>cert</u>. <u>denied</u>, 534 U.S. 1085 (2002). Thus, to the extent that the challenged comment could be interpreted as the prosecutor's "evaluation of the evidence and the conclusions to be drawn from such evidence," <u>Floyd</u>, 850 So.2d at 408, the comment was not improper.

In addressing an assertion that the prosecution made improper statements during its penalty phase closing arguments in violation of the petitioner's right to due process, the Eleventh Circuit stated:

>Even assuming that the prosecution's statements were improper, to obtain habeas relief, [a petitioner] must show that "there has been a violation of due process," which "occurs if, but only if, the improper argument rendered the sentencing stage trial fundamentally unfair." <u>Romine v. Head</u>, 253 F.3d 1349, 1366 (11th Cir. 2001). "An improper prosecutorial argument has rendered a capital sentencing proceeding fundamentally unfair if there is a reasonable probability that the argument changed the outcome, which is to say that absent the argument the defendant would not have received a death sentence." <u>Id</u>. (internal citation omitted). "In determining whether arguments are sufficiently egregious to result in the denial of due process, we have considered the statements in the context of the entire proceeding, including factors such as: (1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors." <u>Land v.</u>

149

<u>Allen</u>, 573 F.3d 1211, 1219-20 (11th Cir. 2009).

<u>Price v. Allen</u>, 679 F.3d 1315, 1326-27 (11th Cir. 2012), <u>cert</u>.
<u>denied</u>, 2013 WL 776457 (U.S. Mar. 4, 2013) (No. 12-658, 12A271).
After thoroughly reviewing the record, viewing the remark in the
context of the overall proceedings, and assessing the "probable
impact" on the jury, <u>see</u> <u>United States v. Hill</u>, 643 F.3d 807, 849
(11th Cir. 2011), this Court is convinced that the prosecutor's
comment did not result in a due process violation.  Floyd's counsel
did not make a contemporaneous objection to the statement, and the
statement itself was isolated and also arguably made in the context
of an argument relating to an evaluation of the evidence, thereby
"tempering its impact."  <u>Price</u>, 679 F.3d at 1326.  This Court is
not convinced that there is a reasonable probability that, absent
the prosecutor's statement, Floyd would not have received a death
sentence.  <u>See</u> <u>id</u>.  Thus, since the comment was not so egregious as
to fundamentally undermine the reliability of the jury's
recommendation, Floyd is not entitled to federal habeas relief on
this claim.

## **M. Ground Thirteen**

As ground thirteen, Floyd asserts that the combination of
procedural and substantive errors deprived him of a fundamentally
fair trial.  Floyd raised this claim on direct appeal, in his Rule
3.851 motion, and in his state habeas petition.  In denying the

cumulative error claim on direct appeal, the Florida Supreme Court
stated:

> Floyd states that the cumulative effect
> of errors committed throughout his trial
> entitles him to relief. We disagree. Any
> errors that occurred during Floyd's trial were
> harmless. There is no reasonable probability
> that the cumulative effect of these errors
> affected Floyd's right to a fair trial.
> Therefore, we deny relief on this issue. See
> generally Whitton v. State, 649 So.2d 861,
> 864-66 (Fla. 1994) (applying cumulative error
> analysis and determining there was no
> reasonable probability that the cumulative
> impact of harmless errors affected either the
> jury's verdict or the defendant's overall
> right to a fair trial).

Floyd, 850 So.2d at 408.

Moreover, the trial court denied his Rule 3.851 motion as to
this claim, stating: "The court having concluded that the defendant
has failed to meet the burden of proof of showing that there is
[sic] any legal grounds for a new trial in either the guilt-
innocence or penalty phases, there is no basis to conclude that
there was cumulative error."   Pet. Ex. 3 at 16.   Upon Floyd's
appeal, in affirming the trial court's denial of his Rule 3.851
motion as to this claim, the Florida Supreme Court concluded:

> Since we have concluded that none of
> Floyd's postconviction claims merit relief, we
> reject his challenge based upon cumulative
> error without further discussion. See Griffin
> v. State, 866 So.2d 1, 22 (Fla. 2003)
> ("[W]here individual claims of error alleged
> are either procedurally barred or without
> merit, the claim of cumulative error must
> fail.").

Floyd, 18 So.3d at 458 n.14.  Additionally, the Florida Supreme
Court denied Floyd's state habeas petition as to this claim,
stating: "Floyd raised a similar challenge in his habeas petition,
and we deny this claim as well."  Id.

Thus, as there are qualifying state court decisions by the
Florida Supreme Court, the Court will address this claim in
accordance with the deferential standard for federal court review
of state court adjudications.  After a review of the record and the
applicable law, the Court concludes that the state court's
adjudications of this claim were not contrary to clearly
established federal law, did not involve an unreasonable
application of clearly established federal law, and were not based
on an unreasonable determination of the facts in light of the
evidence presented in the state court proceedings.  Thus, Floyd is
not entitled to relief on the basis of this claim.

Additionally, even assuming that the state court's
adjudications of this claim are not entitled to deference, Floyd's
claim is still without merit.  Floyd's cumulative error claim
"fails in light of the absence of any individual errors to
accumulate."  Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132
n.3 (11th Cir. 2012).  Moreover, even if Floyd's experienced trial
counsel had performed exactly as Floyd now contends that he should
have, "there is no reasonable probability of a different result in
either the guilt or sentence stage; [this Court's] confidence in

the outcome of the guilt stage and the sentence stage is not undermined by the alleged deficiencies in counsel's performance, considered cumulatively." <u>Burgess v. Terry</u>, 478 F. App'x 597, 601 (11th Cir. 2012) (citing <u>Strickland</u>, 466 U.S. at 694-97) (not selected for publication in the Federal Reporter).  Thus, Floyd is not entitled to relief on the basis of this claim.

**<u>IX. Certificate of Appealability<br>Pursuant to 28 U.S.C. § 2253(c)(1)</u>**

If Floyd seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted.  This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. §2253(c)(2).  To make this substantial showing, Floyd "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  <u>See</u>

153

Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, this Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.    The Petition (Doc. #1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.    The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.    If Floyd appeals the denial of the Petition, the Court denies a certificate of appealability.  Because this Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case.  Such termination shall serve as a denial of the motion.

4.    The Clerk of the Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 27th day of

March, 2013.


MARCIA MORALES HOWARD
United States District Judge


sc 3/26
c:
Counsel of Record

155